# EXHIBIT AA

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF TEXAS
2                  FORT WORTH DIVISION

3    Athina Karahogitis,        )
                                )
4          Plaintiff,           )
                                )
5    VS.                        )
                                ) CIVIL ACTION NO. 4:24-cv-00706
6    TPUSA, Inc. d/b/a          )
     Teleperformance USA, DOES)
7    1-20,                      )
                                )
8          Defendants.          )

9    ************************************************************

10            ORAL AND VIDEOTAPED DEPOSITION OF

11                ATHINA T. KARAHOGITIS

12                    May 20, 2025

13                      Volume 2

14                 (Reported Remotely)

15   ************************************************************

16       ORAL AND VIDEOTAPED DEPOSITION OF ATHINA T.

17   KARAHOGITIS, produced as a deponent at the instance of

18   the DEFENDANT TPUSA, INC. D/B/A TELEPERFORMANCE USA,

19   and duly sworn, was taken in the above-styled and

20   -numbered cause on the 20th day of May, 2025, from

21   12:35 p.m. to 3:49 p.m., before Tonie Thompson, Certified

22   Shorthand Reporter in and for the State of Texas,

23   Registered Professional Reporter, Certified Realtime

24   Reporter, reported by machine shorthand, at the offices

25   of Dorsey & Whitney LLP, located at 200 Crescent Court,
```



1  Suite 1600, Dallas, Texas 75201, pursuant to the Federal

2  Rules of Civil Procedure and the provisions stated on the

3  record or attached hereto.  The deposition shall be read

4  and signed under penalty of perjury.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              A P P E A R A N C E S

 2        (All parties present via videoconference.)

 3   ATTORNEY FOR PLAINTIFF:
         Mr. J. Brian Vanderwoude
 4       DORSEY & WHITNEY LLP
         200 Crescent Court, Suite 1600
 5       Dallas, Texas 75201
         Phone:  (214)981-9900
 6       Fax:  (214)981-9901
         Email:  vanderwoude.brian@dorsey.com
 7
     ATTORNEY FOR DEFENDANT TPUSA, INC. D/B/A
 8   TELEPERFORMANCE USA:
         Mr. Eric A. Gordon
 9       AKERMAN LLP
         777 South Flagler Drive, Suite 1100 West Tower
10       West Palm Beach, Florida 33401
         Phone:  (561)653-5000
11       Fax:  (561)659-6313
         Email:  eric.gordon@akerman.com
12
         -- and --
13
         Mr. Ryan C. Krone
14       AKERMAN LLP
         1300 Post Oak Boulevard, Suite 2300
15       Houston, Texas 77056
         Phone:  (713)623-0887
16       Fax:  (713)960-1527
         Email:  ryan.krone@akerman.com
17
     ALSO PRESENT:
18       Ms. Rachel Tisa, Videographer

19       Ms. Leslie Miller, In-House Attorney,
         Teleperformance
20

21

22

23

24

25
```



```
 1                        INDEX

 2   Appearances                                       285

 3   Index and Exhibits                         286 - 287

 4   Requested Documents/Information                   287

 5                    EXAMINATION INDEX

 6   ATHINA T. KARAHOGITIS
           BY MR. GORDON                              290
 7
       Changes and Signature                          402
 8
       Reporter's Certification                       404
 9
                      EXHIBIT INDEX
10   (Consecutively marked exhibits began with Number 30.)

11   NUMBER       DESCRIPTION                 PAGE REFERENCED
     Exhibit 30 Medical Records                        298
12              (AK-TPUSA 004077-004076)
                CONFIDENTIAL
13
     Exhibit 31 Message, including Group Photo         330
14              (AK-TPUSA 003468)

15   Exhibit 32 Email correspondence regarding         363
                "Re: SIP Payments," last dated 6/9/2023
16              (AK-TPUSA 000552-000561)

17   Exhibit 33 Email correspondence regarding         365
                "Re: K. Athina's New Agreement,"
18              last dated 6/23/2023
                (AK-TPUSA 000565-000567)
19
     Exhibit 34 Plaintiff's Amended Objections and     367
20              Answers to Defendant's Interrogatories

21   Exhibit 35 Flight Records                          368
                (AK-TPUSA 004090-004098)
22
     Exhibit 36 Message                                 387
23              (AK-TPUSA 004089)

24   Exhibit 37 Letter from Workterra, 12/11/2023       390
                (TPUSA0000170-0000183)
25              CONFIDENTIAL INFORMATION
```



```
 1                      EXAMINATION INDEX
                           (continued.)
 2
    (All exhibits that were sent electronically to the court
 3  reporter will be marked and attached to the transcript.)

 4                            * * *

 5                 REQUESTED DOCUMENTS/INFORMATION

 6  NUMBER        DESCRIPTION                  PAGE REFERENCED
    Request 1  Requested email                         309
 7
    Request 2  Requested screenshot                    316
 8
    Request 3  Requested unproduced documents, if any  338
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              P R O C E E D I N G S
 2              (Proceedings commenced at 12:35 p.m.
 3         Central Time.)
 4              THE VIDEOGRAPHER:  Good afternoon.  We are
 5    now on the record.  The time is now 12:35 p.m. on
 6    May 20 -- 20th, 2025.
 7              This begins the video-recorded deposition
 8    of Athina Karahogitis, taken in the matter of Athina
 9    Karahogitis versus TPUSA, Inc., et al., filed in the
10    United States District Court, Northern District of
11    Tarrant County, Fort Worth Division, case number of which
12    is 4:24-cv-00706.
13              The videographer today is Rachel Tisa.  The
14    court reporter today is Tonie Thompson.  We are both
15    representing Esquire Deposition Solutions.
16              Counsel, will you please announce your name
17    and whom you represent, after which the court reporter
18    will swear in the witness.
19              MR. GORDON:  Eric Gordon for the defendant,
20    TPUSA.
21              MR. KRONE:  Ryan Krone also for the
22    defendant, TPUSA.
23              MR. VANDERWOUDE:  And Brian Vanderwoude for
24    the witness and the plaintiff.
25              THE REPORTER:  Thank you.  Please stand by
```



1  for the court reporter's introduction.

2            The oral and videotaped deposition of

3  Athina T. Karahogitis is being conducted remotely via

4  Zoom.  The deponent is at the offices of Dorsey --

5  Dorsey & Whitney LLP in Dallas, Texas 75201.

6            My name is Tonie Thompson, Certified

7  Shorthand Reporter Number 8348.  I am administering the

8  oath and reporting the deposition remotely from -- by

9  stenographic means from my home residence/office within

10 the state of Texas.

11           The deponent has been identified to me

12 through notice of deposition.

13           Please raise your right hand,

14 Ms. Karahogitis.

15           THE DEPONENT:  (Complies.)

16           THE REPORTER:  Do you solemnly swear or

17 affirm that the testimony you will give will be the

18 truth, the whole truth, and nothing but the truth, so

19 help you God?

20           THE DEPONENT:  I do.

21           (Deponent sworn in.)

22           THE REPORTER:  Thank you.  Please lower

23 your hand.

24           THE DEPONENT:  (Complies.)

25           THE REPORTER:  Counsel, please proceed.



```
 1              MR. GORDON:  Thank you.  And good
 2  afternoon, everyone.
 3                  ATHINA T. KARAHOGITIS,
 4  having been first duly sworn, testified as follows:
 5                      EXAMINATION
 6  BY MR. GORDON:
 7     Q.  My name is Eric Gordon, as you know.  I'm the
 8  attorney for TPUSA, and we are here again to complete --
 9  continue and complete your deposition.
10          Do you recall, ma'am, that you were deposed
11  on February 27, 2025?  Do you remember that date?
12     A.  I do.
13     Q.  So the same rules will apply today.
14          Ask that you please speak loudly enough so
15  that we can all hear you.  Different when we're all in
16  the same room, but want to make sure that you -- that you
17  project loudly your answers.  Please speak slowly.  Let's
18  endeavor to not speak over each other.
19          The court reporter is taking down
20  everything that is said, and hopefully this deposition
21  will -- will go off without -- without any issues.
22          At your prior deposition, you testified
23  that you were taking Keppra two times per day, a thousand
24  milligrams per dose.
25          Has that changed?
```



 1       A.  No, that has not changed.

 2       Q.  Are you taking --

 3            THE DEPONENT:  Can you hear me okay?  Just

 4  making sure that I'm speaking loud enough.

 5            MR. GORDON:  Yeah.

 6            THE DEPONENT:  Yeah.  Okay.

 7       Q.  (BY MR. GORDON) Are you taking any other

 8  medication?

 9       A.  No.  Just my vitamins, my Keppra, and basically

10  what I had outlined in my previous deposition.

11       Q.  Did you read the transcript from your prior

12  deposition?

13       A.  I did.

14       Q.  Did you do anything else to prepare for today's

15  continued deposition?

16       A.  I consulted my attorney.  That's basically it.

17       Q.  So we're going to go right -- right to one of

18  the exhibits that we had from the -- from the first day

19  of your deposition.  It was Exhibit Number 23.  It was

20  the complaint that you filed.  And we're putting that up

21  on the screen right now.

22            We're going to scroll down to look at

23  paragraph 16.  And in paragraph 16, you state that after

24  relocating to Texas in 2023, you noticed that women were

25  being pushed out of the organization and lied to about



```
 1   the redundancy of their positions.
 2              Who do you allege was pushed out of the
 3   organization?
 4       A.  Just one second.  I'm just -- I'm reading this.
 5              (Reviews document.)
 6              Well, there were women being -- being
 7   pushed out of the organization.  I had listed -- I think
 8   in the same document, you will see names of other women
 9   that were pushed out of the -- or out of the
10   organization.  So it's already listed in the -- in the
11   complaint itself.
12       Q.  Do you -- do you recall any of those names?
13       A.  Yes.  Marieke Smidt, Lorraine Day, Garima Gupta,
14   just to name a few.
15       Q.  Can you spell the second name?
16       A.  Lorraine Day?  The second -- the second name?
17       Q.  Yes.
18       A.  L-o-r-r-a-i-n-e, and her last name is Day,
19   D-a-y.
20       Q.  Who was the third name that you listed?
21       A.  Garima Gupta.
22       Q.  The first name was Marten Smidt?
23       A.  Marieke Smidt.
24       Q.  Marieke Smidt was not employed by TPUSA,
25   correct?
```



1    A.  She was employed by Tel- -- with Teleperformance

2  Group.

3    Q.  But not by TPUSA, right?

4    A.  Specifically, no.  She was part of the group.

5    Q.  And Ms. Day was not a TPUSA employee either,

6  correct?

7    A.  Ms. Day actually was.  She was relocated to the

8  U.S.

9    Q.  When was that?

10    A.  That was -- I don't remember the exact date, but

11  that was --

12    Q.  What year?

13    A.  -- a couple of years before -- before I was.

14    Q.  Do you know what position she was in at TPUSA?

15    A.  COO.

16    Q.  And you say that she was employed with TPUSA

17  when you transferred to TPUSA in 2023?

18    A.  No, I did not say that.

19    Q.  Okay.  So when -- when was Lorraine Day employed

20  by TPUSA?

21    A.  As I explained, I don't remember the exact

22  dates.  She was initially employed by Teleperformance in

23  the UK, and then she was promoted and relocated to the

24  USA, where, three months later, she was terminated.

25    Q.  Do you have any knowledge as to the reasons why



1  she was terminated?

2      A.  Not at this time.

3      Q.  And Ms. Gupta, she was not a TPUSA employee,

4  correct?

5      A.  She was a C-level female of the Teleperformance

6  Group.

7      Q.  Not employed by TPUSA, correct?

8      A.  Correct.

9      Q.  Your former boss, Miranda Collard, who made the

10  decision to terminate your employment, she's also a

11  female, right?

12      A.  She is a female.  I am not entirely sure that

13  she was the one that made the decision to terminate me.

14      Q.  Well, why do you think Ms. Collard, as a female,

15  would try to push other women out of the company?

16          MR. VANDERWOUDE:  Objection.  Form.

17          MR. GORDON:  You can answer.

18      A.  I don't know why she would want to do that, but

19  she did.

20      Q.  (BY MR. GORDON) In your prior deposition, when

21  asked about TPUSA's professional conduct,

22  nondiscrimination, anti-harassment, and anti-retaliation

23  policy, you stated that you do not recall seeing the

24  policy, but that anyone that dared to bring anything to a

25  hotline or to complain was eventually pushed out of the



```
 1  business.
 2            Do you recall giving that testimony?
 3       A.  I do.
 4       Q.  You then stated you don't remember specific
 5  names, but you can bring us specific names.
 6            Do you remember any names now?
 7       A.  Can you please -- can you please ask me the
 8  entire question?  Any names --
 9       Q.  The question --
10       A.  Yeah, can you repeat the question?  Uh-huh.
11       Q.  Yeah.  The question was, Do you remember the
12  specific names?
13       A.  Any -- any names of what?  Can you please ask me
14  the entire question?
15       Q.  Okay.  You testified on -- in your deposition
16  that you didn't recall seeing the professional conduct,
17  nondiscrimination, anti-harassment, and anti-retaliation
18  policy, but that anyone that dared to bring anything to a
19  hotline or to complain was eventually pushed out of the
20  business.  And you said that you didn't remember names
21  that day, but you would come back to us with other names.
22            Do you remember those names?
23       A.  At this point in time, no, not right now.
24       Q.  You've had, what, three months since the last
25  deposition to come up with names of individuals who you
```



1  claim were pushed out of the business for making a

2  complaint, and you still can't remember any of those

3  names?

4        A.  Well, I've personally made complaints.  So I was

5  let go.  I mean, does --

6        Q.  But that's not what you testified --

7        A.  I -- I was -- I was one of those that actually

8  had a voice and made complaints about how women were

9  pushed out.

10       Q.  But you understand that's not what your

11  testimony was about.  Your testimony was specific to

12  other people.  You said anyone that dared bring anything

13  to a hotline or to complain was eventually pushed out.

14  And I asked you for names, and you couldn't give me any,

15  but you said you'd get back to us and give us names.

16             You don't --

17             MR. VANDERWOUDE:  Objection.  Misstates her

18  prior testimony.

19       Q.  (BY MR. GORDON) You don't have any names to give

20  today?

21       A.  I know of people -- I don't remember their names

22  exactly right now, but I know of people that had -- I

23  mean, even a couple through my LinkedIn that had reached

24  out to me that had gone to hotlines and eventually were

25  pushed out of the organization and too --



1    Q.  Who?

2    A.  -- many --

3    Q.  Who?

4    A.  I don't have the -- I can get it back to you,

5    but right now, I don't remember everyone's name by heart.

6    Q.  Please look at paragraph 18 of the complaint.

7    And you can take a minute to review this.

8    A.  (Reviews document.)

9    Q.  I'll direct you specifically to the third

10   sentence of paragraph 18, where you state that you had

11   just informed Teleperformance of a diagnosis of epilepsy

12   and had requested accommodation to be allowed to fly

13   business class per your physician's recommendation.  Is

14   that correct?

15   A.  I'm still reading.

16                (Reviews document.)

17                Yes, if what I'm reading is correct, yes.

18                MR. GORDON:  Okay.  I'm going to now

19   introduce another exhibit, and I believe, Madam Court

20   Reporter, we left off at 20 -- the last exhibit was 26?

21   That's a question for the court reporter.

22                THE REPORTER:  I have Exhibit 23 --

23                MR. VANDERWOUDE:  Eric, I think we're on

24   Exhibit 30.  The last one was 29.

25                (Comments made off the written record.)



 1              (Deposition Exhibit Number 30 referenced.)

 2      Q.  (BY MR. GORDON) So Exhibit 30 we're going to

 3  introduce next, the medical records that you introduced

 4  during discovery.  These were doctors' notes that you

 5  produced to us.  It's an eight-page document that starts

 6  with Bates Number 004077.

 7              Can you see these up on the screen?

 8      A.  I do.

 9      Q.  Okay.  So I'm going to take you through a couple

10  of these pages.  Let's go first to the third page of this

11  document Bates Number 4077.  This medical note is dated

12  January 26, 2021.

13              Are you familiar with this document?

14      A.  This is translated.

15      Q.  That is correct.

16      A.  Uh-huh.

17      Q.  This was your first diagnosis of any epileptic

18  activity.  Is that correct?

19      A.  I -- I cannot recall if this was the first --

20  the first EEG that I had or diagnosis.

21      Q.  Do you recall having any medical treatment

22  for -- for epileptic activity prior to January 2021?

23      A.  I don't remember the exact date right now.

24      Q.  There's nothing --

25      A.  It was -- it was January.  I'm just not sure if



App. 584

1  it was '20 or '21 right now.
2      Q.   There's nothing in this medical note relating to
3  a need for you to fly business class.  Is that correct?
4      A.   This is an EEG readout.  This is not a doctor's
5  note, which I have submitted.
6      Q.   And the conclusion from this doctor's note is
7  that the diagram was compatible with epileptic activity,
8  correct?
9          MR. VANDERWOUDE:  Objection.  Form.
10     A.   I am in the -- I am not a doctor.  I can't even
11  verify this translation.
12     Q.   (BY MR. GORDON) Okay.  Looking ahead to document
13  on page 6, which is document Number 4021.  This is --
14  according to the medical records that you provided to us,
15  this was your next treatment for epileptic activity,
16  dated March 19, 2021.
17          Do you see that document in front of you?
18     A.   I see a translated version in front of me.
19     Q.   Is there anything in this document that relates
20  to a need for you to fly business class?
21     A.   Again, this is an EEG readout.  This is not
22  direction in terms of even the medication I was to take
23  or anything else.  This is -- this is a readout of an
24  EEG.
25     Q.   Going ahead now to page 7 of this document,



1   which is Number 4076 Bates number.  This was the next

2   document that you provided to us related to your

3   epileptic activity.  And this was a medical report that

4   was signed by your doctor.  According to this document,

5   treatment with -- and the medication that's listed there

6   is levetiracetam -- I know I'm mispronouncing it, but

7   that's Keppra, right?

8        A.  I believe so.

9        Q.  Right.  And so treatment with Keppra was

10  successful according to this medical report, correct?

11       A.  Yes.  That's what I'm still taking.

12       Q.  Medical -- yeah.  The medical report also states

13  that this kind of epilepsy does not impair mental ability

14  and concentration.

15            Do you see where it says that?

16       A.  I do see that.

17       Q.  The medical report also states, based on these

18  records, your doctor recommends you get 8 hours of sleep

19  per night and intermittent work in front of the screen

20  with mandatory breaks of 10 minutes every hour.

21            Do you see that?

22       A.  I do.

23       Q.  There's no other limitations related to epilepsy

24  listed in this medical report, correct?

25       A.  I'm not sure I understand.



App. 586

1      Q.   There's no other limitations listed in this
2  medical report by your doctor?
3      A.   It says, "We suggested her regular and enough
4  sleep at least 8 hours and intermittent work in front of
5  the screen with mandatory breaks of 10 minutes every
6  hour.  If due, for example, to travel conditions sleep
7  deprivation occurs, sleep has to be compensated even
8  during the day."
9      Q.   Correct.  Nothing beyond that is listed in this
10 medical note, correct?
11     A.   Correct.
12     Q.   There's nothing in this medical note which
13 requires you to fly business class.  Isn't that correct?
14     A.   It refers to the fact that I need to be able to
15 sleep --
16     Q.   Right.  And if you --
17     A.    -- during travel conditions.
18     Q.   And if you couldn't sleep, then you would be
19 required to have sleep the next day, right?
20     A.   During the same day.
21     Q.   Yeah.  Does it say anywhere in this medical note
22 anything about flying business class on flights?
23     A.   So sleeping during an economy flight long haul
24 is something that I should have been able to do.
25     Q.   Does it say you're required to fly business



1  class?

2      A.  It does not.  But it does state that I need to

3  sleep, and I lived out of a plane.  I was on a plane all

4  the time traveling all across the world.  So I often

5  touched the ground and went straight to a meeting.

6  Sleeping was not an option.  The only time that I could

7  sleep would be if I were traveling business class to be

8  able to make it to my meetings and on the next flight

9  out.

10     Q.  Epilepsy does not -- in 2023, epilepsy did not

11  otherwise impact your life.  Isn't that right?

12                MR. VANDERWOUDE:  Objection.  Form.

13     A.  In which sense are you asking me?

14     Q.  (BY MR. GORDON) I'm asking in any sense.  Based

15  on these medical notes and based on your prior testimony,

16  epilepsy did not have any substantial impact on your

17  life?

18     A.  Epilepsy is a part of my life.  I live with

19  epilepsy every single day.  Being in the sun, being able

20  to sleep, it's -- it's part of my life, so I don't

21  understand why you're saying that it didn't have an

22  impact on my life in 2023.

23     Q.  And you managed -- you managed to live your life

24  in 2023, even with epilepsy, with the help of taking

25  Keppra and following your doctor's advice, correct?



```
 1        A.  Yes, I follow the recommendations of my doctor
 2   to try to manage the situation and the condition that I
 3   have.  It's something that I have to live with.
 4        Q.  And -- and you managed it successfully and you
 5   continue to manage it successfully?
 6                  MR. VANDERWOUDE:  Objection.  Form.
 7        Q.  (BY MR. GORDON) Right?
 8        A.  I don't understand the question exactly.  What
 9   do you define by "successful"?
10        Q.  You live your life every day -- having epilepsy
11   doesn't stop you from living your life.  Isn't that
12   right?
13        A.  No, epilepsy does not stop me from living my
14   life.
15        Q.  Okay.
16        A.  That doesn't mean that I don't deal with
17   epilepsy every single day.
18        Q.  I --
19        A.  (Indiscernible) -- live by it.
20                  (Clarification made by the reporter.)
21        Q.  (BY MR. GORDON) Sorry.  Finish your answer.
22        A.  I said, I live with this condition every day of
23   my life.
24        Q.  And you're able to work still?
25        A.  I am.
```



```
 1       Q.   You're able to take care of yourself every day?

 2       A.   I do my best.

 3       Q.   You get up in the mornings, you help to take

 4  care of your family, take care of work, clients, right?

 5       A.   I don't understand what that has to do with

 6  anything, but I do my best to take care of myself so that

 7  I can live with the condition that I have.

 8       Q.   Let's turn back to the complaint now,

 9  paragraph 18.  You also allege that you just had surgery

10  related to breast reconstruction after cancer.

11            I added the word "breast" for

12  clarification.

13            Do you see that?

14       A.   I do not.

15       Q.   It's being highlighted for you now.

16       A.   Yes, I see that.

17       Q.   Okay.  When do you allege that you had that

18  surgery?

19       A.   I don't remember the exact date.  October --

20  October of the previous year.

21       Q.   October of 2022, correct?

22       A.   Yes.  I'm not sure that this was the -- because

23  I also had a hysterectomy, so I had two surgeries.

24       Q.   Okay.  But this one, you relate to --

25       A.   You added the word "breast," so I'm just --
```



1      Q.  Let's take -- let's take out the word breast and

2  just say, just had surgery related to reconstruction

3  after cancer.

4      A.  Uh-huh.

5      Q.  Are you talking about your breast, or are you

6  talking about a hysterectomy?

7      A.  That was -- that was October 2022.

8      Q.  And that was one year prior to the date of your

9  termination, correct?

10     A.  Yes.

11     Q.  According to the medical records that you

12  provided to us, you were diagnosed with breast cancer in

13  November of 2015, and you had a mastectomy in January of

14  2016.

15             Are those dates correct?

16     A.  Yes.

17     Q.  The procedure was successful, and you were in

18  remission starting in January of 2016, correct?

19     A.  I had the reconstruction -- the restoration, I

20  would say -- in April of 2022.  And then I had to re- --

21  I had to redo my mastectomy and have the implants,

22  because one had burst in my chest and had to be replaced.

23  So they basically has to scrape my -- my chest again and

24  replace the implants, and that was in October of 2022.

25     Q.  Okay.  But the question was:  You've been in



1  remission from cancer starting in January of -- of 2016.

2  Isn't that right?

3        A.   Yeah.

4        Q.   Thankfully, you're still in remission today

5  since January of 2016, correct?

6        A.   Thank God, yes.

7        Q.   So cancer has not been an issue for you since

8  you had the procedure in January of 2016?

9        A.   And I hope that that continues to be the case.

10       Q.   I hope so too.

11       A.   Thank you.

12       Q.   Cancer did not limit you in any way during 2023,

13  right?

14       A.   No, but, again, it became -- it became a way of

15  living.

16       Q.   In 2023, did cancer impact your breathing, your

17  walking, or your talking?

18       A.   No.

19       Q.   In 2023, did cancer impact how you heard, what

20  you saw, how you slept, how you cared for yourself, or

21  how you worked?

22       A.   No.  The impact was, however, the fact that I

23  did change countries, so the significant impact was more

24  on the healthcare side and on the insurance front and

25  whether and how I would be covered post my relocation to



1  the USA.

2      Q.  You didn't provide any medical records regarding

3  the reconstruction in October of 2022.  Do you know why

4  those records were not provided?

5      A.  I -- what do you mean they were not provided?

6      Q.  We have not seen records specific to any

7  procedure that took place in October of 2022.

8      A.  Mr. Gordon, Teleperformance covered the cost of

9  that surgery, so I don't understand how you're telling me

10  today that I did not notify anyone or I didn't let

11  anybody know.  So I don't understand the question.

12      Q.  The question is:  On specific medical records

13  that you have in your possession --

14      A.  Uh-huh.

15      Q.  -- regarding an October 2022 procedure, we

16  haven't gotten anything from you.  Just wanted to confirm

17  that you didn't have any medical records from --

18      A.  But I did, and Teleperformance -- no,

19  Teleperformance had access to all my records.  They paid

20  the hospital for -- it was covered totally by the

21  insurance -- by the insurance in Teleperformance Greece.

22  So they have all my records, including my leave of

23  absence at the time.

24      Q.  You don't have any --

25      A.  My medical leave.



 1      Q.  -- (indiscernible) records in your possession?
 2                (Clarification made by the reporter.)
 3      Q.  (BY MR. GORDON) You don't have any of those
 4  medical records in your possession.  Is that correct?
 5      A.  I have -- no, that is not correct.  I have
 6  provided the -- the records.
 7      Q.  (BY MR. GORDON) You have provided records
 8  regarding your epilepsy.  We haven't seen any records
 9  from you or your counsel regarding a procedure in
10  October of 2022.
11      A.  Those have been submitted.
12      Q.  Are you saying you submitted them to your
13  counsel?
14      A.  Yes.
15      Q.  We have not received those.
16      A.  There's also an exchange of communication with
17  the insurance company at the time or -- and even after,
18  because in April of 2024, I found out that the company
19  had initially declined payment of that surgery.  And it
20  was after my intervention with HR in Teleperformance
21  Greece and with the insurance agent that represents
22  Teleperformance Greece and the corporate healthcare plan
23  that that was then paid off.  So --
24      Q.  Was the procedure --
25      A.  -- if you would like that -- if you would like



1  that email, I can get that to you as well, but I'm sure

2  it's been submitted already.

3      Q.  We would like that email.  We have not seen

4  that.  And the --

5      A.  Absolutely.

6      Q.  -- October 2022 procedure, that was done in

7  Greece, right?

8      A.  Yes, that was done in Greece.

9      Q.  So is the documentation that you're referring

10 to -- are these documents that you exchanged with

11 Teleperformance Greece or with TPUSA?

12     A.  Teleperformance Greece has my -- the paperwork

13 that you get when you're -- from the hospital, basically

14 my medical leave and what was done.  So that was

15 submitted to HR at the time and also to the insurance

16 company that represented Teleperformance Greece for all

17 of its employees.

18     Q.  In October of 2022, you were -- you were still

19 employed by Excalibur as an -- and Excalibur contracted

20 with TP Greece, and --

21     A.  I was an employee of Teleperformance Greece, and

22 I had all of the benefits that an Teleperformance Greece

23 employee would have, which included medical coverage.

24     Q.  Okay.  This all happened before you became

25 employed by TPUSA?



```
 1        A.  It did.

 2        Q.  Looking in paragraph 18 --

 3        A.  But I was -- at Teleperformance, I was in my

 4   global role.  It was just before my transition.  My

 5   contract transitioned from Teleperformance Greece to

 6   Teleperformance Group.

 7        Q.  Looking at paragraph 18 of your complaint, you

 8   also allege that "Plaintiff believes that Teleperformance

 9   was concerned about the cost of her healthcare and was

10   attempting to avoid paying her health insurance during

11   the notice period."

12              Do you see that part that's been

13   highlighted for you?

14        A.  I do.

15        Q.  Did someone tell you that TPUSA was concerned

16   about the cost of your healthcare?

17        A.  Well, they didn't have to.  I was let go just a

18   few -- just a few days, or maybe a week, after I informed

19   Teleperformance USA about my healthcare conditions as

20   part of the open enrollment process.

21        Q.  Who did you tell?

22        A.  Oh, I don't remember the names exactly.

23   Personnel in HR --

24        Q.  You don't remember the name?

25        A.  -- during a call.
```



```
 1              It was -- it was a couple of names.  Maybe
 2  Answar and -- I don't remember the other name.  I'd have
 3  to have another look at my -- my records.  I don't
 4  remember the name right now, but I'm sure it's in the
 5  documentation that you probably already have from my
 6  attorneys.
 7       Q.  Can you spell that name, please?
 8       A.  If I'm spelling it correctly by memory, A-n-s --
 9  I think it's -w-a-r.
10       Q.  And you're claiming that is a TPUSA HR employee?
11       A.  It was a Teleperformance USA call that took
12  place as part of the onboarding and enrollment in
13  healthcare.  I don't remember who else was on that call.
14       Q.  And you claim that that call took place when?
15       A.  It was in November of 2023.  I don't remember
16  the -- the month I was let go.  I don't remember the
17  exact date.
18       Q.  And did that person tell you that they were
19  concerned about the cost of your healthcare?
20       A.  I can't recall exactly, but I don't know how
21  much healthcare cost in the USA, and it's significantly
22  higher than in any -- any other countries.  And knowing
23  my conditions, healthcare was very important to me, so I
24  wanted to make sure that I was fully covered because of
25  my being a breast cancer survivor and, of course,
```



```
 1   epilepsy -- I'm an epileptic.  So healthcare was very

 2   important to me.  It could eventually cost millions in

 3   the U.S.

 4       Q.  Did someone tell you that TPUSA was attempting

 5   to avoid paying your health insurance?

 6       A.  No, but I didn't get COBRA, although I was

 7   supposed to, so . . .

 8       Q.  Are you aware that TPUSA uses a third party to

 9   provide health insurance?  An insurance company, right?

10       A.  Well, yeah.  So did Teleperformance Greece, but

11   they covered me.

12       Q.  Do you understand that your medical procedures,

13   whatever they were or would be, would not have any impact

14   on what TPUSA pays for healthcare?

15       A.  I am not aware of that, nor could I be aware of

16   it, but I know that it costs significantly higher for

17   those that have preexisting conditions.

18       Q.  Are you claiming that TPUSA somehow influenced

19   their third-party health insurance company to deny your

20   claims?

21       A.  I do not know.

22       Q.  In paragraph 18, you also allege that your

23   medical insurance should have ran through the six-month

24   notice period and your COBRA entitlement should not have

25   started until May 2024.
```



1          Do you see that see that highlighted

2    portion of paragraph 18?

3         A.  I do see that.

4         Q.  What's the basis for your belief that your

5    medical insurance should have continued through May 2024?

6         A.  I had a six-month notice period in my contract,

7    and unlike other males that were let go for whatever

8    reason, they were covered for 12 months, in some cases

9    more; however, I was let go within 9 minutes.  I was

10   employed for almost 11 years, and all it took was

11   9 minutes, and I did not get any coverage at all.

12        Q.  You were employed by TPUSA starting January 1

13   of 2023, correct?

14        A.  My contract was transferred to Teleperformance

15   USA in view of my promotion.  I was with the

16   Teleperformance Group, managing global clients, for a

17   number of years.

18        Q.  Do you understand that your employment agreement

19   does not require payment of your medical insurance during

20   the six-month notice period?

21        A.  If that's the case, then I was promised

22   something different, because I was promised healthcare

23   throughout the duration and I was -- and my six-month

24   notice period was there to give me six months.

25        Q.  There's not one document that provides that



1  you're entitled to health insurance coverage from TPUSA

2  during the six-month period after your termination.

3  Isn't that right?

4      A.  No, that's not right.

5      Q.  Can you point to one document that provides

6  you're entitled to health insurance coverage from TPUSA

7  during the six-month period after your termination?

8      A.  Well, I assume this is part of policies that are

9  not communicated any time or visible to the employees,

10  because honestly, I have not seen any of that.

11      Q.  So you're just guessing that there's a --

12      A.  I am not guessing.  What I'm saying is what I

13  was promised, and what my contract stated was that I had

14  a six-month notice period.

15      Q.  Let's take a look at paragraph 19 of the

16  complaint.  In paragraph 19, you allege that there were

17  five female chiefs, including you, Kelly Grypari,

18  Emmanuelle Commenge, Fannie Decla, Garima Gupta, and

19  Marieke Smidt.

20          These are some of the names you mentioned

21  earlier today.  Is that correct?

22      A.  What's the question.

23      Q.  That's what paragraph 19 alleges?

24      A.  Yes.

25      Q.  Kelly Grypari is actually the current chief



 1  financial officer for EMEA at Teleperformance.

 2              Were you aware of that?

 3      A.  No, because she's not.

 4      Q.  So what is her position?

 5      A.  I don't know what her current position is, but

 6  she has been sent back to Teleperformance Greece, and

 7  somebody from Majorel is the CFO for EMEA.

 8      Q.  Are you in contact with Kelly Grypari?

 9      A.  She did message me.

10      Q.  When did she message you?

11      A.  This week.

12      Q.  What did she say to you, and what did you say to

13  her?

14      A.  She wanted to wish me a happy birthday.  It was

15  my birthday earlier this month.  And I thanked her.

16      Q.  Did she say anything else in that communication?

17      A.  No, that she wishes me well and that --

18      Q.  Anything else?

19      A.  -- she apologized for the delayed, belated

20  birthday wishes.

21      Q.  Did she mention anything about her current

22  position with EMEA?

23      A.  She did not.

24      Q.  Did you ask her anything about her current

25  position?



```
 1        A.  I did not.
 2        Q.  Did you chat with her about -- anything about
 3   this case?
 4        A.  No, sir.
 5        Q.  Did you communicate with her through WhatsApp?
 6        A.  No.
 7        Q.  Did she text you?
 8        A.  No.
 9        Q.  Did she call you?
10        A.  She messaged me.  I don't remember if it was
11   either LinkedIn or through Message ECS.  One of the two.
12   I can share a screenshot if you would like.
13        Q.  Sure.  You don't have to do it now.
14        A.  Okay.
15        Q.  Are you in communication with Emmanuelle
16   Commenge?
17        A.  I am not.
18        Q.  Were you aware that she's the current chief
19   legal officer of EMEA?
20        A.  She was and she still is.
21        Q.  Both Kelly and Emmanuelle -- neither one of them
22   is an employee of TPUSA, correct?
23        A.  Well, I had two roles.  I was EMEA chief client
24   officer and global deputy chief client officer.  So
25   everyone within the group was employed by one entity or
```



```
 1  another depending on their location, so that is not
 2  really relevant.
 3      Q.  That's not my question.  Listen to my question.
 4          Question was:  Are Kelly and Emmanuelle
 5  employees of TPUSA, to your knowledge?
 6      A.  Not that I know of.
 7      Q.  Fannie Decla also was not an employee of TPUSA,
 8  correct?
 9      A.  I am not entirely sure.  I don't know.
10      Q.  She was separated on March 18 of 2023.
11          Do you know the circumstances surrounding
12  her separation?
13      A.  She was replaced by a male.
14      Q.  Do you know why she separated?
15      A.  Well, she was replaced by somebody else.
16      Q.  Again, not my question.
17      A.  There was a change in leadership, and she was
18  replaced, and although --
19      Q.  Do you know --
20      A.  -- I think that she found out the same way that
21  Garima found out.  Garima found out through her team
22  while she was updating them on a Friday afternoon, and
23  she was informed by them that she was being fired.  So I
24  think that -- if I recall correctly, that's -- something
25  similar happened with Fannie Decla.
```



1      Q.  You don't know the reasons for her separation?

2      A.  I know she was a well-respected leader for a

3  number of years as a CHRO in EMEA.

4      Q.  Have you spoken to any of the decision-makers as

5  to why Fannie was no longer working for EMEA?

6      A.  The decision-makers were not very responsive to

7  any of these women, including myself.

8      Q.  Garima Gupta left the company -- it was for

9  mutual reasons.  She was not --

10     A.  It was not for mutual reasons.

11     Q.  She was not terminated.

12          She also -- Garima Gupta was not a TPUSA

13  employee, correct?

14     A.  Garima Gupta was terminated.

15     Q.  Listen to my question again, please.

16          Garima Gupta was not a TPUSA employee,

17  correct?

18     A.  Correct.  But you also made a statement, and I

19  would like to correct that.

20     Q.  There's no pending question.

21          Marieke Smidt was also not a TPUSA

22  employee, correct?

23     A.  Correct.

24     Q.  Take a look at paragraph 20 of the complaint.

25  In paragraph 20, you allege that "Teleperformance has



1  announced a number of job opportunities similar to

2  plaintiff's role since she was fired."

3              What job opportunities have been announced

4  similar to your prior role since you were terminated in

5  November of 2023?

6      A.  A few weeks after I was let go, there were roles

7  announced on LinkedIn that I could have -- they were EVP

8  of client solutions -- similar roles to what I had -- I

9  have had in the past.  I could have -- I could have

10  applied to any of those.  I was (indiscernible) --

11      Q.  Did you?

12      A.  -- to fill those --

13              No, because no one was responding to my

14  emails, so --

15      Q.  You did not apply for any -- for any role.

16  After you left TPUSA --

17      A.  No.

18      Q.  -- in November of 2023, you never applied for

19  another position --

20      A.  You don't -- well, you don't apply to a role

21  when you were just let go from a company.  And plus, in

22  Teleperformance, it's very rare that someone that's been

23  fired would be allowed back in.

24      Q.  So the positions that you're referring to in

25  paragraph 20, you say that they were announced -- or that



1  they were promoted on LinkedIn.  Is that correct?

2      A.  Yes.  Yes, that is correct.

3      Q.  What were the positions?  What were the names of

4  the -- the titles of these positions?

5      A.  I would have to check my records.  EVP of client

6  solutions, VP of client solutions, account management

7  roles -- I don't remember the exact titles, but I could

8  go back to them on LinkedIn.  I'm sure that you could as

9  well.

10      Q.  But you never applied for any of them --

11      A.  No.  I wouldn't --

12      Q.  -- right?

13      A.  I wouldn't apply to a company that had just let

14  me -- terminated me.  But these roles were just announced

15  a few weeks after my termination.

16      Q.  Do you have any documents related to these

17  opportunities?

18      A.  I would have to go back and check.  There may be

19  a screenshot of some sort from the job posting at the

20  time.

21      Q.  If you have that, would you not have already

22  produced it to your counsel --

23      A.  I think I --

24              (Indiscernible cross talk.)

25              (Clarification made by the reporter.)



```
1              MR. GORDON:  You have to let me finish the
2    question --
3              THE DEPONENT:  I'm sorry.
4              MR. GORDON:  -- before you answer.
5              THE DEPONENT:  I'm sorry.  I apologize.
6      Q.  (BY MR. GORDON) If you had screenshots of those
7    job opportunities, you would have provided them to your
8    counsel to produce them through discovery, right?
9      A.  That is correct, yes.
10     Q.  So if -- if they have not been produced, then
11   you don't have them.  Is that correct?
12     A.  No.  I mean, I -- I think everything's been
13   given to Brian -- my attorneys have them.
14     Q.  You're alleging in the complaint that you were
15   discriminated against because you're a woman.  That's one
16   out of your complaints, right?
17     A.  Yes.
18     Q.  Did any TPUSA employee ever make any comments to
19   you about your sex?
20     A.  Comments like, "Oh, you know, you should mute,"
21   or, "We can't hear you," or, "Oh, TP Women -- yeah,
22   right, TP Women."  Yeah, comments like that, yeah,
23   unfortunately, we were given those quite often -- more
24   often than we would like.  But the response was to grow
25   thicker skin, so . . .
```



1    Q.  Who made any comments to you about you being a

2  woman?

3    A.  Mr. Gordon, if I were a male, I would still have

4  a job today with Teleperformance.  If I were younger, I

5  would still have a job today with Teleperformance.  The

6  treatment is just very different for males versus

7  females.

8    Q.  I understand that's your belief and that's what

9  you're going to try to prove in this case and that's what

10  you're trying.  What you have to do here today is listen

11  to the question that I'm asking you and answer the

12  question.

13         The question was, Did a TP -- any TPUSA

14  employee ever make comments to you about your sex?  You

15  responded to that question with a couple of different

16  comments.  And I asked you who specifically made any

17  comments to you.  And we need names.

18    A.  Yeah, I understand that, but the Teleperformance

19  Group has five -- or had 500,000 employees worldwide.

20  Where everyone was based or employed from, I have no idea

21  of knowing if someone was a Teleperformance USA employee

22  or not.

23    Q.  So that's your answer to my question?

24    A.  Yes, that's my answer.

25    Q.  Did any TPUSA employee ever make any statement



1  to you that you believe suggests sex discrimination?

2       A.   What do you mean by "sex discrimination"?

3       Q.   That you were being treated differently because

4  you're a woman.

5       A.   Many women felt they were being treated

6  differently because they were women.

7       Q.   Not asking about other women.  We're only here

8  talking about you today.

9       A.   Uh-huh.

10      Q.   Did any TPUSA employee ever make any statement

11  to you that you believe suggested sex discrimination

12  towards you?

13      A.   So when you're told that you should grow thicker

14  skin and just deal with it because things like that

15  happen or things like being muted or, you know, "Don't do

16  too much on the TP Women side," or comments are made like

17  that -- so would you consider that as comments on

18  sexual -- or sex or gender discrimination, Mr. Gordon?

19      Q.   Who told you to grow thicker skin?

20      A.   Miranda did.

21      Q.   Anyone else?

22      A.   I -- I heard it from many others, but I don't

23  recall exactly where they're employed or their names.  I

24  represented many women because I was part of the

25  Teleperformance Women.  So it happened --



```
 1        Q.  When did --

 2        A.  -- quite a bit.

 3        Q.  When did Miranda allegedly tell you to grow

 4   thicker skin?

 5        A.  Oh, she said it more than -- more than a couple

 6   of times.

 7        Q.  When was the first --

 8        A.  When I would -- when I would bring things to her

 9   attention, that was often the response.

10        Q.  What things?

11        A.  About how males were treating us in the

12   organization.

13        Q.  When was the first time that she allegedly told

14   you to grow thicker skin?

15        A.  I don't remember when the first time was.  I

16   don't remember exactly.

17        Q.  And you don't recall the specific context of

18   why?

19        A.  Well, the context was I had brought something to

20   her attention.

21        Q.  What did you bring to her attention?

22        A.  Males making comments, muting, not being

23   respectful towards women -- those kinds of comments.

24        Q.  Which males?

25        A.  Within the organization.
```



1      Q.   Within TPUSA?

2      A.   I -- I do not know where everyone was employed.

3      Q.   So which males?

4      A.   Joao Cardoso, for example, and a few others.

5  Augusto Martinez -- many members of the executive

6  committee of the group, to give a few examples.

7      Q.   During the first day of your deposition, you

8  testified that the only complaint that you submitted to

9  Miranda was the group picture, which I'm going to show

10 you in a minute.  We'll talk about that, but are you now

11 saying that you made other complaints about your sex --

12     A.   Regarding what I --

13     Q.   -- to Miranda --

14               (Indiscernible cross talk.)

15               (Clarification made by the reporter.)

16     A.   Sorry.  Sorry.  Can you please repeat?

17     Q.   (BY MR. GORDON) In part one of your deposition,

18 you testified that the only complaint you submitted to

19 Miranda was the group picture.

20               Are you now saying that you made other

21 complaints of sex discrimination to Miranda?

22     A.   Mr. Gordon, I said that that was -- in my -- in

23 the first part of my deposition, what I said was that

24 that was the most recent, not the only.

25     Q.   Well, we can look back at the testimony.  I



```
 1   don't think that's what your testimony was.
 2                    But are you saying now that you're --
 3   you're adding to what you said during your first
 4   deposition and you're saying that now you made other
 5   complaints to Miranda about being a woman?
 6        A.   What I said at the time -- and you can check my
 7   deposition -- was that that was the most recent and that
 8   I didn't remember any others specifically at -- at the
 9   particular time.  I'm --
10        Q.   So now --
11        A.   -- (indiscernible) anything.
12                    (Indiscernible cross talk.)
13                    (Clarification made by the reporter.)
14        A.   I -- what I said was that I haven't changed
15   anything --
16        Q.   (BY MR. GORDON) What --
17                    (Indiscernible cross talk.)
18        Q.   (BY MR. GORDON) What do you allege that -- that
19   Joao Cardoso said to you that you then complained to
20   Miranda about?
21        A.   Well, he asked me to do less for women.  He was
22   rude in his -- and disrespectful in his communications
23   more than a few times, including in front of audiences on
24   calls with others.
25        Q.   When did he tell you to do less for women?
```



1    A.  It was during the summer of 2023.

2    Q.  What was the context?

3    A.  It was just a conversation about work, and we

4  were planning a women meeting change event that he kept

5  on asking me to postpone, which I did once, but when we

6  had clients invited, it was hard to postpone it again.

7    Q.  Did she tell you why he wanted you to do less

8  for women?

9    A.  He did not.

10    Q.  Is there anyone else that you complained to

11  Miranda about regarding sex discrimination?

12    A.  I remember telling her about being muted during

13  meetings with Augusto Martinez as well and telling her

14  about the other case that I mentioned during the first

15  part of my deposition.

16    Q.  When did you tell her that you were muted?  And

17  by "muted," you mean on a call, that --

18    A.  Yeah.

19    Q.  -- you were actually muted during the call?

20    A.  Well, not -- more than once.  I mean, it was --

21  it was more like a pattern.  "Oh, Athina's having

22  technical problems.  Let me mute her," mute.

23    Q.  Do you know why you would have been muted during

24  a call?

25    A.  When certain men in the organization do not



 1  respect women, unfortunately that's what happens.  And it

 2  didn't just happen to me; it happened --

 3       Q.  What role --

 4       A.  -- to others.

 5       Q.  What role did Augusto Martinez have?

 6       A.  Exactly during which time frame, because there

 7  were a number of --

 8       Q.  Twenty twenty- -- sorry.  2023.

 9       A.  Okay.  In 2023, a number of organizational

10  changes happened.  So he was EMEA deputy -- he was deputy

11  CEO of EMEA or president of EMEA.  He was also then COO

12  of EMEA, multilingual of EMEA -- he changed a number of

13  roles throughout the last part of the 2022 and throughout

14  2023.

15       Q.  He was never employed by TPUSA, correct?

16       A.  I -- I do not know.

17       Q.  And Joao Cardoso was also never employed by

18  TPUSA.  Is that right?

19       A.  I do not know.

20       Q.  You said that --

21       A.  But they are both part of the executive

22  committee.

23       Q.  You said that you also complained to Miranda

24  about the comment -- or you complained to Miranda about

25  sex discrimination, and she -- and she said "just deal



1  with it."  Is that accurate?

2       A.  She said that sometimes we just need to deal

3  with it and grow thicker skin and not let it get to us.

4       Q.  So was the "grow thicker skin" comment part of

5  the same conversation of the "just deal with it" comment,

6  or were those in separate conversations?

7       A.  Same conversation.

8       Q.  And you had that conversation one time or more

9  than one time with Miranda?

10      A.  More than one time.

11      Q.  Was it more than three times?

12      A.  I don't remember exactly.

13      Q.  Were any of these conversations in writing?  Any

14  text messages, WhatsApp messages?  Anything in writing?

15      A.  There could be some Teams messages on my -- on

16  my laptop.

17      Q.  You haven't produced anything.  So if you had

18  them, would you have produced them to your attorney?

19      A.  My laptop was given to my attorney, and as far

20  as I know, it is now in your hands.

21      Q.  I actually don't believe we have the laptop yet,

22  but we're not going to waste time on that now.

23              During your deposition, you identified a

24  single incident where you claim that you reported sex

25  discrimination to Miranda.  You identified a WhatsApp



```
 1  message, including a photo.

 2              MR. GORDON:  Can we pull that up?

 3              MR. KRONE:  (Complies.)

 4              MR. GORDON:  And we're going to make this

 5  our next exhibit, Madam Court Reporter.

 6              THE DEPONENT:  That was the most recent.

 7              (Deposition Exhibit Number 31 referenced.)

 8      Q.  (BY MR. GORDON) So this is the message that you

 9  referred to in your prior deposition, and the message was

10  from you to Miranda.

11              MR. GORDON:  If you scroll all the way up.

12              MR. KRONE:  (Complies.)

13      Q.  (BY MR. GORDON) You can --

14              MR. GORDON:  Or sorry.  The other way.

15              MR. KRONE:  (Complies.)

16      Q.  (BY MR. GORDON) You can see that this was from

17  you to Miranda Collard, and the date of the message was

18  November 15, 2023.

19              You wrote to Miranda, "I love you.

20  Remember, you are a queen of all hearts and the strongest

21  most resilient woman this organization has ever had.

22  Hashtag, I stand by Miranda always."

23              And then you added a photo, and the photo

24  there, which is up on the screen, says, "Look at this

25  picture.  Sad to see the number of women shrinking."  And
```



 1  then you wrote, "Time to get our spirit back," to which

 2  Miranda gave you a heart emoji.

 3              Do you see all of that?

 4      A.  I do.

 5      Q.  The photo that you sent to Miranda has, what,

 6  100-plus people in it, it looks like?  Would you agree?

 7      A.  I have not counted, but a large number.

 8      Q.  I won't hold you to the number.  I'm estimating.

 9              And there's a number of women that are --

10  that are in the photo.  It's hard -- hard to see now.  If

11  you're able to enlarge it, you can see that there are a

12  number of women in this photo.

13      A.  There are some.

14      Q.  Did you report to anyone else at TPUSA, other

15  than Miranda, that you believed that you were being

16  discriminated against because you were a woman?

17      A.  I'm trying to remember.  I wouldn't have gone to

18  anybody else except Miranda.

19      Q.  You allege in your -- in your third claim for

20  relief, you allege that you were paid substantially less

21  than the male deputy chiefs for performing similar job

22  duties.

23              Is that what you allege in your third

24  claim?

25      A.  Those that were of Miranda's direct reports,





1  yes.

2     Q.  Which male deputy chiefs do you believe you

3  should have been paid the same as or more than?

4     A.  I believe that I should have gotten paid the

5  same, especially given the fact that I had two roles,

6  than those of the likes of Mamta Rodrigues, Akash

7  Pugalia, Will Fritcher.

8     Q.  Did you complain to anyone at TPUSA that you

9  thought you were being paid less than males in similar

10 positions?

11    A.  When I was -- when I asked the question, I was

12 told that the difference is in the shares and that that's

13 what I should focus on because that's where the money is.

14 At the time, the shares were significantly, of course,

15 higher than what they are today or what they were

16 throughout 2023.

17    Q.  Who did you ask the question of?

18    A.  When Miranda offered me the position, she told

19 me what my compensation would be.  And then later on, a

20 few months later, there was a conversation also with

21 Dinos, because I was picking up a EMEA chief client

22 officer role as well.

23             And during those conversations -- there

24 were a number of them -- it was brought up that, again,

25 the fact that I had my PSP as a stock option was what I



1  should focus on, because ultimately, that was what would

2  make a difference.

3      Q.  Do you agree that for part of your employment

4  with TPUSA, Gustavo Mir was in the same role as you,

5  global deputy chief client officer?

6      A.  Gustavo was in the role for less -- less than a

7  year.

8      Q.  And are you aware -- you're aware that you were

9  getting paid more salary than Mr. Mir?

10     A.  That may have been the case, but I'm not

11  entirely sure if just the salary -- the components from

12  country to country would vary, and she was -- he was paid

13  out of Mexico.

14     Q.  Are you aware that Mr. Mir's salary was less

15  than Linda Comp-Noto's salary?

16     A.  No.

17     Q.  Are you aware that Mr. Mir's salary was less

18  than Mamta Rodrigues's salary?

19     A.  I am not aware of -- or was not aware of their

20  salaries, but I do -- I do know that Akash Pugalia was

21  much higher than us, and he was new -- newer to the group

22  than we were.  And also that Will Fritcher was much

23  higher in pay.

24     Q.  Which --

25     A.  Now, in Mexico, there are often other ways of



1  compensating executives with additional shares, ad hoc
2  bonuses, and things like that.  So you would have to look
3  at his entire package to determine whether someone was
4  paid higher or lower.
5       Q.  Do you believe that you should have been paid --
6  strike that.
7            Do you believe that your experience level
8  was the same as Will Fritcher's experience level?
9       A.  Why not?
10      Q.  Do you know what Will Fritcher's experience
11 level was?
12      A.  Yes.  He was with the Teleperformance Group for
13 more years than I was, but from a number of years of
14 experience, if we were to tally it all up, I had just as
15 many years of experience as he did.
16      Q.  Do you believe that you should have been paid
17 more than Mr. Fritcher?
18      A.  I believe I should have gotten paid as a
19 package -- again, my total salary and bonus and all
20 components involved should be equal to my peers.
21      Q.  Are you aware that Mamta Rodrigues is paid more
22 than Mr. Fritcher and Mr. Mir?
23      A.  No.
24      Q.  What was your answer?
25      A.  I said -- I said, No.  But she and -- she and



```
 1  Miranda are very close friends, so I could understand if
 2  she was getting paid more.
 3      Q.  Does that change your opinion that women are not
 4  paid equal to men for the same work when you have a
 5  female, Mamta Rodrigues, being paid more than
 6  Mr. Fritcher and Mr. Mir?
 7      A.  No, it doesn't.
 8      Q.  Your complaint in paragraph 40 alleges that
 9  Teleperformance discriminated and retaliated against you
10  by terminating your employment as a result of you
11  incurring medical and other expenses due to treatments
12  related to your cancer and epilepsy.
13              MR. GORDON:  And we have -- can we
14  highlight that just so that it's clear.
15              MR. KRONE:  (Complies.)
16      Q.  (BY MR. GORDON) Do you see that?
17      A.  I do.
18      Q.  What medical expenses did you incur in 2023?
19      A.  I'm sorry.  I'm still -- I'm still reading the
20  paragraph, trying to understand what's going on.
21              (Reviews document.)
22              Yes, this was upgrades of tickets that I --
23  I paid for out of pocket.
24      Q.  Paragraph 40 is what we're talking about.  I
25  think that's specific to treatments for cancer and
```



 1  epilepsy, and that's what the allegation states in
 2  paragraph 40.  Nothing about --
 3       A.  I'm trying to --
 4       Q.  Nothing about --
 5       A.  It says -- at the end of that, it says
 6  "exercising her right to request an accommodation of
 7  plaintiff's disability and/or medical condition."
 8       Q.  So are you not alleging that they're -- that you
 9  were discriminated and retaliated against based on
10  incurring medical expenses?  It's only -- it's only the
11  air -- the travel expenses?
12       A.  Well, no.  I have no -- I have no coverage.  I
13  have no medical coverage, so any medical exams that I
14  need to have performed, I have to pay out of pocket.
15       Q.  What medical expenses did you incur in 2023 that
16  you are referring to in this paragraph?
17       A.  All of my medical exams.  Nothing is -- nothing
18  is covered.  All of my checkups for my cancer, all paid
19  out of pocket.  My EEGs, my doctors' visits, everything
20  out of pocket.  No coverage -- I had no coverage versus
21  2022.
22            And for the first three months, actually,
23  from January to March, I wasn't even paid; because the
24  transition of my contract from Europe to the USA, I
25  didn't get my first paycheck.  I had to pay everything



1  out of pocket until May when I was -- when I was first

2  paid.  That's when I got my first payroll check in the

3  USA, which was backdated from January 1st.  But for those

4  three months, I had to pay everything out of pocket,

5  including travel expenses.

6      Q.  You only produced one record from 2023, one

7  medical record, and that was August 2nd, 2023.  It's

8  document 4062.  We already talked about it.  That's the

9  only medical record that you -- that you provided.

10            So I don't know what other medical expenses

11 you're referring to in -- in this paragraph 40 of the

12 complaint, which is focused on calendar year 2023 when

13 you were employed by TPUSA.

14            Are there other medical records that you

15 haven't produced to us from 2023?

16     A.  There are follow-up -- I mean, I have annual

17 checkups every year, checking up on my cancer, and I have

18 EEGs at least twice a year because of my epilepsy.

19            So I think I gave pretty much everything,

20 but if there's something that is missing, I can go back

21 and double-check.  I didn't realize that you needed

22 receipts of costs incurred in 2023, but if that was

23 something that -- if that's something that you need, then

24 I can definitely go back and give you the receipts of all

25 of the medical -- you know, medical exams that I've had.



1    Q.  We have no idea what medical exams you had or

2  what medical expenses you had other than what you

3  produced to us.  And so you've only produced one --

4  you've only produced one record.

5              And so if there are other medical records

6  that you're withholding that you haven't provided to your

7  counsel, we ask that you please provide them to him

8  immediately.

9    A.  I am talking about receipts for, like, blood

10 work and things like that, that if those are needed as

11 well, then I can provide those to you.  Or the receipts

12 for the exams that you have, for example, I did not

13 provide the receipts for the cost of those, but I can --

14   Q.  Every -- every medical record that we requested

15 as part of the -- part of our request to produce includes

16 expenses, includes doctors' notes -- includes everything

17 that's related to your medical history, specifically

18 during 2023.  We asked for prior to 2023 also.  And,

19 again, the only thing that we've been provided is one

20 note from August 2nd, 2023.

21              So are you testifying --

22   A.  There were -- there were -- no.  There were a

23 number of EEGs, for example, and also my biopsy results

24 for my cancer and such.

25              And, again, these are also accessible by



1  the Teleperformance -- Teleperformance Greece, which is

2  part of the Teleperformance Group, and they covered the

3  cost of those exams.  So I --

4      Q.  Okay.

5      A.  -- actually figured that you would have access

6  to those.

7      Q.  You have an obligation to comply with discovery,

8  as I'm sure your lawyer has told you.  And so if you have

9  withheld anything that is responsive to our request, we

10  ask you to immediately provide it to your lawyer so he

11  can provide it to us.

12      A.  I have not withheld anything, but if the

13  receipts -- the cost of those exams are needed, then I'm

14  happy to do that, and blood work as well.  I'll have a

15  look and see what I did in 2023, and I will --

16      Q.  What --

17      A.  -- submit it.

18      Q.  What evidence do you have that TPUSA terminated

19  you because you incurred medical expenses in 2023?

20      A.  Well, I had just completed open enrollment, and

21  then I got dismissed.  So all of these additional costs

22  of my annual checkups and EEGs and all of that, that --

23  including medication, which I did require a prescription

24  for in the U.S. -- would be significantly higher.

25      Q.  No one told you that you were being terminated



1  because you incurred medical expenses in 2023, correct?

2      A.  I was being told that the Teleperformance Group

3  was letting me know and that they understood that it was

4  a shock and it was unexpected and --

5      Q.  No one told you that you were being terminated

6  because you incurred medical expenses in 2023, correct?

7      A.  No.  It was a nine-minute conversation.

8      Q.  Do you --

9      A.  Or not even a conversation.  It was nine minutes

10 of "We're sorry, but this is over."

11     Q.  And you never received a document in which you

12 were told that TPUSA was terminating you because you

13 incurred medical expenses in 2023, right?

14     A.  If I had, you would have it.

15     Q.  You allege in paragraph 43 of the complaint that

16 "Teleperformance's discriminatory intent was manifested,

17 in part, by Teleperformance's stated goal to reduce

18 medical expenses related to older/disabled persons."

19             Do you see that?

20     A.  I do.

21     Q.  Who do you claim made this stated goal to reduce

22 medical expenses related to older or disabled persons?

23     A.  I do not know who exactly or if it was one

24 person in particular, but this was definitely a decision

25 from management, which is why the top 100 under 45



 1  existed.  Future talent -- it's all about future talent,
 2  meaning younger talent.
 3              And, of course, those that were disabled or
 4  if you were on sick leave for whatever reason, it was
 5  always looked at differently.
 6              And these are all expenses.  So 2023 was a
 7  year where the company was reducing expenses
 8  significantly, including travel, including -- every
 9  little expense would require a very high-level approval.
10  So everywhere -- anywhere there could be a price cut,
11  including insurance, then that was the case.
12      Q.  You are alleging that you were discriminated
13  against because of your age also, right?
14      A.  Yes.
15      Q.  On November 29, 2023, the date of your
16  termination, you were 50 years old, correct?
17      A.  And a half.
18      Q.  Sorry?
19      A.  I was over 50.
20      Q.  You're -- yeah.  Your birthday is May 12th.  So
21  you were about 50 1/2.  Is that what you said?
22      A.  That -- that's what I said, yes.
23      Q.  Okay.  Did any TPUSA employee ever make any
24  comments to you about your age --
25              THE DEPONENT:  (Sotto voce comments made.)



App. 627

```
 1                    MR. VANDERWOUDE:  Sure.  Yeah.

 2                    Sorry, Eric.  She just asked if we could

 3  take a break.  We have been going a little bit over an

 4  hour.  Would now be an appropriate time to take a break?

 5                    MR. GORDON:  Now is fine.

 6                    MR. VANDERWOUDE:  Okay.

 7                    THE DEPONENT:  I mean, do you want to

 8  finish the question?

 9                    He can finish the question.  It's just the

10  screen time, because I have a screen right in front of my

11  face.

12                    MR. VANDERWOUDE:  Yeah, yeah.

13                    MR. GORDON:  We can take a break now.

14  That's fine.  I'll pick it up when we come back.

15                    THE DEPONENT:  Okay.  Thank you.

16                    MR. VANDERWOUDE:  Say 2 o'clock Central,

17  just like seven, eight minutes?

18                    MR. GORDON:  That's fine.

19                    THE VIDEOGRAPHER:  We're going off the

20  record at 1:53.

21                    (Break taken at 1:53 p.m.)

22                    (Back on the record at 2:05 p.m.)

23                    THE VIDEOGRAPHER:  We are back on the

24  record at 2:05.

25                    MR. GORDON:  Thank you.
```



1    Q.  (BY MR. GORDON) Okay.  Picking up right where we
2   left off.  Last question to you -- and I'll repeat it so
3   we have -- so it's better for the transcript -- did any
4   TPUSA employee ever make any comments to you about your
5   age?
6    A.  There were comments made about being
7   discriminated because of age, yes.
8    Q.  Which TPUSA employees do you claim made comments
9   to you about your age?
10    A.  Comments about age were made -- not only to me,
11   but to others -- by, for example, David Minkus, Michael
12   Aronowitz.  It was -- it was noticeable within the
13   organization that if you were older, then your time was
14   up; you weren't considered a future leader.
15    Q.  I'm asking you specifically about your claim, so
16   not about anyone else's claim.  I want to know -- you
17   claim that you were fired based on your age -- one of the
18   reasons why you were fired.
19            So I want to know:  Did anyone make any
20   comments to you or to anyone else about your age?
21    A.  Well, not specifically, the way you're asking
22   the question, no.  But about age, yes.  About future
23   leaders, yes.
24    Q.  Are there any documents that you believe
25   suggests that you were discriminated against because of



1  your age?

2      A.   I was not within the top 100 under age 45 group,

3  because I didn't meet the age criteria.

4      Q.   And was that document ever sent to you as a

5  basis for why you were being terminated?

6      A.   No.

7      Q.   Do you believe Miranda Collard terminated you

8  because of your age?

9      A.   Yes.

10     Q.   Do you know how old Miranda Collard was in

11  November of 2023?

12     A.   Not exactly.

13     Q.   She was 49.

14     A.   Uh-huh.

15     Q.   She was 18 months younger than you.

16          What evidence do you have that Miranda

17  terminated you because you were 18 months older than her?

18     A.   Getting older and having health issues, not

19  exactly a best combination for a future leader, given the

20  top performance standards.

21     Q.   I'm not asking you about health issues right

22  now.  This is purely based on your age claim.  So we have

23  to separate those.  We've talked a little bit about your

24  disability claim.  Now we're talking about your age

25  discrimination claim, and so you've said that you believe



1   that Miranda Collard fired you because of your age.

2                    The question is:  What evidence do you have

3   that Miranda fired you because of your age?

4       A.  I don't remember at this time.

5       Q.  You've identified employees who you claim were

6   treated more favorably than you because they were younger

7   than you.  One name that you gave was Will Fritcher.

8                    Do you know how old Will Fritcher is?

9       A.  I believe that he is -- just turned 50.

10      Q.  He was born in 1975, so he's about 2 years and

11  10 months younger than you.

12      A.  Okay.

13      Q.  Do you think he was treated more favorably than

14  you based on his age and your age?

15      A.  Yes.

16      Q.  Do you have any evidence to support that?

17      A.  Evidence --

18      Q.  To support your belief that Will Fritcher was

19  treated better than you because he's 2 years and 10

20  months younger than you.

21      A.  Well, he is younger; he was in the top 100 under

22  45; he's male, and he's still employed by

23  Teleperformance.

24      Q.  Do you know that Dan Kramer is still employed by

25  TPUSA?



```
 1        A.  I do.
 2        Q.  Did you know that Dan Kramer is seven years
 3   older than you?
 4        A.  I'm not aware of his age.
 5        Q.  Did you know that Mamta Rodrigues is still
 6   employed by TPUSA?
 7        A.  No.
 8        Q.  Did you know that Mamta Rodrigues is about the
 9   same age as you?  She's three months younger than you.
10        A.  No.
11        Q.  Did you report to anyone at TPUSA that you
12   believed you were being discriminated against because of
13   your age?
14        A.  When the top 100 under 45 was created, I had
15   mentioned it, yes.
16        Q.  To whom?
17        A.  I don't remember exactly.  It was a while ago.
18        Q.  Did you ever tell Miranda Collard that you
19   believed that you were being discriminated against
20   because of your age?
21        A.  I don't remember.
22        Q.  Plaintiff's sixth claim for relief is breach of
23   contract, and we covered your contract in detail during
24   day one, but we still have a few more questions to cover.
25             Going to go to paragraph 52.  Paragraph 52
```



1  alleges that when you were offered employment in the

2  United States, you were promised relocation benefits and

3  full payment of all commissions due on the invoices

4  attached as Exhibit B.

5              Do you see where it says that?

6              MR. GORDON:  Can you highlight that, Ryan?

7              MR. KRONE:  (Complies.)

8              MR. GORDON:  Thank you.

9      Q.  (BY MR. GORDON) During your prior deposition,

10  when asked about the $9,000 you are claiming for

11  relocation benefits, you testified that "I don't recall

12  at this point exactly which part of it it is."  That was

13  page 252, lines 3 to 14, of your deposition.

14              Do you recall that?

15      A.  Yes, I do.  I would need to see the --

16      Q.  Do you recall -- do you recall now why you

17  believe TPUSA owes you $9,000 for relocation benefits?

18      A.  I would need to see the table again, but I was

19  promised -- I was promised a number of things as part of

20  my relocation.  There were car allowance.  There was

21  tickets for myself and my family to go back and forth to

22  Europe a couple of times a year.  There were a number of

23  things that were promised at the time.

24      Q.  There was no promise that you could fly your

25  family back and forth to Europe multiple times during the



1  year.  The promise was to relocate you and your family to

2  Texas when you started working for TPUSA.  Isn't that

3  correct?

4      A.  No.

5          (Clarification made by the reporter.)

6      A.  No.

7      Q.  (BY MR. GORDON) No.  So what do you claim the

8  promise was in -- well, that's the question.  What do you

9  claim the promise was?  That TPUSA would pay for you and

10 your husband and your son to fly back and forth multiple

11 times between Greece and Texas?  Is that your testimony?

12     A.  Twice a year, yes.

13     Q.  And who told you that?

14     A.  When I had my meeting with Alan Winters, he

15 explained to me what was usually offered to those that

16 were relocating.  And I had the dual roles, which

17 required me to be in Europe for parts of the year, so

18 that is why the coming and going to Europe was included.

19     Q.  And that's what you claim this $9,000 is for?

20     A.  Can I -- can you show me the -- the table again,

21 please?

22     Q.  It's not an exhibit right now.  So I'm asking

23 you --

24     A.  Okay.

25     Q.  -- don't want to look at that --



 1    A.  I would need to see it to -- to be able to
 2  answer that question.  Can you bring it up, please?
 3    Q.  I'm going to put that on hold --
 4    A.  Okay.
 5    Q.  -- because we have very limited time.
 6        In the last sentence of paragraph 52, you
 7  claim that you were promised you would receive all
 8  benefits, including severance pay, that are available to
 9  other executives at Teleperformance.
10        Do you see that?
11    A.  Yes.
12    Q.  Who made that promise to you?
13    A.  Miranda did.
14    Q.  Was that in writing or was it verbal?
15    A.  It was during the termination call.
16    Q.  She told you that you were going to be paid
17  severance pay that is available to other executives at
18  Teleperformance?
19    A.  She said that she was going to make it right and
20  that I would get everything that I was entitled to.  And
21  during prior calls when others were being let go, the
22  severance pay that was communicated for anyone being let
23  go was also communicated.  So I was aware of what others
24  were getting during processes when we were letting one
25  person or another go at times, and severance pay was



1  always included.

2      Q.  Did Miranda mention severance pay to you during

3  your termination call?

4      A.  She mentioned that she would make it right and

5  that I would get everything that I'm entitled to.

6             I mentioned severance; I mentioned holiday

7  pay; I mentioned my commissions.

8             And she said, "We're going to do everything

9  that's right, and we're going to get you everything that

10  you need."

11      Q.  What -- what amount of severance pay do you

12  believe that you were entitled to?

13      A.  I believe that that's in my -- in my -- in my

14  complaint, but that would include the -- my bonus, my

15  commissions, and car allowance, health insurance, and

16  also my shares, which I was just promised a couple of

17  months before I was let go.

18      Q.  Those are all individual items that you're

19  referring to, and we've talked about, I believe, all of

20  those.

21             Severance pay is its own category --

22      A.  Yes.

23      Q.  -- usually a lump-sum amount that certain

24  employees can get paid by certain companies, typically

25  when it's included in a contract.



```
 1                 So when you say that you were entitled to
 2    severance pay --
 3         A.   Uh-huh.
 4         Q.   -- are you talking about those other categories?
 5         A.   No.
 6         Q.   Or are you talking about something in addition
 7    to those other categories that you call a lump-sum
 8    severance pay?
 9         A.   No.  Severance -- severance, at the time, was, I
10    believe, one to two weeks' pay for every year employed by
11    the group.
12         Q.   You were employed by TPUSA for one year,
13    correct?
14         A.   I was employed by Group for almost 11 years.
15         Q.   You were employed by Excalibur prior to being
16    employed by TPUSA, correct?
17         A.   I was considered a Teleperformance employee.
18    That's in my contract.  And that's how I was treated,
19    that's how I was communicated to clients, and that --
20    those are the benefits that I received as an employee,
21    even though I was paid out through Excalibur.
22         Q.   Can you name --
23         A.   That was just a means of payment, not the
24    benefits or the paid time off or logging into the systems
25    or anything of that sort.  I was an employee.
```



 1      Q.  Can you name any TPUSA employee that was paid
 2  severance pay?
 3      A.  Yes.  Everyone that was let go was given
 4  severance pay except me.
 5      Q.  Name -- name names.  Who were the TPUSA
 6  employees that you are aware of who were paid severance
 7  pay following separation from the company?
 8      A.  I don't know where everyone is employed today or
 9  was employed by, but David Minkus, for example, he got
10  severance when he was let go -- a number of other
11  employees.  Brandy Presti, she was given severance when
12  she was let go.  Michael Aronowitz was given severance
13  when he was let go.
14          I don't recall any names at this -- any
15  other names right now, but I think I gave you a few
16  examples.
17      Q.  Do you know if David Minkus was employed by
18  TPUSA?
19      A.  I believe he was.
20      Q.  Do you know if David Minkus had a contract with
21  TPUSA?
22      A.  I don't know the terms of his contract, no.
23      Q.  Do you know if Brandy Presti was employed by
24  TPUSA?
25      A.  Yes.



```
1         Q.  Do you know if Brandy Presti was -- if she had a
2    contract with TPUSA?
3         A.  Yes.
4         Q.  Do you know what the terms of Brandy Presti's
5    contract were?
6         A.  No.
7         Q.  And just to be clear, Brandy Presti was a
8    female, correct?
9         A.  Yes.
10        Q.  Do you know if Michael Aronowitz was a TPUSA
11   employee?
12        A.  Yes.
13        Q.  Do you know the terms -- do you know if
14   Michael Aronowitz had a contract with TPUSA?
15        A.  Yes.
16        Q.  Do you know what the terms of that contract
17   were?
18        A.  No.
19        Q.  Continuing on in the -- in the complaint,
20   paragraph 56, you claim that Teleperformance defrauded
21   you by making representations of material fact that you
22   would be compensated for all the prior business you
23   brought to Teleperformance through Excalibur.
24            Do you see that?
25        A.  Yes.
```



1     Q.   Who made that representation to you?

2     A.   Teleperformance did.

3     Q.   Who specifically?  Teleperformance is a -- is a

4  name of a company.  Tell us an individual who you claim

5  made this representation to you.

6     A.   Miranda Collard, Dinos Chamalelis -- those were

7  the people in copy when my contract was being negotiated.

8  That included an amendment the summer of 2023 to include

9  the commissions for the sales that I had performed in my

10  previous role.

11     Q.   What specifically do you mean by prior business

12  brought -- those words in that allegation?

13     A.   The sales I made in my previous role --

14     Q.   For which clients?

15     A.   -- before my promotion.  Before my promotion.

16     Q.   For which clients?

17     A.   For Philip Morris International, Western Union,

18  eBay, Notion, Dropbox, Malwarebytes, and N26.

19     Q.   These were all clients of -- of Teleperformance

20  before you began doing work for any of them.  Isn't that

21  right?

22     A.   Can you please repeat the question?

23     Q.   These were clients of Teleperformance before you

24  ever started doing work with any of them.  Isn't that

25  right?



1    A.  No, that is not right.

2    Q.  Which ones do you believe you initiated -- you

3  created for the company?

4    A.  I brought in Malwarebytes, Notion, N26, and

5  Dropbox.

6    Q.  How much annual revenue for each one do you

7  believe was attributable to you?

8    A.  I don't remember the exact numbers, but if you

9  give me one minute to perform the calculations.

10           For Philip Morris International, for parts

11  of the business that I brought in -- I picked up the

12  account at around 16, 17 million euro a year, and within

13  three years, it got to around the 60 million a year in

14  revenue mark.

15           N26 was under 20 million a year.

16           Malwarebytes was a smaller account, around

17  a couple of million a year, one point something.

18           Dropbox, I brought in in 2016 and was over

19  10 million the last few years -- around the 12 million

20  mark a year, to give you examples.

21           Notion, I brought in -- was one of the last

22  accounts that I had brought in and would be definitely

23  over 10 million a year in revenue.

24    Q.  When I asked you -- when I asked you who made

25  the representation to you, you mentioned two names:



1  Miranda and Dinos.

2          Can you spell Dinos's first and last name,

3  please?

4      A.  When you asked the representation in terms of

5  the commissions, that was what I answered to.  I'm happy

6  to spell Dinos' name.  It's -- Dinos is short.  Sorry

7  it's.  Constantinos Chamalelis.

8      Q.  Can you spell the name for the court reporter?

9      A.  Yes.  C-o-n-s-t-a-n-t-i-n-o-s, and the last name

10  is Chamalelis, C-h-a-m-e-l-i-l-i-s [sic].  Sometimes it's

11  spelled only with an H in the beginning.

12      Q.  In paragraph -- strike that.

13          In paragraph 56, you also claim that

14  Teleperformance told you that you would receive advance

15  notice if there were any issues related to your

16  performance.

17          Who made this representation to you?

18      A.  Can you please rephrase the question to make

19  sure that I understand it?

20      Q.  In paragraph 56, you claim that Teleperformance

21  told you that you would receive advance notice if there

22  were any issues related to your performance.

23          Who made this representation to you?

24      A.  This was known within the organization.  If

25  there were issues with performance, then you would be put



1  on a -- a performance improvement plan.  So you would be

2  given this feedback, and it would be documented in the

3  company's systems, and you would be put on an improvement

4  plan.

5      Q.  Senior executives in companies typically are not

6  put on performance improvement plans.

7              Was there someone specifically who told you

8  that you would receive advance notice if there were any

9  issues related to your performance?

10     A.  During Webinars and global meetings, the

11 guideline given by Bhupender, saying himself, was that

12 any individual that was to be let go was to be first put

13 on a PIP plan.  That included management, leadership --

14     Q.  Did --

15     A.  -- executives.

16     Q.  Did anyone tell you directly that you would

17 receive advance notice if there were any issues related

18 to your performance?

19     A.  Yes, it was part of the conversations.

20     Q.  So no one -- no one -- no one had a conversation

21 with you and told you that you would not be terminated

22 without receiving advance notice prior to -- advance

23 notice if there were issues related to your performance?

24     A.  Of course.

25     Q.  Who -- who told you that?



1        A.   Both Miranda and Dinos and Yannis and Agustin

2   when I had conversations about my promotion, of course.

3   I was a very well-respected and valued employee in the

4   group.  "Of course, Athina, if there is -- if there are

5   any challenges, we'll definitely let you know."

6             I mean, I wasn't going to relocate just

7   like that.  Why would I pick up and change my role if I

8   wasn't promised something like this?

9        Q.   Let's look back at what was Exhibit 11, which

10  was the May 1, 2023, email regarding a client issue.

11            This was advance notice of issues relating

12  to your performance, right?

13       A.   No.

14       Q.   Miranda writes, "Athina, please schedule a call

15  with myself and Mamta on," blank, redacted, "ASAP to help

16  us understand why 15 million as the second-highest issue

17  of the year for the group.  This week, please.  This is

18  the latest waterfall that shows we will be plus-14

19  percent year-over-year.  I don't buy it."  From Miranda.

20            Do you see that?

21       A.   I do see that, yes.

22       Q.   Let's also look at what was Exhibit 12, which

23  was an August 5 to 7, 2023, email chain regarding

24  commitment numbers.

25            MR. GORDON:  You want to pull that up on



```
 1   the screen.
 2              MR. KRONE:  (Complies.)
 3        Q.  (BY MR. GORDON) This email chain related to the
 4   multimillion-dollar gap in your commitment.
 5              MR. GORDON:  And you can scroll down.
 6   Just, yeah, start there.
 7              MR. KRONE:  (Complies.)
 8        Q.  (BY MR. GORDON) From Miranda on August 7, "We
 9   can schedule a call to review.  You are completely
10   missing the point.  The verticals do not use new business
11   liquidation as to achieve core original commitment.  They
12   have a percentage growth commitment year-over-year made
13   up of core and NB all leading above the original
14   budget.  So you don't have only a 6- to 7-million-dollar
15   gap.  You have a 12-million-dollar gap less anything that
16   is core growth.  I'll talk to Joao."
17              MR. GORDON:  And then scroll up to the next
18   email.
19              MR. KRONE:  (Complies.)
20        Q.  (BY MR. GORDON) You respond back, "I know what I
21   said to" -- "Thank you, understood."
22              This email chain related to the
23   multimillion-dollar gap in your commitment was another
24   advance notice of issues with your performance, right?
25        A.  No.
```



1    Q.  You think your performance was stellar based on

2  these emails?  You had no idea that there was any issues

3  with your performance?

4    A.  No.

5    Q.  You state in paragraph 56 that Teleperformance

6  represented to you that you were an outstanding performer

7  who could expect to be with Teleperformance long term.

8             Who made that representation to you?

9    A.  Everyone that I had spoken to and that told me

10  about my promotion.

11    Q.  Who is "everyone"?  Name names specifically.

12    A.  Agustin Grisanti, Yannis Tourcomanis.

13  Joao Cardoso, Agustin [sic] Martinez, Miranda Collard, to

14  name a few.

15    Q.  Did Miranda define what "long term" meant.

16    A.  Well, I don't think anybody expected that I

17  would be one of the people that would leave the group.

18    Q.  Did she define what "long term" meant?

19    A.  We never discussed the potential exit, thus my

20  commitment to relocate.

21             And this was one example, in terms of the

22  attainment, to which budget exactly and which commitment

23  exactly.

24             And Klarna was an account that I had just

25  picked up a few months ago which was owned by


ESQUIRE
DEPOSITION SOLUTIONS

1  Mamta Rodrigues.  And I see that you've blocked out some

2  of the -- some of the words that were part of the -- or

3  other accounts that were mentioned during that process.

4            I achieved 100 percent of my target before

5  the year was even over.  These were stretch targets in

6  addition to that changed and fluctuated every single

7  month.  There were at least six to seven different

8  versions of files that we had to maintain and to showcase

9  one issue or another, particular to Klarna.  There were

10  also press releases in terms of why Klarna reduced their

11  volumes.  It wasn't my gap.  It was a decision and an

12  automation on the client's front that brought that gap in

13  volume, not mine.

14      Q.  Oh.  I'm going to move on because that was not

15  responsive to my question.

16            My question next is:  Did you think you

17  could never be terminated from TPUSA?

18      A.  No, I did not think that.

19      Q.  Your contract with TPUSA expressly states that

20  your employment is at will, meaning you can be

21  terminated, right?

22      A.  Yes.

23      Q.  In paragraph 57, you claim that Teleperformance

24  recruited you with the intent to convert your clients to

25  Teleperformance and then fire you.



```
 1              What evidence do you have to support this
 2  allegation?
 3      A.  I have emails that were exchanged where we were
 4  making calculations on a three-year plan.  My shares,
 5  which were the primary carrot that was put in my face in
 6  order to accept the role, were on a three-year vesting
 7  period, which I was given the last -- my last PSP was
 8  just a couple of months before I was let go.  Everything
 9  was based on a minimum three-year plan.  And I have -- I
10  believe you also have all of that documentation.
11      Q.  Okay.  Skipping ahead.  During your prior
12  deposition, you discussed your claim that TPUSA owes you
13  300,000 for taxes.
14              Do you remember that conversation?
15      A.  I do.
16      Q.  Do you recall that there was an email chain that
17  we looked at.  This was Exhibit --
18              MR. GORDON:  Was a prior exhibit, Ryan, or
19  is this one that we need to add?
20              MR. KRONE:  Yeah, we need -- is this a
21  June 9th email?
22              MR. GORDON:  June 9th, yeah.  Is this new?
23              MR. KRONE:  Yeah, this is a new one.
24              MR. GORDON:  Okay.  All right.  So we're
25  going to add, Madam Court Reporter, the next document,
```



1  which is AK-TPUSA 552-561.  We'll put that up on the

2  screen.

3                 (Deposition Exhibit Number 32 referenced.)

4      Q.  (BY MR. GORDON) This is an email chain between

5  you and Miranda regarding commissions and taxes.  It has

6  a reference line of "SIP Payments."

7                 Do you recall this email chain between you

8  and Miranda Collard?

9      A.  Yes.

10     Q.  Sorry.

11     A.  Yes.

12     Q.  The third email down, which starts on June 8,

13  2023, you wrote, "Miranda, this is a 300K impact for me.

14  What can be done?  Can we please amend the contract?  I

15  am told it's up to you.  Do I need to go back to Dinos?"

16                 Are you referring to the tax liability when

17  you say it's "a 300K impact"?

18     A.  Yes.

19     Q.  Miranda responds and tells you, "Yes, you will

20  have to go back to Dinos," right?

21     A.  Uh-huh.

22     Q.  Is that a "yes"?

23     A.  I'm reading it.  I'm sorry.

24                 (Reviews document.)

25                 And your question?



 1      Q.  You reply back to Miranda's email, and you

 2  wrote, "Thank you.  I will pull together and talk to him

 3  because we had done an exercise together on the gap since

 4  there were extra costs to liquidate my consultancy

 5  contract, a large delta in taxation, et cetera, that the

 6  amount of the pending commissions would cover."

 7               That's what you wrote, correct?

 8      A.  I did.

 9      Q.  Are you saying that Ms. Collard made some

10  separate promise to cover the $300,000 difference?

11      A.  This is not the entire thread of communication,

12  because there was also then communication with

13  Kelly Grypari on the tax implication, which showed -- I

14  think it was Kelly Grypari -- that showed that the 300K

15  impact was over a three-year -- it was over a three-year

16  time frame and also the change in the -- not the change,

17  but the amendment of the contract that was required in

18  order for me to be paid out, but I never was paid out.

19      Q.  You testified that Miranda made this promise,

20  not -- not Kelly Grypari.

21      A.  Yes, Miranda made this promise.  She had to

22  approve it; otherwise, nothing would be done if she

23  hadn't -- she had to approve to contract.

24      Q.  And Miranda referred you back to Dinos to have

25  any discussions with Dinos about this.  Isn't that



1  correct?  That's what's in the email.

2      A.  Because I had a dual role.  I had the EMEA chief

3  client officer role as well.

4      Q.  And so you're saying that Ms. Collard made some

5  separate promise to cover the $300,000 difference?

6      A.  I'm saying that there was a different thread

7  where she approved it.

8      Q.  And this document allegedly, are you claiming

9  that you produced that to us?

10      A.  I believe we have, yes.

11      Q.  Okay.  So if we don't have any such document,

12  then have you withheld it?

13      A.  No, I have not withheld it.  It is in my device

14  as well.

15      Q.  Looking at another document now.  This is

16  another new exhibit.  It's a June 23, 2023, email from

17  Miranda to you regarding taxes.  It's TPUSA document

18  565-567.

19          (Deposition Exhibit Number 33 referenced.)

20      Q.  (BY MR. GORDON) Do you see this email exchange?

21      A.  I'm reading it now.

22          (Reviews document.)

23          What's the question?

24      Q.  On page 565, Ms. Collard tells you that because

25  it wasn't in your agreement, you would need to meet with



1  Dinos and Joao to see how it can be resolved under the

2  EMEA region, correct?

3      A.  Yes.  Again, though, this is not all of the

4  communication.  There is communication post this that has

5  Miranda approving this.

6      Q.  Halfway down the email, Ms. Collard says, I

7  realize this was done to help compensate for the taxation

8  issues from your Romania contract and having to now

9  become a TP employee.  I do believe I recall you and

10 Dinos doing the math on this front if I'm not mistaken.

11 In our discussion, this was a 300K impact."

12          Do you see that?

13     A.  Yes, I do.

14     Q.  Ms. Collard says nothing about TPUSA paying your

15 tax liability, correct?

16     A.  This was in her approval for the commissions and

17 the amendment to my contract.

18     Q.  Miranda approved the amendment of your contract

19 to give you two extra quarters, but there were no

20 documents confirming approval of payment of any tax

21 liability.  Isn't that right?

22     A.  I don't entirely understand your -- your

23 question.  I'm sorry.

24     Q.  There are no documents confirming Miranda's

25 approval of payment of tax liability.  Quite the



```
 1  contrary.  She has referred you to Dinos, and that's
 2  what's in this email, right?
 3      A.  Well, I had two roles, so both had to sign off,
 4  but ultimately, this was the agreement in the final
 5  approval of my contract, and this is why there were two
 6  additional quarters added.  That was my initial request.
 7              (Deposition Exhibit Number 34 referenced.)
 8      Q.  (BY MR. GORDON) Going to your answers to
 9  interrogatories now.  On page 4 of your answers to
10  interrogatories, you say that TPUSA failed to reimburse
11  you for approximately $50,000 in additional travel
12  expenses that you incurred to relocate yourself and your
13  family to the U.S.
14              That's what you wrote, right?
15      A.  Scroll down.  I'm trying to --
16      Q.  We're highlighting it now.
17      A.  Okay.  Thank you.
18              I see it now.
19      Q.  During your deposition, you testified that "if
20  you look at the cost of flights alone for my family to
21  travel back and forth to Europe twice a year, that adds
22  up to that amount."
23              Do you recall that testimony?
24      A.  I recall the conversation, yes.
25      Q.  Is it still your testimony that the $50,000 in
```



1  travel expenses that you're claiming is related to

2  flights for your family back and forth from Europe?

3      A.  Yes.  I believe we have also submitted the --

4  the receipts that you -- that you asked for.

5      Q.  So we're going to put those -- we're going to

6  put those up now.

7              This is another new exhibit.  It's

8  documents 4090 to 4098, which are flight records that you

9  produced to us.

10             (Deposition Exhibit Number 35 referenced.)

11     Q.  (BY MR. GORDON) These are the flights that

12  you're referring to that covers the $50,000 in additional

13  travel expenses that you're claiming, correct?  It's a

14  nine-page document.

15     A.  (Reviews document.)

16             Yes.

17     Q.  Let's go to page 4090.  It appears that you paid

18  for a flight, but it has no date.  Do you know what date

19  this flight was for or what this charge was for?

20     A.  I don't remember.  I don't remember.

21     Q.  Go to page 4091.  It appears you paid for

22  flights from Dallas to Athens on March 10, 2023; and from

23  Athens to New York to Dallas on August 10, 2023.

24             You're claiming that you should have been

25  reimbursed for this flight by TPUSA, but you weren't?



```
 1        A.  (Indiscernible) remember this one.

 2               (Clarification made by the reporter.)

 3        A.  I don't remember -- I don't remember for this

 4   one.

 5        Q.  (BY MR. GORDON) You don't remember whether you

 6   were reimbursed by TPUSA for this?

 7        A.  I do not, no.  I'm sorry.  I don't remember.

 8               MR. GORDON:  Go to the next page, 4092.

 9               MR. KRONE:  (Complies.)

10        Q.  (BY MR. GORDON) Same question.  Do you recall if

11   you were reimbursed by TPUSA for this flight?  This one

12   is on December 18, 2023.

13        A.  I don't think so.  I don't remember, but I don't

14   think so.

15               MR. GORDON:  Go to the next document, which

16   is 40- -- it should be 4094.  And -- yeah.

17               MR. KRONE:  (Complies.)

18        Q.  (BY MR. GORDON) Same question for this one.

19   This is the flight that was December 21, 2024.  Were you

20   reimbursed by TPUSA for this flight?

21        A.  I don't remember.

22        Q.  You don't recall?

23        A.  I'm sorry.  I don't remember.  I would have to

24   go back and look at my expense report at the time.

25        Q.  And this was December 21 --
```



1    A.  I don't -- I don't think that this was -- this
2  was reimbursed.  I'm not -- I don't remember exactly,
3  though.  It's hard for me to remember.
4    Q.  This is the year after you were terminated by
5  TPUSA, correct?
6    A.  Yes, it was.
7    Q.  So you were not entitled to be --
8    A.  No, I remember --
9    Q.  You were not entitled to be paid --
10    A.  I remember now.  No, these were -- these were
11  tickets for the -- for the year that followed, which
12  would have been covered had I still been employed by
13  Teleperformance.
14    Q.  Okay.  So you had already been gone from
15  Teleperformance for a year when you took this flight,
16  correct?
17    A.  Yes.  My family was relocated, and I was
18  promised tickets for myself and my family back to Europe.
19  So this is -- these are costs that I incurred because I
20  had just relocated my entire family, so . . .
21              MR. GORDON:  Go to the next document.
22              MR. KRONE:  (Complies.)
23    Q.  (BY MR. GORDON) This is 4095.  This is for
24  flights from June 18, 2024, to July 13, 2024.  Also these
25  are after you were terminated from TPUSA, correct?



 1      A.  Yes.

 2      Q.  Are you claiming that somehow TPUSA is

 3  responsible to reimburse you for these flights that you

 4  took many months after you were terminated from the

 5  company?

 6      A.  Yes.

 7          MR. GORDON:  Go to the next document.

 8          MR. KRONE:  (Complies.)

 9      Q.  (BY MR. GORDON) Just curious, in your opinion,

10  how many times do you think TPUSA has to reimburse you

11  for flights back to Athens?  Three of these flights were

12  after your termination.

13      A.  These are examples of business class that you

14  had asked -- what you're showcasing right now is examples

15  of business class that you asked -- asked me to produce.

16      Q.  Well, these -- these are flights that took place

17  after you were terminated.

18      A.  Uh-huh.

19      Q.  So I'm just wondering:  Should TPUSA continue to

20  pay for your -- for your travel back -- back to Greece

21  indefinitely?

22      A.  Indefinitely, no, but for at least a couple of

23  years after I was let go.  I mean, I did relocate my

24  family, so . . .

25      Q.  That wasn't in the contract, was it --



 1       A.   This was what was promise -- no.   This was in

 2  the email with Alan Winters with a long list of

 3  everything else that was supposed to be promised to me

 4  and wasn't --

 5       Q.   And Alan Winters told you that you would be

 6  compensated or reimbursed for flights to Europe even

 7  after you were terminated by the company?

 8       A.   I sent notes after my call, and I shared those

 9  with -- I sent those back to him with Miranda in copy.

10  And that was the norm for people that were relocated --

11  for executives that were relocated.

12       Q.   That even after they were terminated, they would

13  be paid for their travel expenses indefinitely by the

14  company.   Is that --

15       A.   Well, no.

16       Q.   -- what you're saying?

17       A.   That was promised to me before I was terminated.

18  I was lured to the U.S. and then afterwards let go, so

19  the cost of going back and forth to Europe, obviously,

20  was something that was promised by Teleperformance.

21              MR. GORDON:  Okay.  Moving forward.  Madam

22  Court Reporter, how much time do you have left, please?

23              THE REPORTER:  I show you've been on the

24  record 2 hours and 5 minutes.  If you want to confirm

25  that with the videographer.



```
 1                  Ms. Tisa, if you want to confirm that.
 2                  THE VIDEOGRAPHER:  (No audible response.)
 3                  MR. GORDON:  I will take your -- your
 4    estimate.  Thank you.
 5       Q.  (BY MR. GORDON) Okay.  Going ahead.  I want to
 6    go to Interrogatory Number 4, which asks you to identify
 7    each individual employed by TPUSA whom you contend
 8    discriminated against you because of your disabilities
 9    and when the alleged acts occurred.
10                  In the fifth sentence of your response --
11                  MR. GORDON:  If we can highlight that.
12                  MR. KRONE:  (Complies.)
13       Q.  (BY MR. GORDON) -- you wrote that you underwent
14    surgery related to cancer and the Teleperformance Group
15    forced you to work through surgery.
16                  Do you see the highlighted part of this
17    answer?
18       A.  Yeah, but I would like to read the question and
19    then read the answer so I could understand.  Thank you.
20                  (Reviews document.)
21       Q.  You ready?
22       A.  Yeah, yeah.  I'm just reading the rest.  Okay.
23    What is your question?
24       Q.  Is the surgery that you're referencing in this
25    answer your mastectomy from 2016 or your procedure that
```



1  you had done in October of 2022?

2      A.  When I had my surgery back in 2016, I was forced

3  to come to the office and also travel even though I had

4  my drainage tubes and -- still attached to -- to my body.

5              And I was forced to type, even though I

6  could barely move my arms.

7              And I could barely also walk.  When I

8  traveled, for example, to Poland on business trips, I had

9  to get help from my colleagues to help get me out of bed

10 because I could not get myself out of bed.

11             When I had -- in October of 2022, when I

12 then had my other surgery, there was just no time to --

13 there was no time because we had to be in front of

14 clients.  We had to -- a bunch of deliverables to meet,

15 so there was no time to -- to recover.  It was -- we had

16 to pick up, and even though I was still on sick leave, I

17 was expected to join calls and to work.

18             So as soon as I was up from anesthesia,

19 work it was, and that's how it continued to be.

20     Q.  So the procedure that you had done -- the

21 surgery you had done in 2016, at that point you were

22 working through Excalibur for TPUSA Greece.  Is that

23 correct?

24     A.  Teleperformance Greece, yes, they paid for my --

25 I was insured by Teleperformance Greece.  And yes, that



1  is correct; that was my mastectomy and the restoration

2  process.

3      Q.  Did TP Greece fire you in 2016 after you had

4  that procedure?

5      A.  They did not.

6      Q.  Did they fire you in 2017?

7      A.  They did not.

8      Q.  Did they fire you in 2018?

9      A.  They threatened to if I didn't go into the

10  office.

11      Q.  They didn't fire you.  And, in fact, they didn't

12  fire you all the way through 2022, and they didn't fire

13  you then either, right?  At that point, you decided to

14  take a promotion and move to the United States and work

15  for TPUSA.

16          MR. VANDERWOUDE:  Objection.  Form.

17      A.  At that point in time, my job -- although I was

18  employed in Teleperformance Greece, Mr. Gordon, it's

19  important to note that I was not working on clients for

20  Teleperformance Greece.  I was working for global

21  clients.  I was under the global client arena.  I was

22  managing global clients.  I was not working in

23  Teleperformance Greece.

24          So the only thing that changed during my

25  promotion is the fact that I had a larger portfolio and



App. 661

1  an advanced position, but I was always doing global work

2  for global clients.

3      Q.  (BY MR. GORDON) In your answer to this

4  interrogatory, when you refer to a "surgery related to

5  cancer" --

6      A.  Uh-huh.

7      Q.  -- it's either the 2016 surgery or the 2022

8  surgery, both of which took place before you were

9  employed by TPUSA.  Isn't that correct?

10      A.  No.

11      Q.  No one from TPUSA forced you to work through a

12  surgery because you had no surgery during 2023.  Isn't

13  that right?

14      A.  My global role -- my promotion with TPUSA took

15  place in June of 2022.  And through that time until the

16  contract was changed, my costs were rebilled to

17  Teleperformance USA as part of an internal process.

18          The contract is just a technicality within

19  the Teleperformance Group depending on where you're

20  physically located at the time.

21          And this is referring to both of my

22  surgeries, because for both and including my

23  hysterectomy, which is not what this is pertaining to, I

24  always worked the second I woke up from anesthesia

25  because we had to tend to clients.  And if you didn't



1  show up, then your job was at risk.  It's that simple.

2       Q.   Looking down at Interrogatory Number 5, asked

3  you to identify each individual employed by TPUSA whom

4  you contend discriminated against you because of your

5  sex.

6            Again, you only mentioned Miranda Collard's

7  name in your answer, but then you write that there might

8  be others involved in the decision to terminate you based

9  on your sex --

10           THE DEPONENT:  I'm sorry.  The screen is

11 making me dizzy.  Can you please go back to the -- I

12 don't know who has control of the scrolling, but if you

13 can just not scroll up and down like that, because it

14 makes my head spin a little bit.

15           MR. GORDON:  We can highlight starting --

16 right there, yeah.

17           MR. KRONE:  (Complies.)

18           THE DEPONENT:  Yeah, I'd just like to read

19 the question as well.

20           (Reviews document.)

21           I am reading the highlighted now.

22           "TPUSA has claimed that all decisions were

23 made by Miranda Collard but has refused to provide any

24 documentation as to why the actions identified in

25 Interrogatory Number 1 were taken or by whom.  The



1  persons involved in the following decisions may have been

2  involved in, including but not limited to, the

3  discrimination."

4      Q.  (BY MR. GORDON) So my question to you is:  Who

5  are these other persons who may be involved -- who you

6  believe might be involved in the decision to terminate?

7      A.  Well, it's not a decision that Miranda would be

8  able to take on her own.  The people that I mentioned

9  before, Agustin Grisanti, Joao Cardoso, Dinos Chamalelis,

10  Bhupender -- I mean, there were just a number of people

11  that would have had to agree to terminate a position like

12  mine.

13      Q.  And you're basing that on what?

14      A.  On the 11 years' experience with the Group.

15      Q.  Anyone ever told you that Miranda did not have

16  the authority to terminate you?

17      A.  I had two roles, so it would have to be an

18  approval from the folks in Europe as well.

19      Q.  That's your belief?

20      A.  That is how things were done.  It's not just --

21      Q.  Looking back --

22      A.  -- my belief.

23          MR. GORDON:  Looking back Interrogatory

24  Number 1.  So we can scroll back up to that.

25          MR. KRONE:  (Complies.)



1    Q.  (BY MR. GORDON) The last paragraph of your

2  response says that this answer does not take into account

3  the full extent of your damages, including noneconomic

4  damages, to compensate you for the emotional distress and

5  suffering that TPUSA's discriminatory conduct caused.

6              What were the symptoms of your claimed

7  emotional distress?

8    A.  My sleep has been impacted, my heart rate has

9  gone up, my stress levels are high, and my entire life

10  was put up in smoke.  And I am now also not insured, and

11  it would cost me millions should something happen to me

12  in terms of --

13    Q.  Do you have any -- do you have any medical

14  records relating to your sleep, your heart rate, or your

15  stress level being high?

16    A.  My stress level?  What do you mean by -- what

17  medical record --

18    Q.  You just listed three things.  You said that --

19    A.  Uh-huh.

20    Q.  You said the symptoms of your claimed emotional

21  distress were based on your sleep's been interrupted,

22  your heart rate is up, and you have -- and your stress

23  levels are high.  That's what you testified to as

24  symptoms of your emotional distress.

25              I'm asking:  Do you have any medical



1  records to support any of this?  We haven't seen them.

2      A.  No.

3      Q.  Did your emotional distress prevent you from

4  working or prevent you from getting another job?

5      A.  How would you mean that?

6      Q.  Just what I asked.

7      A.  Well, in the beginning, it was very, very

8  stressful.  It took me a while to be able to cope, but --

9  it just took a lot to be able to digest everything that

10  happened to me and to my family.

11          But most importantly, the stress is more

12  about what if something happens to me and I'm uninsured.

13  And the medical costs in the U.S. is just -- and on a

14  general note, I can -- it's really hard to be insured,

15  and it will cost a lot of money should anything happen to

16  me.  I can't even quantify that.

17      Q.  Did you ever experience these emotional distress

18  symptoms before your separation from TPUSA?

19      A.  (Indiscernible.)

20      Q.  Sorry?

21      A.  I mean, I would get nervous when I was ready to

22  get my annual checkups, because you just wonder what if,

23  but -- but no.  It happened after I found out I was no

24  longer insured.

25      Q.  Did you ever have emotional distress when you



1  were first diagnosed with cancer?

2      A.  Yes.

3      Q.  Did you suffer any --

4      A.  It was --

5      Q.  -- emotional distress --

6      A.  It --

7      Q.  Go ahead.

8      A.  Sorry.  I mean, it was a lot to process.  It was

9  a lot to process at the time, but I got through it.

10     Q.  Did you -- did you suffer any emotional distress

11 before or after you had your mastectomy?

12     A.  I consider that all as part of my -- my

13 diagnosis and then getting back into the -- to the swing

14 of work.

15         I remember -- I remember being asked to

16 come back and to write an RFP.  And I'm grateful for some

17 of the colleagues that I had that actually sat through

18 and did the typing for me when -- or with me when I was

19 unable to type yet we had to submit RFP responses to be

20 awarded business.

21         And I believe that if you also speak to

22 them, that they would acknowledge the fact that it was a

23 difficult time for me.  But I -- including my clients,

24 which sent me flowers and understood everything that I

25 Was going through, visited me in my home, and continued



 1  to -- to be there for me during my -- during my ordeal.

 2              But I worked every single day.  I worked

 3  every single day that I needed to despite the pressure.

 4  Did it stress me?  Yes.  Any human being would have been

 5  stressed.  But other than that, the stress of the unknown

 6  and -- at that time, I knew that I was covered

 7  healthcarewise.  Not being covered healthcarewise is --

 8  is a massive stress.

 9              And it's not 2016.  This is now, you know,

10  9 years later and I am over 50.  So it's -- it's not the

11  same.  It's definitely not the same.

12      Q.  Did you suffer any emotional distress when you

13  were first diagnosed with epilepsy?

14      A.  That was during the lockdown, so no, not much.

15  It was more of a shock than -- than anything else.  But

16  then there was just so much going on with -- with work

17  and just having to get people to remote work and all of

18  that.  So it was a shock, but that was it.

19      Q.  After receiving notice of your termination, did

20  you consult with any healthcare practitioner about the

21  symptoms that you were experiencing?

22      A.  I was not insured, so I did not.

23      Q.  You didn't see a doctor?

24      A.  (No audible response.)

25      Q.  You didn't see --



```
 1        A.   No.
 2        Q.   -- a psychologist or a psychiatrist or a
 3    counselor or a therapist of any kind?
 4        A.   No.   Just my neurologist.
 5        Q.   Neurologist?
 6        A.   Yeah, the doctor that monitors the progress of
 7    my -- my epilepsy.
 8        Q.   Okay.
 9        A.   My neurologist.
10        Q.   But no other doctors that you treated -- for any
11    of these symptoms related to emotional distress?
12        A.   No.   I started taking some over-the-counter
13    vegan calming stress -- I think I listed those in my --
14    first part of my deposition -- to help deal with the
15    stress.   I started meditating, exercising, and trying to
16    deal with it.
17        Q.   Have you ever been prescribed any medications to
18    deal with stress?
19        A.   No, other than for my ep- -- what I have for my
20    epilepsy, no.
21        Q.   So the answer is "no"?
22        A.   (Indiscernible) --
23             THE REPORTER:  I'm sorry.  I'm having a
24    hard time hearing you, ma'am.
25             MR. GORDON:  Yeah, me too.  Can you
```



```
 1  please --
 2              THE DEPONENT:  I'm sorry.  I said -- okay.
 3  I'm getting tired, yeah.
 4              MR. VANDERWOUDE:  Yeah.  Eric, mind if we
 5  take a break?  We've been going a little over an hour and
 6  10 minutes.
 7              MR. GORDON:  A break is fine.
 8              MR. VANDERWOUDE:  Okay.
 9              THE DEPONENT:  Thank you.
10              THE VIDEOGRAPHER:  We're going off the
11  record at 3:14 p.m.
12              (Break taken at 3:14 p.m.)
13              (Back on the record at 3:22 p.m.)
14              THE VIDEOGRAPHER:  We are back on the
15  record at 3:22.
16       Q.  (BY MR. GORDON) Ma'am, were there events in your
17  life other than the separation of your employment from
18  TPUSA which could have also caused or contributed to your
19  stress in 2023?
20       A.  No.
21       Q.  Any issues involving health and family members?
22       A.  I've had issues -- my mom has a cancer history,
23  but that -- nothing new.
24       Q.  So you're dealing -- or you were, in 2023,
25  dealing with your mom's cancer diagnosis?
```



1      A.  No.  My mom's had chronic leukemia for over 15,

2  16 years, so it wasn't anything new.  2022, I would say,

3  was a bit of a harder year for her, but no, she's

4  actually in remission and she's all good.  Thank you.

5      Q.  Is she based in the U.S. or -- or in Greece or

6  elsewhere?

7      A.  She's based in Greece.

8      Q.  Any issues in 2023 involving health of friends

9  or any friends -- other types of issues that could have

10  also contributed to your stress?

11      A.  We had a colleague that committed suicide a few

12  months after she was let go from Teleperformance, which

13  was hard to deal with, but that was in October of 2023

14  just before I was let go.

15      Q.  What was that person's name?

16      A.  Marino Netto.

17      Q.  Can you spell the first and last name?

18      A.  Marino, M-a-r-i-n-o, and her last name was

19  Netto, N-e-t-t-o.

20      Q.  Was she based in TP Greece?

21      A.  No.  She was in the USA.

22      Q.  And that occurred, you said, around the time

23  that you were separated from TPUSA?

24      A.  It was early October 2023.

25      Q.  Were you close with Ms. Netto?



```
 1      A.  Yeah.
 2      Q.  I imagine that must have also been a stressful
 3  situation for you?
 4      A.  In October, yes, it was.  She's very much
 5  missed.
 6      Q.  In 2023 and 2024, were there economic issues or
 7  marital difficulties or other family issues that could
 8  have also contributed to your stress?
 9      A.  No.
10      Q.  Have you ever been diagnosed with a mental
11  illness or mental disorder?
12      A.  No.
13      Q.  Have you ever been diagnosed with depression?
14      A.  No.
15      Q.  Have you ever been diagnosed with anxiety?
16      A.  No.
17      Q.  I'm going to show you now a document that is
18  numbered 4089, which is a communication between you and
19  Koda Skurzewski.
20              MR. GORDON:  Pull that one down, Ryan, and
21  we're going to put up the Koda chat first.
22              MR. KRONE:  (Complies.)
23              THE REPORTER:  Will this be our next
24  exhibit?
25              MR. GORDON:  Yes, ma'am, this is our next
```



1  exhibit, Number 4089.

2          (Deposition Exhibit Number 36 referenced.)

3      Q.  (BY MR. GORDON) It's a chat between you and

4  Koda Skurzewski.  And the name is spelled at the top of

5  the document.

6          Do you recall this communication?

7      A.  Yes.

8      Q.  Koda Skurzewski was another individual who was

9  previously employed by TPUSA, correct?

10     A.  Yes.

11     Q.  She sent you a message on December 27, 2023,

12 which said, "Hi, Athina.  Sorry to hear about your role.

13 I 99 percent assumed you'd be safe.  I think you may

14 know, but I left TP.  It's so different and I love it.

15 I'm looking for a strong global bds" -- or is that BDs,

16 business developers?  "I know that was not your role, so

17 salary is different, but uncapped commissions and I know

18 your skill set.  Want to chat?"

19          Do you see that?

20     A.  I do see that, uh-huh.

21     Q.  And then you responded back and said, "Hey,

22 Koda.  Thank you so much.  Why not?"  Right?  That's what

23 you wrote, yes?

24     A.  That a question?  I'm sorry.  Yes.

25     Q.  Yes.  Okay.



1              And then you exchanged a couple of more

2 messages in this document that you were going to connect

3 after the holidays, but it appears that Ms. Skurzewski

4 was interested in hiring you.  Is that right?

5        A.  Yes, that is correct.

6        Q.  Did you ever speak with Ms. Skurzewski after

7 January 1, 2024?

8        A.  Yes, I did.

9        Q.  And did you discuss with her employment

10 opportunities?

11        A.  Yes.

12        Q.  And tell us what did she tell you and what did

13 you say to her about possible employment opportunities.

14        A.  She was looking for salespeople.

15        Q.  Okay.  Did she make you an offer?

16        A.  I was overqualified for what she was looking

17 for.

18        Q.  But she offered you a job?

19        A.  She didn't make an offer, but it was through the

20 conversation that I was overqualified, and a sales role

21 was -- I'm not -- I wasn't a salesperson.

22        Q.  If you wanted the job, do you think you could

23 have gotten it?

24        A.  I don't think so because I'm not a hunter.  She

25 was looking for hunters.



1    Q.  So when did you speak with her?

2    A.  Oh, I don't remember the exact date.  It was

3  around the beginning of the year, something around --

4  around there.

5    Q.  Did you have one phone call with her about

6  employment opportunities or more than one?

7    A.  I don't remember exactly.  It was probably a

8  couple -- one, two, something like that.

9    Q.  But in the end, you decided that -- that you

10  were overqualified for the -- for the job.

11    A.  Well, she didn't make me an offer, but she --

12  she was -- I mean, what she was looking for was more of a

13  junior salesperson.

14    Q.  Do you think you could not have done the job?

15    A.  I'm not a hunter, like I said.

16    Q.  So you said you were overqualified for the job.

17  That means --

18    A.  Yeah.  She was looking for a junior salesperson,

19  and I'm a client executive, so account management,

20  farming, relationship building, not cold calling and

21  hunting.

22    Q.  So you were not interested in -- in that

23  position?

24    A.  No.  That was a position that was much lower, as

25  she also stated in her -- in her text message.



 1      Q.  How much would you have gotten paid if you
 2 had -- had been offered a position there, roughly?
 3      A.  We never got to that point of discussing
 4 numbers, because --
 5      Q.  Do you know -- do you know how much a position
 6 like that usually pays?
 7      A.  I don't know how much she pays her BDs, no, but
 8 it was much less than -- it wasn't a six-digit number.
 9 It was much lower, so . . .
10      Q.  But you don't know because you never explored
11 the offer with her?
12      A.  No, because it wasn't something that I would be
13 able to do.
14      Q.  You could do it; you just didn't want to do it,
15 right?
16      A.  No.  I'm not a hunter.  I wouldn't do it.  I
17 wouldn't be able to do it.  I wouldn't be successful at
18 it.
19           (Deposition Exhibit Number 37 referenced.)
20      Q.  (BY MR. GORDON) Following your termination from
21 TPUSA on December 11, 2023, you were sent a COBRA
22 notification letter from TPUSA's COBRA administrator
23 Workterra.  We're putting that up on the screen right
24 now.  It starts with document -- it's TPUSA 000010 --
25 sorry -- 170.  It's a 14-page document.



```
 1                This letter explains that you're health
 2    insurance was ending due to your termination, but you had
 3    the right to elect COBRA continuation coverage.
 4                Do you see that?
 5        A.  Yeah.  You showed me this document, I believe,
 6    during my first deposition.  That was the first time I
 7    saw it.
 8        Q.  The letter was sent to your home address in
 9    Mineral Wells, Texas.  Do you see on the top of the first
10    page?
11        A.  I --
12        Q.  Is that your address?
13        A.  That is, but I never received it.
14        Q.  Did you contact -- strike that.
15                You knew that your health insurance with
16    TPUSA would end upon your termination, right?  Like,
17    everybody knows that.
18        A.  Well, I was actually paid for three months,
19    which was until March, and then after my attorneys got
20    involved, I was paid until the end of May.  So that would
21    be technically when the COBRA should take into effect.
22        Q.  Did you contact anyone at TPUSA to ask them and
23    to confirm whether or not you continued to have health
24    insurance?
25        A.  I was trying to contact many people in TPUSA.
```



1  And I had sent email responses to HR, on a general note,

2  to discuss my termination, but I was not getting a

3  response.

4      Q.  Who did you contact at TPUSA to ask them about

5  your healthcare coverage?

6      A.  I didn't specifically ask about my healthcare

7  coverage, but on a general note, things that were

8  pending.  And Miranda and HR were in copy of those

9  emails.

10     Q.  But the emails did not reference healthcare

11  coverage.  Is that right?

12     A.  It was things that were still left open to have

13  a conversation about.

14     Q.  But nothing about health insurance?

15     A.  No.  I actually didn't realize that I wasn't

16  covered until May -- until after May.

17     Q.  Did you contact anyone at TPUSA to ask them why

18  you had not received a COBRA letter?  You knew what the

19  COBRA letters were, right?

20     A.  I was expected to -- I mean, people from HR were

21  supposed to reach out to me for other reasons as well,

22  but nobody reached out.  So if they weren't being

23  responsive for one thing, then why should I follow up on

24  another?  They weren't even being responsive to my

25  attorneys at the time.



1    Q.  But you never questioned anyone about why you

2  didn't receive a COBRA notification letter, right?

3    A.  I was in contact with them for everything that

4  was still pending, and that included -- did I

5  specifically write out COBRA?  No.  But there were a

6  number of things that were open, and they were not open

7  to any conversation.  No one replied to any of my emails.

8  No one reached out to me.  It was as if they just deleted

9  me from existence after that last call that I had with

10  Miranda the day I was terminated.

11    Q.  Why haven't you tried to purchase health

12  insurance since your termination from TPUSA?

13    A.  It doesn't cover any of my underlying

14  conditions, so none of my preexisting -- not underlying.

15  Sorry.  My preexisting conditions are not covered.

16    Q.  Have you tried obtaining Obamacare/Affordable

17  Care Act care?

18    A.  Right now, that -- that wouldn't cover me

19  anyway.

20    Q.  Have you tried obtaining Medicaid?

21    A.  Yes.  That requires -- I mean, I've gone

22  through -- I've gone through the Internet to see what it

23  is that would be applicable, but still I -- I am not

24  entitled.  I was -- from a social security perspective,

25  I -- I am no longer employed, so I don't have that.



1    Q.  Do you have any documents to support any of your
2    attempts to obtain health insurance since you left TPUSA?
3    A.  I have tried to acquire private insurance, and I
4    think that we've already submitted a couple of offers
5    that I've had for insurance.  But, again, no coverage in
6    terms of the preexisting conditions, which is the major
7    issue for me.
8    Q.  Is your husband covered under health insurance?
9    A.  He is.
10    Q.  How is he covered?
11    A.  He has an insurance plan from Greece that covers
12    him internationally, and he doesn't have any -- any other
13    health issues.  I'm the only one.
14    Q.  When did you first try -- well, strike that.
15         Is it your testimony that you applied for
16    Medicaid and were denied, or is it your testimony that
17    you researched Medicaid online and then you decided not
18    to apply for it?
19    A.  I have not applied because I have -- my
20    preexisting conditions would not be covered, and today I
21    don't have social security.  I'm not employed to have
22    social security benefits.
23    Q.  Have you met with any expert in the field of
24    health insurance coverage in order to look for ways in
25    which you could get health insurance?



1    A.  I've spoken to a couple of insurance -- yes.

2    Q.  Who have you spoken to?

3    A.  But, again, none -- none of my preexisting

4  conditions would be covered.

5    Q.  Who have you spoken to?

6    A.  I don't have their names at this point in time.

7  I researched online, and I've gotten -- I believe you

8  have the offer that I've had for health insurance.  I've

9  already produced that.  But, again, the point is that --

10  I mean, if you know any insurance companies that would

11  insure someone with my preexisting conditions, I would

12  love a reference.

13    Q.  Have you met with an attorney who specializes in

14  that area to ask what the strategies are for someone in

15  your situation to try to obtain health insurance?

16    A.  An attorney?

17    Q.  Yes.

18    A.  No.

19    Q.  The people that you've reached out to, those

20  were -- were -- what types of professionals were they?

21    A.  Insurance -- insurance agencies.

22    Q.  And what did they tell you?

23    A.  It would be very expensive to get coverage, and

24  preexisting conditions would not be covered.

25    Q.  Did they provide you any written opinion on



1  that, or was this just verbal?

2      A.  I have had one offer.  I believe I may have that

3  one.  I think that's the one that I submitted.

4  Everything else is just online searches and what's

5  covered and what's not.

6      Q.  What --

7      A.  No one covers preexisting conditions.

8      Q.  What do you mean when you say "submitted"?

9      A.  So if you go online and you search, they -- you

10 know, the insurance agencies pop up, and then you have

11 people spamming you and calling you and emailing you.

12          And I've -- I've had calls with insurance

13 agents, and as soon as preexisting conditions are heard,

14 then it's really hard to get approved for any of those.

15 I haven't had any that have approved my preexisting

16 conditions.  So anything cancer-related, anything related

17 to my brain, not covered.

18     Q.  Wouldn't you still want health insurance

19 coverage anyway even if they -- even if those two issues

20 were not covered?

21     A.  It's a lot of money, and it would still not

22 cover me for the most important elements.

23     Q.  How much is the health insurance that you've

24 been offered?

25     A.  I don't remember exactly, but like 20,000 a



1  year, but it wouldn't cover me for anything that I

2  already have, which is what I'm high risk for.

3      Q.  So you could get healthcare coverage.  You think

4  it would cost you 20,000 a year.  It just wouldn't cover

5  anything related to your preexisting conditions of cancer

6  and epilepsy.  Is that correct?

7      A.  Yes, that's correct.

8      Q.  And as of today, you've chosen not to get health

9  insurance because of -- because it will not cover

10  preexisting conditions.  Is that right?

11      A.  Well, it's a lot of money, and it won't cover me

12  for what's most important to me, which is what I'm high

13  risk for.

14      Q.  So you've opted to go uninsured?

15      A.  I haven't been able to -- to pay for that yet.

16      Q.  Do you have any records, any documents, any

17  emails that reflect the attempts that you've made to get

18  health insurance coverage since your separation from

19  TPUSA?

20      A.  I don't remember right now.

21      Q.  You're seeking to recover attorneys' fees and

22  costs in this case, right?

23      A.  Yes.

24      Q.  According to your interrogatory answers, you are

25  claiming $75,000 as of the date of your answers, which



1  was January 6, 2025.

2          Has the amount of attorneys' fees that you

3  are claiming changed since that date?

4      A.  Yes.

5      Q.  As of today, what is the amount of attorneys'

6  fees that you are claiming in this case?

7      A.  I'll defer to my attorney for that.

8      Q.  You don't know what the number is?

9      A.  I don't remember that by heart.

10     Q.  As of today --

11     A.  But it will be more after today, so . . .

12     Q.  As of today, have you paid any attorneys' fees

13 or costs to your lawyer?

14     A.  I have paid some, yes.

15     Q.  How much have you paid to date?

16     A.  I don't remember exactly, but the most recent

17 payment was -- I pay it off little by little.  So I've

18 paid a couple of thousand recently.  And I don't remember

19 the exact amount that I've paid so far, but I'm sure that

20 my attorneys can provide you with that information.  I've

21 lost track.  It continues to grow.

22     Q.  Is your arrangement with your -- with your

23 attorney based on an hourly basis or is it based on

24 contingency?

25     A.  It's on an hourly basis.



1    Q.  How can you afford to pay your attorneys their

2  hourly rates but not afford to purchase healthcare

3  insurance?

4    A.  Two separate things.

5    Q.  You testified during our prior deposition --

6  your prior deposition that you had zero dollars in your

7  checking account.

8        Where is the money coming from to pay your

9  attorneys?

10    A.  I sold the majority of my stock with

11  Teleperformance that I had -- vested stock from my

12  previous role with Teleperformance.

13    Q.  Right.  You told us about that also and said

14  that that's what you were living off of --

15    A.  Uh-huh.

16    Q.  -- since you left Teleperformance.  So that's

17  now a year and a half.  Do you still have money left in

18  that account?

19    A.  No.

20    Q.  How much money do you have left from the money

21  that you -- that you obtained from selling your

22  Teleperformance stock?

23    A.  Not much.  Maybe -- I think it's almost all gone

24  now.

25    Q.  Is that in a different account from your



```
 1  checking account?

 2       A.  No.

 3       Q.  So how much is in your checking account?

 4       A.  Right now, hmm, less than a thousand.

 5       Q.  And that includes all the money that you -- that

 6  you got from selling your Teleperformance stock?

 7       A.  Yeah, yes.

 8                 MR. GORDON:  Okay.  I do not have any more

 9  questions.

10                 MR. VANDERWOUDE:  Reserve.

11                 THE DEPONENT:  Thank you.

12                 THE REPORTER:  Any more questions, Counsel?

13                 MR. GORDON:  Not from defense.

14                 MR. VANDERWOUDE:  No.  We'll reserve.

15  That's it.

16                 THE REPORTER:  Okay.  Thank you.  Counsel,

17  let's verify our orders for the record before we

18  disconnect.

19                 Mr. Gordon, I show you'd like today's

20  transcript and exhibits delivered electronically via

21  E-Transcript, and you would like your copy of the video

22  synced.  Is that correct, sir?

23                 MR. GORDON:  Yes.

24                 THE REPORTER:  Thank you.

25                 And then for you, Mr. Vanderwoude, I show
```



1   that you'd like today's transcript delivered via

2   E-Transcript electronically, and exhibits, and you do not

3   need to purchase a copy of the video at this time.  Is

4   that correct, sir?

5                   MR. VANDERWOUDE:  Yes.

6                   THE REPORTER:  Thank you.

7                   If you would, please take us off the video

8   record, Ms. Tisa.

9                   THE VIDEOGRAPHER:  We are going off the

10  record at 3:49.

11                  (Proceedings concluded at 3:49 p.m.

12                  Central Time.)

13                  (Deponent will read and sign transcript.)

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    CHANGES AND SIGNATURE

2    DEPONENT NAME:  ATHINA T. KARAHOGITIS, VOLUME 2

3    DATE:  MAY 20, 2025

4        Please indicate changes on this sheet of paper,
     giving the change, page number, line number, and reason
5    for the change.  Please sign each page of changes.

6    PAGE  LINE              CHANGE          REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```



1    I, ATHINA T. KARAHOGITIS, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted on the previous
     page(s), and that I am signing this under penalty of
3    perjury.

4

5

6    _____
                    ATHINA T. KARAHOGITIS, VOLUME 2

7

8

9

10

____ No changes made.  ____ Amendment Sheet(s) attached.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
 2                    FORT WORTH DIVISION

 3    Athina Karahogitis,        )
                                 )
 4          Plaintiff,           )
                                 )
 5    VS.                        )
                                 ) CIVIL ACTION NO. 4:24-cv-00706
 6    TPUSA, Inc. d/b/a          )
      Teleperformance USA, DOES)
 7    1-20,                      )
                                 )
 8          Defendants.          )

 9        REPORTER'S CERTIFICATION/FILING CERTIFICATE
      ORAL AND VIDEOTAPED DEPOSITION OF ATHINA T. KARAHOGITIS
10                 TAKEN ON MAY 20, 2025
                        VOLUME 2
11

12        I, Tonie Thompson, Certified Shorthand Reporter in

      and for the State of Texas, Registered Professional
13

      Reporter, Certified Realtime Reporter, pursuant to the
14

      Federal Rules of Civil Procedure, hereby certify to the
15

      following:
16

17        That this deposition transcript is a true record of

      the testimony given by ATHINA T. KARAHOGITIS, the
18

      deponent named herein, on _____ after said
19

      deponent was duly sworn/affirmed by me.
20

21        That the deposition transcript was submitted on the

      _____ day of _____, 2025, to _____, for
22

      examination, signature and return to me by
23

      _____, 2025.
24

25        That the deposition transcript ____ was returned to

      Esquire Deposition Solutions on _____, 2025, was
```



1   properly executed by the deponent to the deposition

2   officer, and the attached change/correction sheet

3   contains any changes, and the reasons therefor, made by

4   the deponent.

5       That the deposition transcript ____ was not returned

6   to the deposition officer by the deponent.

7       That the original deposition transcript, or a copy

8   thereof, together with copies of all exhibits, was

9   delivered on the _____ day of _____, 2025, to

10  _____ for the safekeeping and use at trial.

11      That the amount of time used by each party at the

12  deposition is as follows:

13      MR. VANDERWOUDE.....00 HOURS:00 MINUTES
        MR. GORDON..........02 HOURS:52 MINUTES
14      MR. KRONE...........00 HOURS:00 MINUTES

15      That pursuant to information given to the deposition

16  officer at the time said testimony was taken, the

17  following includes counsel for all parties of record:

18          (Please see Appearances index, page 285.)

19      That a copy of this certification was served on all

20  parties shown herein.

21

22

23

24

25              (Continued on the next page.)



1    Certified to by me this 29th day of May, 2025.

2

3                         Tonie Thompson
                        Texas CSR Number 8348
4                        Expiration Date:  01/31/2027
                        NCRA Number 27999
5                        Expiration Date:  09/30/2026
                        Esquire Deposition Solutions
6                        Firm Registration Number 003
                        1235 North Loop West, Suite 510
7                        Houston, Texas 77008
                        Phone:  (713)524-4600
8                        www.esquiresolutions.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



App. 692

# EXHIBIT BB

UNCERTIFIED DRAFT TRANSCRIPT

1   Deposition of MIRANDA COLLARD

2   June 13, 2025

3   Case No. 4:24-cv-00706

4

5                THIS IS AN UNCERTIFIED DRAFT

6                TRANSCRIPT! PLEASE DO NOT QUOTE

7                FROM THIS DRAFT IN PLEADINGS OR

8                ELSEWHERE.  THE CERTIFIED

9                TRANSCRIPT IS THE ONLY OFFICIAL

10               RECORD WHICH MAY BE RELIED UPON

11               FOR VERBATIM CITATIONS OF

12               TESTIMONY.

13

14  This realtime transcription has not been proofread.
    It is the court reporter's uncorrected translation, **a**
15  **draft, not the certified transcript.**  It contains
    errors and/or mistranslations which may result in
16  nonsensical word combinations.  Page numbers and line
    numbers in this draft will not correspond to those in
17  the final, certified transcript.

18  This interactive realtime service is provided to you
    solely as a litigation aid and is in no way an
19  official transcript.

20  The court reporting Global Access agency and the
    court reporter, Rachel Crossett, are not responsible
21  for the misuse of this realtime draft transcript by
    anyone.

22

23

24

25

UNCERTIFIED DRAFT TRANSCRIPT

2

```
 1                     P R O C E E D I N G S

 2

 3            THE VIDEOGRAPHER:  Good morning.  We are

 4    on the record.  The date today is June 13, 2025, and

 5    the time is approximately 9:32 a.m.  My name is Chad

 6    Potts, a legal video technician with Global Access

 7    Litigation Services of San Clemente, California.  Our

 8    court reporter today is Rachel Crossett.

 9            This marks the beginning of Media No. 1 in

10    the video deposition of Miranda Collard in the matter

11    of Athina Karahogitis -- can you say it for me?

12            MS. KARAHOGITIS:  Karahogitis.

13            THE VIDEOGRAPHER:  Versus TPUSA, Inc., et

14    al., Case No. 4:24-cv-00706 now pending before the

15    United States District Court for the Northern

16    District of Texas Fort Worth Division.

17            This deposition is being taken on behalf

18    of the defendant.

19            MS. WIRTH:  Plaintiff.

20            THE VIDEOGRAPHER:  -- plaintiff.  Thank

21    you.

22            And would counsel all please present

23    themselves for the record, and then we'll swear in

24    the witness and begin the deposition.

25            MS. WIRTH:  Gabrielle Wirth, @ for the
```

```
 1    plaintiff Athina Karahogitis.

 2              MR. GORDON:  Eric Gordon for the defendant

 3    TPUSA, Inc.

 4              MR. KRONE:  Ryan Krone for defendant

 5    TPUSA, Inc.

 6

 7              MS. WIRTH:  Also present.

 8              MS. MILLER:  Leslie Miller for TPUSA, Inc.

 9              MR. MAY:  John May with TPUSA.

10              MS. KARAHOGITIS:  Athina Karahogitis.

11              THE VIDEOGRAPHER:  If we can swear in the

12    witness, we will begin the deposition.

13

14                   MIRANDA LEIGH COLLARD,

15    having been first duly sworn to testify to the truth,

16    the whole truth, and nothing but the truth, was

17    examined and testified as follows:

18

19                        EXAMINATION

20    BY MS. WIRTH:

21       Q.    Could you please state your full name for

22    the record and give us your home address.

23       A.    Sure.  It's Miranda Leigh Collard.  And my

24    home address is 58 East 4050 South in Bountiful, Utah

25    84010.
```

UNCERTIFIED DRAFT TRANSCRIPT

```
 1              questions was read back as

 2              follows:

 3              "QUESTION:  And when did you

 4              first learn that she was having

 5              ongoing medical problems related

 6              to her cancer?")

 7         MR. GORDON:  Same objection.

 8         THE WITNESS:  I wasn't aware outside of

 9  the breast reconstruction.

10         THE REPORTER:  I was not aware or I was

11  aware?

12         THE WITNESS:  I -- I wasn't aware of

13  ongoing cancer problems outside of her needing to

14  have -- fix me up.

15    Q.     BY MS. WIRTH:  A reconstruction?

16    A.     Yeah.

17    Q.     When did the reconstruction occur?

18    A.     I believe that was October of '22, maybe.

19    Q.     And when -- in October of '22, did anyone

20  talk to you about whether or not as an employee was

21  working for TPUSA even though someone else was paying

22  her she would be entitled to family leave as a remote

23  employee?

24    A.     No.

25    Q.     Have you ever investigated whether or not
```

UNCERTIFIED DRAFT TRANSCRIPT

1    it takes Mr. Mir and how long it took Athina?

2        A.    I have not.

3        Q.    Okay.  And where did you get Exhibit 7

4    from?

5              MR. GORDON:  Object to form.

6              THE WITNESS:  I don't -- I don't recall.

7        Q.    BY MS. WIRTH:  Why don't we have a

8    transmittal?

9        A.    I don't know what that is.

10       Q.    Athina hears what I'm talking about with

11   respect to the delays in the Italian project.  An

12   e-mail.

13             MR. GORDON:  She's already testified she

14   doesn't know where it came from.

15             THE WITNESS:  I don't know.

16       Q.    BY MS. WIRTH:  Where did it come from when

17   you included it in Exhibit 1?

18       A.    I don't know.

19       Q.    Okay.  When did you first learn that

20   Athina had epilepsy?

21       A.    I've never heard that.

22       Q.    You never heard that she, while at work in

23   2021, fell and ended up in the hospital with a

24   diagnosis of epilepsy?

25       A.    I did not.

UNCERTIFIED - DRAFT TRANSCRIPT                95

1    Q.    You never heard that her husband was

2  driving her because she lost her license for six

3  months?

4    A.    I did not.

5    Q.    You never heard that she could not be

6  exposed to computers for a significant period of

7  time?

8    A.    I did not.

9    Q.    What did you hear about her request for

10  business class travel?

11    A.    Nothing.

12    Q.    You didn't see any e-mails on the subject?

13    A.    I did not.

14    Q.    Are you at all familiar with epilepsy.

15    A.    I am not.

16    Q.    Are you aware it's a neurological disease?

17    A.    I guess.  I could assume, yes.

18        MR. GORDON:  Don't assume.

19        THE WITNESS:  No.  I don't know.

20    Q.    BY MS. WIRTH:  So you wouldn't have any

21  idea what accommodations might be appropriate for

22  someone with epilepsy?

23    A.    No, I would not.

24    Q.    Is it possible that Athina told you of her

25  treatment or her diagnosis and you've forgotten?

```
 1        A.    I don't believe so.

 2        Q.    And no one outside of HR knew that you

 3   were contemplating Athina before she was actually

 4   terminated?

 5              Sorry, I think I said that wrong.

 6              No one outside of HR knew that you were

 7   contemplating terminating Athina before you actually

 8   terminated her?

 9        A.    Correct.  And legal.  Sorry.  Legal, yes.

10        Q.    On 11-13 you were communicating with Mr.

11   Cardoso about Athina in the anticipation of

12   litigation.

13              What caused you to believe there was going

14   to be litigation?

15              MR. GORDON:  What year are you talking

16   about?  What year are you referring to?

17              MS. WIRTH:  11-13, 2023.

18              MR. GORDON:  Are you referring to a

19   document that you want her to review?

20              MS. WIRTH:  Not yet.

21              MR. GORDON:  You want the question

22   repeated.

23              THE WITNESS:  Yes, please.

24        Q.    BY MS. WIRTH:  On 11-13 you were talking

25   to Mr. Cardoso, or communicating with Mr. Cardoso,
```

UNCERTIFIED DRAFT TRANSCRIPT                    27

```
 1    about Athina in anticipation of litigation.  I don't

 2    want anything that may have been said by lawyers, I

 3    just want to know why you were talking to Mr.

 4    Cardoso?

 5         A.    I don't recall.

 6         Q.    What litigation did you anticipate before

 7    she was terminated?

 8         A.    I don't recall.

 9         Q.    Do you consult with counsel before every

10    termination?

11         A.    No.

12              MR. GORDON:  Tell us when you're at a good

13    time to take a break.  It's almost been an hour.

14              MS. WIRTH:  What do you guys need for

15    lunch?  There's a lot around here.

16              MR. GORDON:  An hour.

17              THE VIDEOGRAPHER:  Going off the record.

18    The time is 12:29 p.m.

19                   (Whereupon, a lunch recess was

20                    taken.)

21              THE VIDEOGRAPHER:  Going back on the

22    record.  The time is approximately 1:39 p.m.

23         Q.    BY MS. WIRTH:  You remember you're still

24    under oath?

25         A.    Yes.
```

UNCERTIFIED DRAFT TRANSCRIPT

1    Q.    Okay.  You just read the exhibit.

2          Do you want to go back and look at it?

3    A.    No, I see it.

4    Q.    Okay.  So he was informed in writing she

5    was not going to be available.

6    A.    Okay.

7    Q.    And then she made the point of saying, I

8    want to make sure you got my tentative response when

9    she rejected the invitation and that she'd try and

10   join the call late on that day.

11         What else could she have done?

12   A.    I don't know what else she could have

13   done.  That would be up to Joao.

14   Q.    Did you ever ask him?

15   A.    Yeah, we had a conversation in -- we had

16   the meeting in the DR in I want to say April of 23

17   where Joao and I met briefly after the TP EMEA review

18   where Athina had presented, and very much struggled

19   to do so.  I use the word froze a bit, which was a

20   very key meeting for our group and her job

21   responsibilities.  And she was rightfully upset about

22   that.  And Joao and I had a conversation about some

23   of the, what do we do from here.  He had been

24   struggling with some of the meetings in getting the

25   right level of information out.  And we discussed

UNCERTIFIED DRAFT TRANSCRIPT

1    what had taken place.

2       Q.    What exactly was the conversation, then?

3       A.    We were genuinely worried that what had

4    just transpired in that presentation was of concern,

5    first and foremost for Athina of course.  And then

6    how we could coach and remediate those things going

7    forward and what we needed to do.  And I simply said

8    to Joao, We just need to let the emotions come

9    through, be there for her, like, let's just get

10   through this week of meetings and then we'll come

11   back around to how we progress from from here.

12      Q.    And you don't recall at all that Athina

13   told you that he had asked her to come back to EMEA?

14      A.    No.

15      Q.    You don't recall text messages where she

16   informed you that she was team Miranda and was not

17   considering going back to him?

18            MR. GORDON:  Object to form, compound

19   question.

20            You can answer.

21            MS. WIRTH:  That's a proper objection.

22   I'll give you that one.

23            THE WITNESS:  I don't recall it, no.  But,

24   no, I recall her saying things like team Miranda,

25   and, you know, those types of things for sure.

    1    it, did you believe everything in it was true?

    2        A.    Yes.

    3        Q.    So the first sentence says, This is

    4    Teleperformance Group, Inc.'s official notice to you

    5    under your employment and non-competition agreement,

    6    dated January 1, 2023, that TGI is waiving and will

    7    not be enforcing the non-compete -- non-competition

    8    and non-solicitation provisions under Sections 5-B, 1

    9    and 2, period.

   10            What authority did you have to sign on

   11    behalf of Teleperformance Group, Inc.?

   12        A.    The Teleperformance Group, Inc., is likely

   13    a mistake in the document.

   14        Q.    A mistake?

   15        A.    Yes.

   16        Q.    You're terminating one of your employees

   17    and you just made a mistake?

   18            MR. GORDON:  Object to form.  She didn't

   19    draft the letter.

   20            THE WITNESS:  I did not draft it.

   21            THE REPORTER:  What did you say?

   22            THE WITNESS:  I did not draft it.

   23        Q.    BY MS. WIRTH:  You don't read carefully

   24    the documents you sign when you're terminating

   25    people?

```
 1              MR. GORDON:  Object to form.
 2              THE WITNESS:  I do my best.
 3      Q.    BY MS. WIRTH:  Second paragraph says, You
 4   were notified on September 2, 2023, of the
 5   elimination of your role with TGI.
 6              Again, another mistake?
 7      A.    Correct.
 8      Q.    And it says, Pursuant to your six-month
 9   notification requirement.  That was a written
10   requirement that she be given six months written
11   notice, correct?
12      A.    (Inaudible.)
13              THE REPORTER:  Did you say I guess or yes?
14              THE WITNESS:  I'm sorry.  It was in -- I
15   don't believe so.  No.
16      Q.    BY MS. WIRTH:  Did you check before you
17   signed the letter on behalf of TGI?
18      A.    I did work out the specifics with legal,
19   yes.
20      Q.    So I'll represent to you that it's a
21   written notice, and we'll get it to you in a minute.
22              But where was the written notice that her
23   position had been eliminated?
24      A.    Yeah, I don't recall.
25      Q.    And when you say her position was
```

UNCERTIFIED - DRAFT TRANSCRIPT

1    through --

2        A.    I'd have to validate that, but yeah.

3        Q.    There should be financial reports through

4    the end of the year?

5        A.    Yes.

6        Q.    And what did you do with Athina's clients

7    once you terminated her on November 29th?

8        A.    There's a multitude of ways they went.

9    Some went back into the regions to be managed in the

10   region.  And a handful went into the verticals.

11       Q.    Is there a chart or a list that describes

12   who's getting what where?

13       A.    There's one somewhere, yes.

14       Q.    Do you have that in your e-mails?

15       A.    Likely.  Maybe.  I'd have to look.

16       Q.    Gustavo Mir's job didn't change when he

17   went into the new role, correct?

18       A.    Sorry, what new role?

19       Q.    Well, you stated that he applied for a

20   different position.

21       A.    He did.

22       Q.    And 95 percent of that position was just

23   doing the same job he did, correct?

24       A.    Absolutely not.

25       Q.    What additional roles did he have?

UNCERTIFIED DRAFT TRANSCRIPT

1    A.    He became a CEO of TP Mexico.  So he was

2    running the TP Mexico operation and the local team.

3    Q.    What does the CEO of Mexico do that's

4    different than he did in his role as the global

5    client officer?

6    A.    They run 100 percent accountability to the

7    delivery and the financial results of that country or

8    region all the way to the EBITDA level, and all the

9    people, and all the hiring of the frontline, and all

10   those things.

11   Q.    Does he report to you anymore?

12   A.    No.

13   Q.    Who handles the clients that were formally

14   assigned to him?

15   A.    Same methodology I shared on Athina's. @

16   Q.    So there's a chart as to what happened to

17   his clients also --

18   A.    Some went to local, some went to vertical.

19   Q.    Have you compared how TPUSA is doing with

20   respect to maintaining her client relationships?

21   A.    I have not.  TPUSA doesn't own all of her

22   client relationships anymore. @

23   Q.    So who authorized you to terminate her

24   from her role with EMEA?

25   A.    I didn't need authorization.

UNCERTIFIED DRAFT TRANSCRIPT

1          MR. GORDON:  Can you send it to my e-mail

2    address?

3          THE COURT REPORTER:  Yes.

4          THE VIDEOGRAPHER:  We are now going off

5    the record for the video deposition of Part One of

6    Miranda Collard.  We are now going off the record at

7    6:37 p.m.

8          (End of Proceedings.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT CC

App. 709

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Athina Karahogitis,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO. 4:24-cv-00706** |
| **TPUSA, Inc. d/b/a Teleperformance USA,** | § | |
| **DOES 1-20,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**AFFIDAVIT OF MIRANDA COLLARD IN SUPPORT OF**
**DEFENDANT TPUSA, INC.'S MOTION FOR SUMMARY JUDGMENT**

STATE OF _____    )
                           )
COUNTY OF _____    )

BEFORE ME, the undersigned authority, on this day personally appeared Miranda Collard, who after being first duly sworn deposes and says:

1.       I am over the age of eighteen and am fully competent to testify as to the matters set forth in this Affidavit, which are true and correct based upon my own personal knowledge or information obtained from the corporate records of Defendant, TPUSA, Inc. ("TPUSA").

2.       This Affidavit is filed in support of TPUSA's Motion for Summary Judgment.

3.       I am employed by TPUSA in Salt Lake City, Utah, and am providing this Affidavit in my capacity as its Global Chief Client Officer.  I currently serve as the Chair of TP Women, a Teleperformance global initiative which seeks to address the challenges faced by women in the workplace.

4.       Plaintiff, Athina Karahogitis ("Plaintiff"), was employed by TPUSA as a Global Deputy Chief Client Officer ("GDCCO"). In this role, Plaintiff reported directly to me. I made the

1

decisions to hire Plaintiff, eliminate Plaintiff's position of GDCCO, and to terminate Plaintiff's employment with TPUSA.

5.      The GDCCO position was created by Teleperformance to support its Vertical Chief Client Officers ("VCCOs") in certain regional areas. The VCCOs in 2023 were Mamta Rodrigues, Dan Kramer, Linda Comp-Noto, Will Fritcher, and Rahul Jolly.

6.      Plaintiff had issues reaching her commitment numbers, materially misrepresented to executive leadership her attainment of goals, and she was generally below expectations regarding communication and attendance.

7.      In late April 2023, I met with Plaintiff to discuss her performance issues and ways her performance could improve moving forward. Following the meeting, I emailed Plaintiff a summary of what we discussed. However, despite this meeting, and my clear communication to Plaintiff that her performance needed to improve, it did not.

8.      I made the decision to eliminate the GDCCO role.

9.      Prior to the decision to eliminate the GDCCO role, Mr. Mir applied for and obtained a new role as CEO of TP Mexico.  Mr. Mir's application and promotion was entirely independent of and prior to the decision to eliminate the GDCCO position. The clients for which he was responsible as GDCCO were dispersed amongst the verticals.

10.     On September 22, 2023, I had a meeting with Plaintiff to explain that her position was being eliminated, the clients for which she was responsible would be moved to the verticals, and she would need to think about which vertical to join. I was unable to find any vertical leader who would work with Plaintiff given Plaintiff's performance and reliability issues.

11.     Mr. Mir was the only other GDCCO during Plaintiff's employment. Mr. Mir did not have the significant performance issues that Plaintiff had.

81793051;1                                                                    **App. 711**

12.    Mr. Mir did not receive a bonus for 2023 for his role as a GDCCO because he was only in the position for approximately half of 2023.

13.    Will Fritcher ("Mr. Fritcher"), was paid more than Plaintiff because of his experience and production levels.

**Signature on the following page.**

FURTHER AFFIANT SAYETH NOT.

_____

3

**App. 712**

Miranda Collard

STATE OF _____          )
                                   ) ss:
COUNTY OF _____          )

   This Affidavit was SUBSCRIBED AND SWORN to before me, the undersigned authority, this _____ day of June 2025, by Miranda Collard, who is personally known to me or who has produced _____ as identification, and who verified, under oath subject to penalty of perjury, that the content of the Affidavit is true and correct and based on personal knowledge and/or review of corporate records.


       _____

       Notary Public, State of _____, Signature

       SEAL/STAMP:

# EXHIBIT DD

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Athina Karahogitis,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO. 4:24-cv-00706** |
| **TPUSA, Inc. d/b/a Teleperformance USA,** | § | |
| **DOES 1-20,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**AFFIDAVIT OF MICHELLE SEDLACEK IN SUPPORT OF**
**DEFENDANT TPUSA, INC.'S MOTION FOR SUMMARY JUDGMENT**

STATE OF   California                  )
                                              ) ss.
COUNTY OF   Santa Clara            )

BEFORE ME, the undersigned authority, on this day personally appeared Michelle Sedlacek, who after being first duly sworn deposes and says:

1.      I am over the age of eighteen and am fully competent to testify as to the matters set forth in this Affidavit, which are true and correct based upon my own personal knowledge or information obtained from the corporate records of Defendant, TPUSA, Inc. ("TPUSA").

2.      This Affidavit is filed in support of TPUSA's Motion for Summary Judgment.

3.      I am employed by TPUSA in San Jose, California, and am providing this Affidavit in my capacity as its Human Resources Business Partner.

4.      In my capacity as Human Resources Business Partner, I have access to all relevant employment records and policies for TPUSA.  For information regarding Gustavo Mir, I needed to contact TP Mexico.  For information regarding Rahul Jolly, I needed to contact TP Philippines.

5.     Exhibits A – F, H – P and R – Y of the Appendix to Defendant TPUSA's Brief in Support of its Motion for Summary Judgment are part of TPUSA's business records, are maintained in the ordinary course of business, and were copied from TPUSA's files.

6.     Teleperformance SE is a multinational company, founded in France in 1978, that provides telemarketing, customer relationship management, debt collection, and communication services.  Teleperformance SE maintains its corporate headquarters and principal place of business in Paris, France.   The Teleperformance family is comprised of multiple distinct entities and subsidiaries located in various countries around the world.

7.     Teleperformance USA (commonly known as TPUSA, Inc.), incorporated in 1993 and maintaining its headquarters and principal place of business in Salt Lake City, Utah, is one of the subsidiary entities within the Teleperformance family and provides solutions specific to its clients' needs as it relates to customer interactions or business processing needs.  TPUSA is a subsidiary of Teleperformance SE.

8.     Ypiresia 800 – Teleperformance A.E. ("TP Greece") is a separate subsidiary of Teleperformance SE and is corporately based and does business in Greece.

9.     TPUSA maintains operations, facilities, employees and corporate officers in the United States.  TPUSA does not have any operations, facilities, employees or corporate officers in Greece.  TPUSA does not train TP Greece's employees for the work TP Greece performs.  TPUSA does not have any involvement in the hiring or termination of TP Greece employees.  TPUSA does not have any oversight over commissions paid in TP Greece, the financials of TP Greece, or TP Greece's policies and procedures.

10.    Will Fritcher's date of birth is March 28, 1975.

11.    Mamta Rodrigues' date of birth is August 16, 1973.

81896091;1                                                                                                    **App. 716**

12.     Dan Kramer's date of birth is February 23, 1966.

13.     Rahul Jolly's date of birth is October 22, 1979.

14.     Gustavo Mir's date of birth is April 13, 1978.

15.     Plaintiff's date of birth is May 12, 1973.

16.     Miranda Collard's date of birth is December 9, 1974.

17.     TPUSA has specific policies that outline how an employee can request an accommodation.  TPUSA has no records that Plaintiff ever submitted an accommodation request to the Company, either through SharePoint, or through any other channel.



22.     Plaintiff was fully compensated for all relocation benefits that TPUSA promised to her.

**Signature on the following page.**

FURTHER AFFIANT SAYETH NOT.

_Michelle Sedlacek_
Michelle Sedlacek

STATE OF ___Texas___ )
                            ) ss:
COUNTY OF ___Fort Bend___ )

     This Affidavit was SUBSCRIBED AND SWORN to before me, the undersigned authority, this __18th__ day of June 2025, by __Michelle Sedlacek__, who is personally known to me or who has produced ___Driver's License___ as identification, and who verified, under oath subject to penalty of perjury, that the content of the Affidavit is true and correct and based on personal knowledge and/or review of corporate records.

Notarization performed by means of two-way audio-video communication.
Each signature applied during the session is an electronic signature

Notary Public, State of ___Texas___, Signature

SEAL/STAMP:

ANGELIQUE ROBINSON
NOTARY PUBLIC
STATE OF TEXAS
ID # 13278689
EXPIRES 11-18-2028

This notarial act was an online notarization via
**OnlineNotary.us**

81896091;1

**App. 718**

# EXHIBIT EE

**From**:    Athina Karahogitis [akarahogiti@teleperformance.com]
**Sent**:    7/27/2023 6:27:24 AM
**To**:    Athina Karahogiti [akarahogiti@gmail.com]
**Subject**:    Fwd: Guidance Needed: Athina Relocation

**Regards,**

**Athina Karahogitis**
**Global Deputy Chief Client Officer |Teleperformance Group**
M USA +14254493115 | M EMEA +306942474529
Dallas, Texas USA | Athens, Greece EMEA akarahogiti@teleperformance.com

teleperformance.com | linkedin.com/company/teleperformance

---

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, July 27, 2023 9:12:28 AM
**To:** Anwar Aguilar Araujo <Anwar.AguilarAraujo@teleperformance.com>
**Subject:** Re: Guidance Needed: Athina Relocation

Hi Anwar and thank you very much for your support.

 I already have an Egencia account , do I need to create another one?  And  also, can I use Egencia to book for my son and husband as well? How can I perform this action in Egencia?

 it sure if you are aware but  based on the recent policy I am entitled to business class for a flight over 4 hours, and  had agreed to business call tickets for my husband and  son - If need be I will  cover the cost of upgrading my husband and son to business class. How can I do this?

Thanks again for all of your support.

Sincerely,

Athina

**Regards,**

**Athina Karahogitis**
**Global Deputy Chief Client Officer |Teleperformance Group**
M USA +14254493115 | M EMEA +306942474529
Dallas, Texas USA | Athens, Greece EMEA akarahogiti@teleperformance.com

**App. 720**

CONFIDENTIAL INFORMATION

teleperformance.com | linkedin.com/company/teleperformance

---

**From:** Anwar Aguilar Araujo <Anwar.AguilarAraujo@teleperformance.com>
**Sent:** Thursday, July 27, 2023 05:26
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** FW: Guidance Needed: Athina Relocation

Hello Athina,

To create your travel profile, kindly fill out the attached form and provide the following information for your spouse and son as well:

1.      Full name as it appears in identification.
2.      Date of birth
3.      Frequent flyer number
4.      Passport number
5.      Passport issuing country/region
6.      Passport expiration date

Please let me know if you have any questions.

Best regards,

**Anwar Aguilar Araujo**
**Director, Compensation** | Teleperformance USA | T. 956-467-4914

 

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems. Please consider the environmental impact of needlessly printing this e-mail.

---

**From:** Anwar Aguilar Araujo
**Sent:** Tuesday, July 25, 2023 10:29 AM
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Cc:** John Carleton Del Moral <John.Carleton@teleperformance.com>; Sarah Miller <Sarah.Miller@teleperformance.com>
**Subject:** RE: Guidance Needed: Athina Relocation

Hello Athina,

I have received authorization for your relocation trip; here are the details:

- Economy-class tickets to be booked by the US Travel Desk. I will work with you so they can set up your profile.

**App. 721**

- You will receive a relocation bonus for the net amount of $15,000 USD, which will be paid on the next pay cycle after your arrival in the US. Based on your current plans, this should be on October 7.

Please let me know if you have any questions.

Best regards,


**Anwar Aguilar Araujo**
**Director, Compensation** | Teleperformance USA | T. 956-467-4914

 

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems. Please consider the environmental impact of needlessly printing this e-mail.

---

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, July 20, 2023 12:35 PM
**To:** Faith Pierce <Faith.Pierce@teleperformance.com>; Amber Preis <Amber.Preis@teleperformance.com>; Anwar Aguilar Araujo <Anwar.AguilarAraujo@teleperformance.com>
**Cc:** Daniel Fernando Trovato Reyes <Daniel.Trovato@teleperformance.com>; Shay Kushman <Shay.Kushman@teleperformance.com>; Curt Gray <Curt.Gray@teleperformance.com>
**Subject:** Re: Guidance Needed: Athina Relocation

Thank you Faith and Amwar for your time  today and fir your support.

Sincerely,

Athina



**Regards,**

**Athina Karahogitis**
**Global Deputy Chief Client Officer |Teleperformance Group**
M USA +14254493115 | M EMEA +306942474529
Dallas, Texas USA | Athens, Greece EMEA akarahogiti@teleperformance.com

teleperformance.com | linkedin.com/company/teleperformance

---

**From:** Faith Pierce <Faith.Pierce@teleperformance.com>
**Sent:** Thursday, July 20, 2023 7:58:34 PM
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>; Amber Preis <Amber.Preis@teleperformance.com>; Anwar

CONFIDENTIAL INFORMATION                                                                              TPUSA0000631