IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| Athina Karahogitis | § | |
| | § | |
| v. | § | Case No. 4:24-cv-00706 |
| | § | |
| TPUSA, Inc. d/b/a Teleperformance USA | § | |
| and Does 1-20 | § | |

## <u>DECLARATION OF ATHINA KARAHOGITIS</u>

Pursuant to 28 U.S.C. § 1746, I, Athina Karahogitis, hereby declare as follows:

1.      My name is Athina Karahogitis.  I am over 18 years of age, have never been convicted of a felony or a crime of moral turpitude, and am fully competent to make this declaration.  This declaration supplements my previous depositions and errata thereto.

2.      I am a female over 50 years of age with disabilities, including cancer history and epilepsy.  From 2013 until the end of 2022, I served as a full-time consultant for Ypiresia 800 – Teleperformance A.E. ("*TP Greece*"), a Greek corporation and subsidiary of the group of companies owned by Teleperformance SE (collectively, the "*Teleperformance Group*").  Teleperformance then held itself out as an integrated, global digital business service company that services over 170 countries worldwide. Teleperformance held me out as an Executive Vice President and employee during this time and I received benefits as if I were a Teleperformance employee.  There were multiple contracts with clients that required disclosures if Teleperformance was contracting out and I was never disclosed as someone who was not an employee.

3.     I held regional roles and managed global clients such as Phillip Morris International and Dropbox until May 2022, when I was promoted to a global role within the Teleperformance Group.  TP Greece was merely a payment vehicle and I did not report to anyone in Greece.  My promotion to the position of Global Deputy Chief Client Officer of the Teleperformance Group in May 2022 had nothing to do with TPGreece.  In connection with my promotions, the Teleperformance Group requested that I relocate to the United States and become an employee rather than a consultant.  Although I was promoted in May 2022, and that promotion was announced in June 2022, it took a while to finalize my new contract.  I was promoted again and was given a second role in November 2022 to the position of Chief Client Officer for Europe, the Middle East, and Africa ("*EMEA*").  After settling a number of lawsuits filed by women in November 2022, some of which included discrimination claims, Teleperformance had fired the female Chief Client Officer for EMEA and that is the position I took.

4.     I discussed what I was due in commissions internally at TP as there would be tax consequences from moving and I wanted to ensure I would continue to receive commissions on any contracts I had already obtained which were entered into Teleperformance's system on the Commission Approval Worksheet, a copy of which is attached as Exhibit 1.  Matthew Cuthill had summarized that I would be owed payments on contracts in the system for two years for normal commissions and four years for business development.

2

5.      On November 23, 2022, Teleperformance's finance research out to confirm my understanding of the agreement "In respect of your position change in Teleperformance (effective June 1st, 2022) I wanted to check with you what is your understanding when it comes to duration of SIP payments on Opportunities won when you were acting as Regional SAM?  We want to be clear when it comes to future payments, so your input here will be significant."  I confirmed that "Everything I worked on while under my SAM role will be paid out, this was agreed with Miranda and Dinos as well. Unfortunately many of my CAW's are still stuck in Docusign though as they are pending signatures."   On December 2, 2022, Matthew Cuthill indicated he needed Miranda Collard's written approval to confirm the payment of commissions on contracts sold prior to June 2022 and entered in the CAW and on Friday December 2, Miranda replied "Approved."  This was what Matthew Cuthill had confirmed on November 23, 2022 that I would be paid on all deals sold through June 1, 2022: "So the payments would stop once the 2 years for the normal SAM commission or 4 years for the BD commission had run its court.  So potentially until 2026:)  We should not expect any new revenue deals starting after June 1st though?" Attached as Exhibit 2, is a true and correct copy of the emails I sent and received described above.

6.      In December 2022, TP Greece stopped paying me and I did not receive any pay until I signed an Employment and Non-Competition Agreement with Teleperformance Group, Inc., a Delaware corporation, signed on February 23, 2023 but

3

backdated as of January 1, 2023.  Attached as Exhibit 3 is a true and correct copy of the email I received from Leigh Ryan of Teleperformance confirming when the contract was presented to me.  As her email indicates: only "once the two agreements are signed, Miranda will arrange for payment of your 2022 bonus and check will get you set up on the TGI payroll."

7.      TP Group and TP Greece refused to pay me my agreed salary, my past due commissions or reimburse my travel expenses until I executed the then current version of both agreements.  Miranda Collard urged me to sign repeatedly telling me orally and in emails that the details I was asking about like relocation expenses, insurance and commission payments were often not in employment agreements and assured me she would make sure I received everything since I was being paid through TP.

8.      As Miranda had repeatedly assured me orally and in writing that she would make sure I received what I had been promised and we could iron out the details later, I signed the agreements.  As I told Miranda Collard, I had been unpaid for two months and was having to front my own expense for a great deal of business travel and could not afford to continue to be unpaid.

9.      In March 2023, I received a replacement contract substituting TPUSA for Teleperformance Group, Inc.  In or about July 2023, I entered into an Amended and Restated Employment and Non-Competition Agreement (the "***Employment Agreement***") with the defendant, TPUSA, Inc. ("***Defendant***").   A true and correct copy of that

Employment Agreement is attached hereto and incorporated herein as Exhibit 4.

10.     I submitted my documentation substantiating my earned commissions and the fees earned by Excaliber via Commission Approval Worksheet, well before the July 31, 2023, deadline, and then generated a courtesy invoice reflecting the amounts owed, something not required by Teleperformance but had been customarily done to reflect what had been submitted in Teleperformance's internal system.  Miranda Collard confirmed in an email that if I had submitted the CAW's, I had complied with the contract.  Attached as Exhibit 5 is the page from Exhibit 2 and a true and correct copy of her email to me which I received confirming that the CAW's were the correct documentation.

11.     When I was promoted to the position of Global Deputy Chief Client Officer, the Teleperformance Group required me to relocate to the United States.  At all times relevant to the Complaint, I lived and worked in Mineral Wells, Texas unless I was traveling for business or to facilitate business needs under my role as EMEA Chief Client Officer.

12.     Further, the only annual performance review for 2022 I received was the "360-Degree" review which was comprised of input from over two dozen participants, Miranda told me it was excellent, save and except for the review from the person she was in the process of replacing, Ms. Woelki.

13.     As an example of the disrespect of women was the manner in which women

5

were terminated as compared to men.  Departures and reorganizations were publicly announced and men such as Norbert Szymkowiak and Yannis Toucomanis were given long notice and allowed to vest in their stock.  Norbert was fired in late summer of 2023, was on payroll until end of 2024 and allowed to continue to vest in his shares for two years.  It was publicly announced in required filings that Bhupender Singh was three years vested in his shares after only one year.  Women were fired with a short or no notice, often, in a manner which seemed calculated to humiliate them and preclude them from departing professionally and with dignity.  Another example, I found out that Marieke Smidt was going to be replaced by a man on the 100 < 45 list (Augusto Martinez Reyes) in a webinar before she had been told. See TPUSA 0001104 attached as Exhibit 6.

Age Comments

14.    Since at least 2018, there has been an open stated effort to attempt to have a younger executive and management team by Daniel Julian and Miranda Collard.  The following are specific examples of public statements.  In a Global Webinar with Daniel Julian, CEO of Teleperformance Group, Inc. and Miranda Collard, Daniel stated that the reason he preferred to work with Miranda's group was that everyone was young, "most in their forties, maybe some in their 50s" and "almost no-one in their 60s."  It was a common discussion that David Minkus had been terminated because Miranda did not need the "grey hairs" anymore.  Alan Winters, Global HR, told us in meetings that he had been directed to reduce healthcare costs which many construed as meaning older

6

workers.

15.    In multiple calls I was on from 2018-2023, Julien emphasized working with first younger managers and then the "Top 100 employees under 45" and giving them training and preference in promotions.  Participants on the call objected to this on the call and after the calls and nothing was done.  Members of the 100 employees under 45 often listed their inclusion in this group on LinkedIn.  This "Top 100 employees under 45" was not a one-off attempt but persisted as a deliberate attempt to promote younger managers over older managers over at least 4 years.

<u>Epilepsy</u>

16.    I was first diagnosed with epilepsy in 2021 when I suffered a seizure during work after working long hours.  I told Miranda and HR as I was still not driving and, even today, cannot drive at night.   We spoke about my need for business class travel if meetings were scheduled such that I could sleep for eight hours, which was almost every trip. I told her that I had to avoid too much continuous screen time or light as well as stress.  My husband still drives me on occasion when we are concerned about my schedule violating my doctor's recommendations.  I was required to be on call at all hours, take calls across time zones, and travel more than 50% of the time. I lived out of a suitcase. Epilepsy changed my life. what was demanded of me directly endangered my health. For someone with a known diagnosis like epilepsy, the company should have tried to accommodate, not ignore or deny reasonable support. Instead, the expectations

only got higher. My recovery time after long hauls was longer, screen exposure/stimulation and lack of sleep impact a neurological diagnosis like mine. It often leads to lack of concentration, focus and was life changing for me. It still is.

17.    In May 2022, during a business visit to Bogotá, Colombia, as part of our company's operations in the LATAM region, I was with Alvaro Rivera and we were preparing for a visit with eBay. We went to the meeting and I made a successful presentation, even though I had been travelling for several days before that visit.

18.    After completing the client's visit, while at the hotel booked for my stay, I had an epileptic seizure and Alvaro Rivera personally helped obtain medical assistance. I had to crawl to the door to let Alvaro and the doctor he had summoned in.

19.    The doctor confirmed to me and Alvaro that I had likely suffered an epileptic seizure.

20.    Alvaro told me he promptly reported the incident and the fact that it was likely an epileptic seizure to Teleperformance's Human Resources department. The event was logged as an official health incident in the Teleperformance HR system, as per company protocol for health and safety matters during business travel. My understanding is that this is a Teleperformance system in use by all of the Teleperformance subsidiary and related companies.

21.    I wrote a thank you to Alvaro, his COO Luis Iglesias and his CEO Andres Bernal for being supportive of me during my time of need. I copied my then new

supervisor, Miranda Collard, so she would be aware of the Columbia teams support for me.   Even after this incident, Miranda Collard required me to get advance approval for any business class travel for trips outside the guidelines even though exceptions were automatic for tall or heavy employees – criteria which at that time only applied to the men.

22.    At the time my costs, including my healthcare costs, were being rebilled to TPUSA.   Comments were made by HR about how expensive preexisting conditions would be and Teleperformance did not timely offer me medical coverage.   When it was finally offered in early November 2023, I fully disclosed the extent of my treatments in my application and I was terminated within weeks.

<u>My Replacement</u>

23.    As to my role in EMEA as Chief Client Officer, I was replaced by a male, Alvaro Buesa.   I do not know who replaced me in my TPUSA role as the list of who assumed my clients has not been provided in discovery and Miranda Collard testified in her deposition that she had the list but could not recall the contents.

<u>Aggressive Treatment of Women</u>

24.    Many Zoom meetings which I was required to attend with Joao Cardoso and Augusto Martinez were offensive.   The tone and attitude towards women including me was disrespectful.   Both would interrupt and talk over women, the tone was aggressive and disrespectful.   When a woman would describe a solution, even if was

4865-0320-3045\

based on objective third party data like an industry standard, they would interrupt and express disbelief that the fact could be true. In almost every meeting, inappropriate comments made were directed at the women. As examples, they would say "women stop talking" or "You are having technical difficulties, I am going to mute you" when there were clearly no technical issues. They just wanted to interrupt. They rarely let women, including me, finish a paragraph without interruption. On occasion, they would pretend they would not hear females (that everyone else could hear) and mute them. This also happened on calls where I was the only woman present. In an EMEA meeting in the Dominican Republic in 2023, one of these attacks did completely interfere with my presentation. I was about to present when Augusto Martinez came up and aggressively claimed credit for a client solution I had developed. I was already a little distracted when the meeting began and Joao started interrupting and peppering me with questions. During this time, I and my team always held our composure and stayed professional. I told Miranda of the men's conduct, she told me I needed to put up with it as part of my job. There should be recordings of many, if not most, of these Zoom meetings.

25.    I was told to "do less for women" by Joao Cardoso.

26.    This sexist conduct was not limited to the meetings with Mr. Cardoso. On client calls, clients complained about men who were disrespectful and sarcastic. For example, Norbert Van Liemt used a very disrespectful tone and cut off me and other members of my team on a call with Zalando. The client expressed surprise and

10

disapproval that women would be spoken to in that manner. I reported the incident to Miranda Collard but nothing was done.

27. In my tenure, I never saw an email chastising a man because he cancelled an internal call to be at a client meeting or site visit. Yet one of the documents TPUSA uses as evidence as to why I was terminated is my cancellation of an internal meeting due to a client visit in New York. Attached hereto as Exhibit 7 is a true and correct copy of the email. Moreover, I always tried to make sure I or my assistant reminded Joao I would not be there and why. The men often just did not show up and I never saw an email where a man was similarly criticized.

I declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on July 9, 2025.

Athina Karahogitis

# EXHIBIT 1

## COMMISSION APPROVAL WORKSHEET (CAW)

Account : ................................................................................................

Country where work is performed : ................................................................................

Program Name : ................................................................................

SF opportunity  ID : ................................................................................

MDM LOB ID : ................................................................................

| | | | | |
|---|---|---|---|---|
| Is there a commission split? | No | | Has the contract with the client been signed by both parties? | Yes |

| | | Share of commission % | | |
|---|---|---|---|---|
| Sales person 1 : | Athina Karahogiti | TP EMEA | 100 | Estimated annualized revenue (k€) : |
| Sales person 2 : | | TP EMEA | | Estimated GM% contribution as defined in approved P&L : |

Start date: ....................................

*At the latest: 6 months after first invoicing date*

*Notes concerning the individual sales commission :*

1 - You must be employed by Teleperformance at the time of payout to receive payment. Accordingly, the commissions will cease to be due and payable as of the date of effective termination of the employment contract.

2 - Teleperformance will pay commissions on the basis of the amount invoiced on a quarterly basis on the second regularly scheduled pay date following the close of the quarter for invoices sent to the client.

3 - Teleperformance will pay commissions or bonuses only on opportunities that have been entered into SalesForce.com

4 - The contract and/or Statement Of Work (SOW) for new business must be signed by both the client and Teleperformance before the Commission will be paid. No commission shall be paid if the BD/SAM does not have a Contract Approval Form duly signed by all parties

5 - Commission will be delayed until an appropriately approved CAW is in place

6 - CAW must be submitted latest 6 months after the beginning of production of the above referenced program.

7. Please refer to your signed SIP for the rest of the terms.

*Notes concerning the New Biz commission :*

1- The acceptance of this CAW means New Biz commission will be invoiced by TP EMEA to another TP entity for any New Business brought by a regional Biz Dev or a regional SAM.

2 - For the New Biz brought by TP EMEA with production starting on or after 01/09/2019, the commission will be invoiced during 4 years at 5% based on Group Rules in effect.

| | Name and signature | Date |
|---|---|---|
| Regional Biz Dev or SAM * | _____ | _____ |
| EMEA Chief of Biz Dev or Chief Client Officer * | _____ | _____ |
| Local CFO | _____ | _____ |
| Local CEO | _____ | _____ |
| CFO CEMEA | _____ | _____ |

*Both signatures are required in case of split com*

# EXHIBIT 2

| | |
|---|---|
| From: | Athina Karahogitis |
| Sent: | Friday, June 9, 2023 12:11 AM CDT |
| To: | Miranda Collard |
| Subject: | Re: SIP Payments |

Thank you, I will pull together and talk to him because we had done an exercise together on the gap since there were extra costs to liquidate my consultancy contract, a large delta in taxation etc that the amount of the pending commissions would cover. I will pull together and see item by item what the delta is because he and I did just that. The difference in not making commissions forward looking was compensated for me above all with the role itself and working with you to be honest.

I thought that the contract was just the standard and that what we had agreed would be worked out similar to the relocation topic you and I discussed, so I will go back to him asap.

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Thursday, June 8, 2023 18:35
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Yes, you will have to go back to Dino's for sure. If you are getting your new salary this year, plus bonus, plus additional PSP, and your commission for 2 quarters I can imagine that will put your total comp completely over the level assumed for your contract. Again, I don't have the exact by line item (commission) so am assuming my statement.

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, June 8, 2023 5:24 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

But I didn't realize I would not be getting commissions for all the work already done and Dino's had agreed to paying those out.

I was looking at submission dates when this was related to revenue generation.

Miranda this is a 300 k impact for me. What can be done? Can we please amend the contract? I am told it's up to you. Do I need to go back to Dino's?

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Thursday, June 8, 2023 11:33
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Per Leigh and your signed agreement you should payouts for 2 quarters post your promotion which I sent to Kelly yesterday and Leigh shared as well.



EXHIBIT
20
M. Collard

M

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, June 8, 2023 3:23 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Hi Miranda,

I've been speaking to finance off and on through emails, but it turns out that they seem to think that even if I had a caw that was pending signature in 2022 and I sent it in then I am not entitled to any payment for any revenue generated effective January 1, 2023 - so if I sold something last year then  the payout post Jan 1st doesn't apply so lose out basically on anything I sold. Apparently they are saying I am not entitled to that, so that pretty much means that I lose all my commissions after the end of 2022, so no revenue post that date is calculated and I think that that's where the mixup is.

so they seem to think that I'm only entitled to revenue generated in 2022 and I think that we need to amend my contract so that i am entitled to the payouts post end of 2022 for anything I have submitted (which does not include anything post my change of role). Agreement was that I would still get my commissions for anything I had sold. Finance is saying no revenue calculated from 2023 onward which means a large loss for me.

Apparently, an amendment can fix this. All we need is for it to state that fir all commissions submitted revenue generated fir the period entitled would continue to be paid out. Similar process to my bonus.

Thank you for your supporting me in this .

Thanks
Athina

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Wednesday, June 7, 2023 16:06
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Thank you very much! ❤️⬜

**Regards,**

**Athina Karahogitis**
**Global Deputy Chief Client Officer |Teleperformance Group**
M USA +14254493115 | M EMEA +306942474529
Dallas, Texas USA | Athens, Greece EMEA akarahogiti@teleperformance.com

AK_TPUSA_000558

teleperformance.com | linkedin.com/company/teleperformance

---

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Wednesday, June 7, 2023 17:01
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

No this is great thank you!

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Wednesday, June 7, 2023 7:38 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Hi Miranda ,

There were a number of caw's that had pending signatures for months that I had been chasing.

I can export them so that you can see how long I have been chasing everyone. None are business past the end of the year (meaning new business past 2022 however some do have payout starting in 2023 for example) and all are opportunities created in my previous role.

It's a lot of money for me and no matter what I did I escalated to Kelly a number of times - however DocuSign and signing  caws were the last of everyone's priority snd many also had issues with links not being received - including Kelly.

I always put caws as my last priority because I put business first, and knew the company would also do the same.
Dino's had agreed to these pay outs as well during negotiations as I had explained I had many pending.

Any support you can provide would be much appreciated . I want you to know that I am not asking for longer periods of payout, only  for payouts never paid out due to pending caw signing.

I  hope this helps clarify? I can show you my DocuSign and sales force if that helps?

Please let me know if you need anything else?

Thank you,

Athinac

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Wednesday, June 7, 2023 16:18
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Hey Athina,

Triangulated your latest agreement and it states that you should submit your CAW's, pre (promotion)-January 1st), for payment for 2 quarters. Is that what you submitted? I don't have a view of what was actually submitted but there is a narrative out there that they were submitted through 2024 and some through 2026.

Thank you
Miranda

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Monday, May 22, 2023 9:02 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Hi Miranda,

Demure whenever you want, am on my way to the airport now. What you thought is correct though, it's only for what was sold until 2022, some of the payouts had pending CAW signatures which I was chasing folks for. so there is a delay in these payouts, and a few go out until then. Nothing new- all old stuff.

Thanks,

Athina

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Monday, May 22, 2023 09:17
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Hi Athina,

Let's chat on this when you get a minute. I thought I was approving SIP payments for 2022 per your new contract and not something outside of your contract. I got a message that this was to approve commission payouts out to 2026 but your 2023 comp was a full package adjustment per the language.

Let me know when you have time

Miranda

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Tuesday, May 2, 2023 5:14 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Hi Miranda,

Can you please re approve this since the approval needs to be post my contract?

It's approval for me continue with payout of my pending commissions as per email below.

Thank you so much!

Athina

---

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, April 27, 2023 07:19
**To:** Kelly Grypari <kgrypari@teleperformance.com>; Mateusz Nowakowski <mateusz.nowakowski@teleperformance.com>; Matthew Cuthill <matthew.cuthill@teleperformance.com>
**Subject:** FW: SIP Payments

Hi Kelly,

This is the approval from Miranda to continue payments until they expire.

Thank you,

Regards,

Athina


**Regards,**

**Athina Karahogiti**
**Global Deputy Chief Client Officer  |  Teleperformance Group**
**TP Women / D&I | EMEA Chair and Global Member of the Board**
**+306942474529|+14254493115 |**akarahogiti@teleperformance.com



teleperformance.com | linkedin.com/company/teleperformance

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Friday, December 2, 2022 6:26 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Thank you!

## Regards,

## Athina Karahogiti

**Global Deputy Chief Client Officer  |  Teleperformance Group**
**TP Women / D&I | EMEA Chair and Global Member of the Board**
**+306942474529|+14254493115 |akarahogiti@teleperformance.com**



teleperformance.com | linkedin.com/company/teleperformance

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Date:** Friday, 2 December 2022 - 06:25
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Subject:** Re: SIP Payments

Approved

Get Outlook for iOS

---

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Friday, December 2, 2022 4:20:29 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** FW: SIP Payments

Hi Miranda,

Can you please approve that I get the pending commissions paid out to me?

We had discussed but they also need it in writing apparently.

Thank you!

**Regards,**

### Athina Karahogiti
**Global Deputy Chief Client Officer | Teleperformance Group**
**TP Women / D&I | EMEA Chair and Global Member of the Board**
**+306942474529|+14254493115 |akarahogiti@teleperformance.com**



teleperformance.com | linkedin.com/company/teleperformance

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

**From:** Matthew Cuthill <matthew.cuthill@teleperformance.com>
**Date:** Friday, 2 December 2022 - 04:52
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Cc:** Mateusz Nowakowski <mateusz.nowakowski@teleperformance.com>
**Subject:** RE: SIP Payments

Hello,

Any news on this mate?

Also, could you share the approval from Miranda and Dinos as I need that backup to continue the payments.

Kind regards

**Matthew Cuthill**
**Director Digital Transformation – Finance | Teleperformance** | T +31 6 4223-8118 | Tilburg, The Netherlands | matthew.cuthill@teleperformance.com



teleperformance.com | linkedin.com/company/teleperformance

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

**From:** Matthew Cuthill
**Sent:** Wednesday, 23 November 2022 18:38
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Cc:** Mateusz Nowakowski <mateusz.nowakowski@teleperformance.com>
**Subject:** Re: SIP Payments

Hello,

So the payments would stop only once the 2 years for the normal SAM commission or 4 years for the BD commission has run its course

So potentially until 2026 :)

We should not expect any new revenue deals starting after June 1st though?

Kind Regards

Matthew Cuthill
Director Digital Transformation – Finance | Teleperformance CEMEA

On 23 Nov 2022, at 17:40, Athina Karahogiti <akarahogiti@teleperformance.com> wrote:

Hi Mateusz,

I am well thank you and hope the same for you.

Everything I worked on while under my SAM role will be paid out, this was agreed with Miranda and Dinos as well. Unfortunately many of my CAW's are still stuck in Docusign though as they are pending signatures.

**Regards,**

**Athina Karahogiti**
**Global Deputy Chief Client Officer  |  Teleperformance Group**
**TP Women / D&I | EMEA Chair and Global Member of the Board**
**+306942474529|+14254493115 |**akarahogiti@teleperformance.com
**<image002.png>**

teleperformance.com | linkedin.com/company/teleperformance

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

**From:** Mateusz Nowakowski <mateusz.nowakowski@teleperformance.com>
**Date:** Wednesday, 23 November 2022 - 10:17
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Cc:** Matthew Cuthill <matthew.cuthill@teleperformance.com>
**Subject:** SIP Payments

Hi Athina,

I hope you are doing well!

In respect of your position change in Teleperformance (effective June 1st, 2022) I wanted to check with you what is your understanding when it comes to duration of SIP payments on Opportunities won when you were acting as Regional SAM?

We want to be clear when it comes to future payments, so your input here will be significant.

Best regards,
Mateusz

Mateusz Nowakowski

**Global Sales Compensation Reporting & System Administrator – Finance** | M: +48 885 051 261 | Wroclaw, Poland | mateusz.nowakowski@teleperformance.com

<image001.jpg>

teleperformance.com | linkedin.com/company/teleperformance

# EXHIBIT 3

From:       Leigh Ryan [Leigh.Ryan@teleperformance.com]
Sent:       2/23/2023 2:17:06 PM
To:         Athina Karahogiti [akarahogiti@teleperformance.com]
CC:         Miranda Collard [Miranda.Collard@teleperformance.com]; Constantinos Hamalelis
            [chamalelis@teleperformance.com]; Charles Klotz [Chuck.Klotz@teleperformance.com]; Kelly Grypari
            [kgrypari@teleperformance.com]
Subject:    RE: K.Athina's new agreement
Attachments: TGI A. Karahogiti Employment and Noncompetition Agreement Jan 2023 v.3 EXECUTON COPY.pdf; TP Greece A.
            Karahogitis Termination of Consulting Agreement Dec 31 2022.pdf; TGI A. Karahogitis Employment and
            Noncompetition Agreement Jan 2023 Redline v.3 Execution Copy vs. v.2.pdf; smime.p7s

Hi, Athina,

Attached are the final versions of your Employment and Noncompetition Agreement with TGI and the Termination
Agreement with TP Greece, which have been approved by Miranda and are ready for signature. I have also attached a
redlined copy of the Employment and Noncompetition Agreement, showing the changes made from the version
circulated in December.

Via DocuSign, I will send you and Chuck the Employment Agreement for signature and I'll send you and Dinos the
Termination Agreement for signature. Once the two agreements are signed, Miranda will arrange or payment of your
2022 bonus and Chuck will get you set up on the TGI payroll.

Please let me know if you have any questions.

Best regards,

*Leigh*

**Leigh P. Ryan**
**Chief Legal and Compliance Officer** | **Teleperformance** | San Diego, CA  USA
+917-856-8641

  

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems.
Please consider the environmental impact of needlessly printing this e-mail.

From: Athina Karahogiti <akarahogiti@teleperformance.com>
Sent: Tuesday, February 21, 2023 8:58 PM
To: Leigh Ryan <Leigh.Ryan@teleperformance.com>
Subject: Re: K.Athina's new agreement

Hi Leigh ,

Absolutely it's akarahogiti@gmail.com

Thank you!



EXHIBIT
2
M. Collard

CONFIDENTIAL INFORMATION                                                                                          TPUSA0000786

Athina

**Regards,**

**Athina Karahogiti**
**Global Deputy Chief Client Officer |Teleperformance**
M EMEA +306942474529|M USA +14254493115
Dallas, Texas, USAakarahogiti@teleperformance.com

teleperformance.com | linkedin.com/company/teleperformance

---

**From:** Leigh Ryan <Leigh.Ryan@teleperformance.com>
**Sent:** Tuesday, February 21, 2023 18:53
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Also, Athina, could you please send me your personal email address?  We include that in the Notice provision of the agreement.

Thanks very much,

*Leigh*

Leigh P. Ryan
**Chief Legal and Compliance Officer | Teleperformance** | San Diego, CA  USA
+917-856-8641



The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems. Please consider the environmental impact of needlessly printing this e-mail.

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Tuesday, February 21, 2023 3:52 PM
**To:** Leigh Ryan <Leigh.Ryan@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Hi Leigh,

Attached is the signed version – it is in Greek so not sure how much you wil be able to get from this, at the top is the date signed, so  you will see the date is **13 Δεκεμβριος = December 2013.**

CONFIDENTIAL INFORMATION

TPUSA0000787

I did forward the email as it was when I had sent it to Dinos, so I am sure some edits will follow as Miranda and I had chatted after I sent him the email.

Thanks again,

Athina

**From:** Athina Karahogiti
**Sent:** Monday, February 20, 2023 7:07 PM
**To:** Leigh Ryan <Leigh.Ryan@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Thank you Leigh, as always great to talk to you!!

I found the contract – see attached will need to search through the archive for the signed version tomorrow though.

Thanks,

Athina

**From:** Leigh Ryan <Leigh.Ryan@teleperformance.com>
**Sent:** Monday, February 20, 2023 5:51 PM
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Hi, Athina,

Good to talk with you.  Could you please send me your 2013 consulting agreement?  The only one I have is dated February 2017.

Best regards,

*Leigh*

**Leigh P. Ryan**
**Chief Legal and Compliance Officer** | **Teleperformance** | San Diego, CA  USA
+917-856-8641

  

The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems. Please consider the environmental impact of needlessly printing this e-mail.

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Monday, February 20, 2023 3:44 PM
**To:** Leigh Ryan <Leigh.Ryan@teleperformance.com>
**Subject:** FW: K.Athina's new agreement

Here you go!

**From:** Athina Karahogiti
**Sent:** Monday, January 30, 2023 12:30 PM
**To:** Constantinos Hamalelis <chamalelis@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Signed and also the doc with track changes.

Episis me thn Kelly exeis milisei gia thn diafora?

**From:** Athina Karahogiti
**Sent:** Saturday, 28 January 2023 00:16
**To:** Constantinos Hamalelis <chamalelis@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Here you go! Thes na to steilw egw?

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Friday, December 30, 2022 9:55 AM
**To:** Constantinos Hamalelis <chamalelis@teleperformance.com>
**Subject:** Re: K.Athina's new agreement

Καλημέρα,

Επίσης τα ποσά είναι σε USD ενώ την άσκηση την κάναμε σε ευρώ κ έχει διαφορά.

**From:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Sent:** Friday, December 30, 2022 01:50
**To:** Constantinos Hamalelis <chamalelis@teleperformance.com>
**Subject:** RE: K.Athina's new agreement

Thank you Dino!

Please see comments below:
1. Last name should be Karahogitis (this is how it is listed on US paperwork)
2. Bank holidays should be taken into consideration when I am in country – I think we can find a healthy medium here so that when in Greece the local holidays apply and vice versa.
3. Vacation days should be 25 per year as is now – and any vacation time not taken to date paid out end of year. I also have accumulated holiday days that are to be paid out with this month's invoice.
4. Benefits such as 401 k should be listed – I don't see them anywhere – should be added as an annex
5. I have been on a consultancy contract since December 2013 and not from 2017- to be corrected also to be included as period of employment (acknowledgement of previous years employment)
6. Section 3H – would allow me to keep my Omadiko Asfalistro for the period when in Europe in terms of health insurance.
7. Termination for convenience - notice period is equal for both parties – 6 months

8.      I don't see the relocation package for the US or the fuel allowance for when I am in Greece, mobile etc should be added.

9.      Bonus for 2022 to be paid in Romania in February = 50% based on my previous role and 50% based on my global role - so this should be paid out in Romania.

10.     How will I get the bonus we agreed for the difference in the 500 shares – you were to speak to Kelly?

In terms of my termination agreement, there is no way I can get all CAW's signed by the 15th of January when they have been pending for months, so the cut off date will need to be extended. Also the cut off for the invoicing of commissions should be set to when all commissions have been paid out which means 4 years from now for some. So the contract must remain active. Also we need to see the wording of the termination so that it will also fiscally stand in Romania and should be aligned with the original contract.

Please let me know if I should work with Katerina or Nikos directly on these

Thank you so very much!!! Filakia,

Athina

**From:** Constantinos Hamalelis <chamalelis@teleperformance.com>
**Sent:** Tuesday, 27 December 2022 14:26
**To:** Athina Karahogiti <akarahogiti@teleperformance.com>
**Subject:** K.Athina's new agreement

Hi,
pls for. Your review and comment.
C

Constantinos (Dinos) Hamalelis
CEO  ML Hub – EMEA Deputy COO | Teleperformance | Athens, Hellas
M +30 6942 421 441



The information contained in this communication is privileged and confidential. The content is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone or e-mail, and delete this message from your systems. Please consider the environmental impact of needlessly printing this e-mail.

**EXHIBIT 4**

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

## AMENDED AND RESTATED
## EMPLOYMENT AND NON-COMPETITION AGREEMENT

This EMPLOYMENT AND NON-COMPETITION AGREEMENT (this "Agreement") is entered into effective as of January 1, 2023 by and between **TPUSA, Inc.**, a Delaware corporation (the "Company"), and **Athina Karahogitis**, an individual (the "Employee"). The Company and Employee each may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Employee, indirectly as the sole associate and representative of Excaliber International SRL, a Romanian company (the "Consultant"), has been a consultant on an exclusive basis to an Affiliate (as defined in Section 2(b)) of Company since December 18, 2013 pursuant to a Service Agreement dated December 18, 2013 between Consultant and Ypiresia 800 – Teleperformance A.E., a Greek corporation ("TP Greece") (such agreement, as amended, the "Service Agreement"); and

WHEREAS, Consultant was eligible to receive (1) commissions and other bonuses pursuant to the terms of the 2022 Strategic Account Manager Sales Incentive Plan (the "2022 SIP") and (2) if earned, a prorated portion of her bonus in her role as Global Deputy CCO (as defined below) for the period from June 1, 2022 through December 31, 2022; and

WHEREAS, in connection with Employee's promotion to the position of Global Deputy Chief Client Officer ("Global Deputy CCO") of the group of companies owned by Teleperformance SE (collectively, the "Teleperformance Group") (1) pursuant to the Termination Letter in the form attached hereto as Schedule 1 and effective as of December 31, 2022, TP Greece, Consultant and Employee desire to terminate (a) the Service Agreement with no continuing obligations thereunder except for (i) TP Greece's obligation to pay to Consultant (A) fees for services rendered through December 31, 2022, including any bonus earned for the period from June 1, 2022 through December 31, 2022 in her role as Global Deputy CCO, subject to all applicable withholdings, and (B) reimbursement of fuel, telephone and travel expenses incurred through December 31, 2022, in each case in accordance with the terms of the Service Agreement, and (b) the 2022 SIP with no continuing obligations thereunder except for payment of the commissions and bonuses based on farming targets and K-Sat, if any, due to Consultant under the 2022 SIP for the last two (2) calendar quarters of the fiscal year ended December 31, 2022, subject to Consultant's submission by March 15, 2023 of all applicable documentation with respect thereto and approval thereof as contemplated by the 2022 SIP; and (2) Employee and Company desire to into this Agreement, setting forth the terms and conditions of her employment with Company and providing for Employee's continuous employment with the Teleperformance Group effective as of the date of this Agreement. This Agreement amends and restates in its entirety the Employment and Non-competition Agreement entered into between Employee and Teleperformance Group, Inc., an Affiliate of Company, effective as of January 1, 2023 (the "Prior Agreement"), which Prior Agreement shall be null, void and of no further force or effect.

EXECUTION COPY

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties agree as follows:

1.    (a)    <u>Period of Employment</u>.  Company hereby employs Employee to render services to Company and its Affiliates in the position and with the duties and responsibilities described in <u>Section 2</u> hereof commencing as of January 1, 2023 (the "<u>Commencement Date</u>") and ending on the date on which the Employee's employment with Company is terminated in accordance with <u>Section 4</u>.  The date on which Employee is no longer employed by Company for any reason shall be the "<u>Employment Termination Date</u>", and the period beginning on the Commencement Date and ending on the Employment Termination Date shall be the "<u>Period of Employment</u>."  Notwithstanding the foregoing, when used in Section 5 of this Agreement, the term "Employment Termination Date" shall not include the termination of Employee's employment due to her death.

(b)    <u>Employment Status</u>.  Employee acknowledges and agrees that:

(i)    Employee's employment with Company shall be on an at-will basis and Employee may resign or her employment with Company may be terminated at any time, with or without cause,

(ii)    Nothing in this Agreement shall give Employee the right to continued employment with Company, and

(iii)    Employee's at-will status can be altered only by a written document specifically stating that it is altering the at-will status, executed by Employee and by the Global Chief Client Officer of the Teleperformance Group (the "<u>Global CCO</u>"), the Global Chief Operating Officer of the Teleperformance Group (the "<u>Global COO</u>") or their respective designees.

2.    <u>Position, Services and Exclusivity of Services</u>.

(a)    <u>Position</u>.  Company shall employ Employee as the Global Deputy CCO of the Teleperformance Group or in such other capacity or capacities as may be directed by the Global CCO, the Global COO or a member of the Teleperformance Group senior management team, and Employee hereby accepts such employment and agrees that, throughout her employment with Company, she shall devote not less than one hundred percent (100%) of her working time and attention to Company.  Employee shall report directly to the Global CCO (or her designee).  Employee's duties shall consist of all responsibilities, assignments and tasks consistent with her position, and as may be required or requested by the Global COO, the Global CCO or a member of the Teleperformance Group senior management team.  Employee agrees to observe and comply at all times with the rules and regulations of Company and Teleperformance Group, as amended from time to time, governing the performance of Employee's duties, and agrees to carry out and perform orders, directions and policies of Company, the Global COO, the Global CCO, and/or any member of the Teleperformance Group senior management team, as the case may be, whether stated orally or in writing, in each case consistent with her position.

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

Employee will travel, domestically and internationally, as reasonably required in the performance of her duties and according to the requirements of the business.

(b)      Other Activities.  Effective as of the Commencement Date and continuing until the Employment Termination Date, without the prior written approval of the Global COO or the Global CCO, Employee shall not (i) accept any other employment, (ii) engage in any other business activity (whether or not pursued for pecuniary advantage), directly or indirectly, that is competitive with, or that places her in a competing position to that of, Company or any of its Affiliates, (iii) serve on the board of directors of any Person primarily engaged in the Teleperformance Business, or (iv) serve as an officer, director, employee, or contractor of, or service provider, consultant or advisor to, or participate in any way in the management or operations of, any Person engaged in the Teleperformance Business.

As used in this Agreement:

"Affiliate" shall mean, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under control with such specified Person;

"Business Day" shall mean any day, other than a Saturday, Sunday or legal holiday in the State of Utah, on which banks are open for substantially all their business in Salt Lake City, Utah;

"Person" shall mean any individual, corporation, limited liability company, association, partnership, business trust, joint venture, unincorporated organization, or other entity of any kind; and

"Teleperformance Business" shall mean any business that engages in (A) providing inbound or outbound telemarketing, teleresearch or other teleservices or the outsourcing of telemarketing, teleresearch or other teleservices; (B) operating single media or multimedia contact centers or customer interaction centers that handle customer interaction, customer service, customer relations or customer acquisition, content moderation, trust and safety, health advocacy, health benefits consulting or other health-related customer/member services, or similar services over the telephone, interactive voice response ("IVR"), the Internet or any other channel, including without limitation, monitoring chat rooms and/or Internet or social media posts and/or providing click-to-chat, direct response e-mail or voice over Internet protocol; (C) developing and/or integrating software or other applications, including, without limitation, in connection with e-commerce or wireless applications; (D) providing accounts receivable management, debt collection or debt purchase services; (E) providing outsourced customer relationship management ("CRM") services, business process outsourcing ("BPO") services, back-office services, digital integrated business services, business process management, knowledge services management, technical support or technical assistance; (F) research, analytics, automation, technology, artificial intelligence or digital transformation products and services; (G) user experience design; (H) enterprise feedback management, community management or social media support; (I) consulting (including, without limitation, process consulting), advisory, training, evaluation, assessment (including, without limitation, operational security and IT assessment) or other services; (J) interpretation services on-site or by telephone, video or any other channel; (K) document translation, localization, language testing or training

services; (L) visa application processing or management, consular services, travel and/or related products and/or services; or (M) providing, designing, marketing or advising with respect to recruitment process outsourcing ("RPO") services, including, without limitation, partial cycle or full cycle RPO services, from any location in the world; or other services related in any way to any of the foregoing.

3.    Compensation, Benefits, Etc.  In consideration of the services to be rendered under this Agreement (including, without limitation, services to any Affiliate of Company provided at the request of Company), during the Period of Employment Employee shall be compensated by Company as set forth below, in each case subject to all applicable federal, state or local taxes, withholdings or deductions, if any.  Unless otherwise permitted under US federal tax laws and regulations, the benefits set forth below shall be taxable to Employee.

(a)    Base Compensation.  Employee shall be paid an annual base salary in the amount set forth on Exhibit A hereto (the "Base Salary"), payable semi-monthly at the times and pursuant to the procedures regularly established by Company, as they may be amended from time to time.

(b)    Bonus Compensation.  Employee shall be eligible to receive additional compensation from Company in the form of an annual bonus (or pro rata portion thereof, if applicable) in the maximum amount set forth on Exhibit A hereto, on such terms and in such amount as may be determined by the Global CCO each calendar year during the Period of Employment, if any such bonus is earned by Employee based on the criteria established by the Global CCO (any such bonus, if so earned, the "Bonus Compensation"), subject to Employee's continued employment by Company or a Company Affiliate on the date on which such Bonus Compensation paid.  The bonus criteria will be tied to Employee's personal performance and may include the achievement of certain objectives by Teleperformance Group.  Bonus Compensation, if earned, may be paid, in whole or in part, at any time during the applicable calendar year and/or during or after completion of the first quarter of the year following the applicable calendar year.

(c)    Employee Benefits.  Employee shall have the right to receive benefits and to participate, to the extent that she qualifies under the terms thereof, in the health, dental, vision and other insurance, Section 401(k) plan (with, if applicable, a company matching component on the same terms as generally made for other Company employees, all subject to plan qualifications, employee contributions and other conditions of such plan) and other employee benefit plans maintained by Company, in each case that are generally made available to employees of Company, as such plans may be amended from time to time.

(d)    Car Allowance.  As long as Employee is able to operate a motor vehicle and is licensed to do so by a duly authorized governmental authority within the United States during the Period of Employment, Employee shall be eligible to receive a monthly car allowance from Company in the amount set forth on Exhibit A hereto, subject to Company's car allowance policy, if any, as such policy may be amended from time to time.

(e)    Expenses.  Subject to Employee's submission of appropriate supporting documentation and approval thereof by the Global CCO and the Deputy Chief

Operating Officer of EMEA, Company shall reimburse Employee for reasonable travel and other business expenses incurred by Employee in the performance of Employee's duties hereunder, subject to Company's expense reimbursement policy, if any, as such policy may be amended from time to time.

(f)　　　Paid Holidays; Vacation.  If Employee is working in the United States on a paid public holiday as provided under Company's policy, as amended from time to time (currently 6 days per year), she shall be entitled to such paid public holiday.  If Employee is working outside the United States on a paid public holiday recognized by the Company Affiliate in the country in which she is then working, she shall be entitled to such paid public holiday.  In addition, under the Company's policy as in effect from time to time, Employee shall be entitled to paid-time-off (PTO) equivalent to five (5) weeks (twenty-five (25) work days) per calendar year, which shall be prorated for any partial calendar year during the Period of Employment. Accrued and unused vacation days as of December 31 of each year shall be forfeited and shall not be carried over into the next calendar year unless otherwise required by applicable law.

(g)　　　Performance Shares.  The shareholders of Teleperformance SE ("TPSE") approved a Performance Share Plan for eligible employees of the Teleperformance Group, under which grants of shares are expected to be made in 2023 (the "2023 PSP").  Subject to approval by the Board of Directors of TPSE (the "TPSE Board") of the specific list of beneficiaries and their grants, Employee's continued employment on the grant date and on the vesting date, and at Company's discretion based on Employee's job performance, economic and financial considerations, and other factors applicable at the grant date, Company will recommend to the TPSE Board that Employee be granted a number of TPSE performance shares pursuant to the 2023 PSP similar to that granted to other Teleperformance executives in positions comparable to Employee's.  Although Company cannot commit to a specific grant at this time, Company currently estimates requesting a grant for Employee of approximately 2,000 shares under the 2023 PSP.  The 2023 PSP grant date is currently expected to be in July 2023.  Details regarding the 3-year vesting period, performance criteria and eligibility requirements of the performance shares granted under the 2023 PSP will be set forth in plan regulations to be adopted by the TPSE Board when approving the grants to the beneficiaries and provided to Employee at the time of grant.

(h)　　　Changes.  Notwithstanding the foregoing provisions of this Section 3, Company retains the right to change the Base Salary and/or Bonus Compensation, as determined by the Global CCO or her designee from time to time, upon written notice to Employee, and to enact, amend, or eliminate any insurance plans, benefit plans, compensation plans, share plans, policies or procedures as deemed reasonable and appropriate by Company in Company's sole discretion.  In any such case, the terms of this Agreement shall be deemed amended by the Parties to the extent reasonably necessary to remain consistent with such changes or such enacted, amended or eliminated plans, policies or procedures.  Employee also may be eligible to receive other benefits or participate in other plans of Company or its Affiliates from time to time, as determined in the sole discretion of Company or its Affiliates.

4.    <u>Termination of Employment</u>.

(a)    <u>By Death</u>.  Employee's employment shall terminate automatically upon her death.  Within thirty (30) days after the date of death or such later date as may be required pursuant to <u>Section 11</u>, Company shall pay to the Person prescribed by Company policy any unpaid and vested portion of Employee's Base Salary, earned but unpaid Bonus Compensation, if any, and accrued vacation, if applicable under the Company's then-current vacation policy, up to the date of death, and expenses incurred pursuant to <u>Section 3(e)</u> prior to the date of death that have not been reimbursed.  Other unpaid and vested benefits, if any, including any vested amounts payable to Employee as applicable under <u>Section 3(f)</u> up to the date of death shall be paid pursuant to the terms of the applicable plan or policy.  On and after the date of death, except as provided in this <u>Section 4(a)</u>, Company shall have no further obligations under this Agreement, including without limitation, no obligation to make any Special Payments pursuant to <u>Section 5(b)(iii)</u>.

(b)    <u>By Disability</u>.  If, during the Period of Employment, Employee shall be prevented, in the opinion of a doctor selected by Company, the Global CCO or a member of the Teleperformance Group senior management team, from properly performing the Employee's duties hereunder by reason of any physical or mental incapacity for a period of more than ninety (90) days in the aggregate or forty-five (45) consecutive days, in either case, in any twelve (12)-month period, then to the extent permitted by law, upon ten (10) days' written notice to Employee, the Period of Employment shall terminate.  Company shall pay to Employee, within thirty (30) days after the Employment Termination Date or such later date as may be required pursuant to <u>Section 11</u>, any unpaid and vested portion of her Base Salary, earned but unpaid Bonus Compensation, if any, and accrued vacation, if applicable under Company's then-current vacation policy, up to the Employment Termination Date, and any expenses incurred pursuant to <u>Section 3(e)</u> prior to the date of such notice that have not been reimbursed.  Special Payments, if any, that are due pursuant to <u>Section 5(b)(iii)</u> shall be paid as set forth in <u>Section 5(b)(iii)</u>.  Other unpaid and vested benefits, if any, including any vested amounts payable to Employee as applicable under <u>Section 3(f)</u> up to the date of such notice shall be paid pursuant to the terms of the applicable plan or policy.  On and after the Employment Termination Date, except as provided in this <u>Section 4(b)</u>, Company shall have no further obligations under this Agreement.

(c)    <u>By Company for Cause</u>.  The Global COO or the Global CCO may terminate the Employee's employment immediately for Cause without prior notice at any time.  "<u>Cause</u>" shall mean (i)  a material breach of any provision of this Agreement, which, if in the reasonable opinion of the Global COO or the Global CCO is capable of being cured, is not cured within five (5) Business Days of Employee's receipt of written notice thereof from the Global COO or the Global CCO; (ii) failure to observe limitations on authority imposed by Global COO, the Global CCO or a member of the Teleperformance Group senior management, or failure to follow a specific lawful directive of the Global COO, the Global CCO or a member of the Teleperformance Group senior management; (iii) gross negligence, fraud, embezzlement or theft (other than theft in an immaterial amount) from Company or any of its Affiliates; or (iv) conviction of, or entry of a plea of *nolo contendere* or its equivalent, or participation in any deferred adjudication or plea in abeyance in connection with, any felony (other than a traffic-related felony) or crime of moral turpitude.  In the event of a termination pursuant to this <u>Section 4(c)</u>, Company shall pay to Employee, within thirty (30) days after the Employment Termination

Date or such later date as may be required pursuant to Section 11, any unpaid and vested portion of her Base Salary, earned but unpaid Bonus Compensation, if any, and accrued vacation, if applicable under Company's then-current vacation policy, up to the Employment Termination Date, and any expenses incurred pursuant to Section 3(e) prior to the Employment Termination Date that have not been reimbursed. Special Payments, if any, that are due pursuant to Section 5(b)(iii) shall be paid as set forth in Section 5(b)(iii). Other unpaid and vested benefits, if any, including any vested amounts payable to Employee as applicable under Section 3(f) up to the Employment Termination Date that are not forfeited upon a termination of employment for Cause shall be paid pursuant to the terms of the applicable plan or policy. On and after the Employment Termination Date, except as provided in this Section 4(c), Company shall have no further obligations under this Agreement.

(d)    By Company Without Cause.    Company may terminate Employee's employment without Cause during the Period of Employment upon six (6) months' prior written notice (or pay in lieu thereof). In the event of a termination pursuant to this Section 4(d), Company shall pay to Employee, within five (5) Business Days after the Employment Termination Date or such later date as may be required pursuant to Section 11, any unpaid and vested portion of her Base Salary, earned but unpaid Bonus Compensation, if any, and accrued vacation, if applicable under Company's then-current vacation policy, up to the Employment Termination Date; expenses incurred pursuant to Section 3(e) prior to the Employment Termination Date that have not been reimbursed; and a singular post-employment payment as set forth on Exhibit A. Special Payments, if any, that are due pursuant to Section 5(b)(iii) shall be paid as set forth in Section 5(b)(iii). Other unpaid and vested benefits, if any, including any vested amounts payable to Employee as applicable under Section 3(f) up to the Employment Termination Date shall be paid pursuant to the terms of the applicable plan or policy. On and after the Employment Termination Date, except as provided in this Section 4(d), Company shall have no further obligations under this Agreement.

(e)    Voluntary Termination.    Employee agrees to give to Company not less than six (6) months' written notice in advance of a voluntary termination of her employment. Upon any voluntary termination of employment by Employee pursuant to this Section 4(e), Company shall pay to Employee, within thirty (30) days after the Employment Termination Date or such later date as may be required pursuant to Section 11, any unpaid and vested portion of her Base Salary, earned but unpaid Bonus Compensation, if any, and accrued vacation, if applicable under Company's then-current vacation policy, up to the Employment Termination Date, and any expenses incurred pursuant to Section 3(e) prior to the Employment Termination Date that have not been reimbursed. Special Payments, if any, that are due pursuant to Section 5(b)(iii) shall be paid as set forth in Section 5(b)(iii). Other unpaid and vested benefits, if any, including any vested amounts payable to Employee as applicable under Section 3(f) up to the Employment Termination Date shall be paid pursuant to the terms of the applicable plan or policy. On and after the Employment Termination Date, except as provided in this Section 4(e), Company shall have no further obligations under this Agreement.

(f)    No Limitation.    Company's exercise of its right to terminate Employee's employment shall be without prejudice to any other right or remedy to which it or any of its Affiliates may be entitled at law, in equity or under this Agreement.

(g) <u>Exclusive Remedy</u>.  Employee agrees that (i) the payments and benefits expressly provided and contemplated by this Agreement shall constitute the sole and exclusive obligation of Company and its Affiliates in respect of Employee's employment with and relationship to Company and (ii) except as otherwise provided by law, the payment thereof shall be Employee's sole and exclusive remedy for any termination of Employee's employment with Company.  Except to the extent prohibited by applicable law, Employee covenants not to assert or pursue any other remedies, at law or in equity, with respect to any termination of employment by Company other than to enforce Employee's rights under this Agreement.

(h) <u>Termination Obligations</u>.

(i) Employee hereby acknowledges and agrees that all property of Company and/or its Affiliates, including, without limitation, all files, books, memoranda, manuals, documents, records, reports, notes, contracts, lists, blueprints, electronic media, diskettes, CD-ROMs, other documents and materials, all Proprietary Information and Personal Information (each as defined in <u>Section 5(a)</u>) and other information (including, without limitation, all copies of any of the foregoing), made available or furnished to, or prepared by, Employee in the course of or incident to her employment belong to Company and/or its Affiliates.  Employee shall promptly return to Company all such material, including all copies thereof, upon any termination of Employee's employment or, if earlier, upon Company's request.

(ii) Effective as of the Employment Termination Date, Employee shall be deemed to have resigned from all offices and director positions she then holds with Company or any of its Affiliates.  Concurrently with the execution of this Agreement, Employee shall deliver to Company an executed but undated resignation from all such offices and director positions.  In the event Company is unable for any reason, after reasonable effort, to secure Employee's signature on any document needed in connection with this <u>Section 4(h)(ii)</u>, Employee hereby irrevocably designates and appoints Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, which appointment is coupled with an interest, to act for and on Employee's behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this <u>Section 4(h)(ii)</u> with the same legal force and effect as if executed by Employee.

(iii) <u>Sections</u> 4<u>(g)</u>, 4<u>(h)</u>, 5 (other than, if Employee executes and delivers (and does not revoke) the Release as set forth therein, <u>Section 5(b)(iii))</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u> and <u>18</u> of this Agreement, including Employee's obligations thereunder, and the definitions immediately following <u>Section 2(b)</u> of this Agreement (collectively, the "<u>Continuing Provisions</u>"), shall survive indefinitely beyond the Employment Termination Date.

5. <u>Confidentiality; Noncompetition; Nonsolicitation</u>.

(a) <u>Confidentiality</u>.

(i) Employee understands, acknowledges and agrees that Employee's at-will employment with Company will result in Employee's exposure and access to Proprietary Information.  Employee agrees to hold all Proprietary Information in strict confidence and trust for the sole benefit of Company at all times and not to, directly or indirectly, use, summarize, copy,

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

disclose to any third party, publish, or in the case of tangible Proprietary Information, remove from the premises of Company or any Affiliate of Company any Proprietary Information at any time, except solely to the extent necessary to carry out Employee's responsibilities under this Agreement or otherwise in furtherance of the business of Company. "Proprietary Information" means any and all confidential or proprietary information of Teleperformance, Company or any of their Affiliates, including, but not limited to: (A) trade secrets, know-how, inventions, ideas, processes, improvements, developments, techniques, source and object codes, and works of authorship; (B) technology, practices, benchmarks, policies and procedures used by Teleperformance, Company or any of their Affiliates; (C) information regarding product or service plans, marketing plans, advertising plans, business plans, operations, product or service promotions, staffing strategies, budgets, and financial information; (D) information regarding Clients, Prospects, Suppliers, business associates, employees, and contractors of Teleperformance, Company or any of their Affiliates; and (F) confidential or proprietary information of a third party received by Company or any of its Affiliates under a duty of confidentiality. Proprietary Information does not include (1) information which is or becomes publicly known through lawful means; or (2) information which is disclosed to Employee without confidential or proprietary restriction by a third party not affiliated with Company or any of its Affiliates who rightfully possesses the information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from Teleperformance, Company or any of their Affiliates.

                (ii)    Employee also understands, acknowledges and agrees that Employee's at-will employment with Company may result in Employee's exposure or access to various employee and/or consumer credit, credit card, financial, health, medical and other personal information (collectively, "Personal Information"). Employee agrees not to appropriate, copy, disclose, disseminate, divulge, transmit, make public, use in any criminal manner or otherwise use in any manner inconsistent with Company policy, as amended from time to time, or the express direction of the Global COO, the Global CCO and/or a member of the Teleperformance Group senior management (cumulatively, "Inappropriately Use") any Personal Information, and Employee agrees that under no circumstances will she Inappropriately Use any Personal Information if Employee knows or has reason to know that such use would be detrimental in any way to Company, any of its Affiliates and/or their respective businesses, clients or customers.

                (iii)  If, in connection with any action, suit, investigation or other legal or administrative proceeding, Employee is requested or required to disclose any Proprietary Information or Personal Information, then Employee shall provide Company with prompt written notice of any such request or requirement and shall delay disclosure, if and to the extent permitted by applicable law, until Company or one of its Affiliates has had an opportunity to seek a protective order or other appropriate remedy or to waive Employee's compliance with the provisions of this Section 5(a). If, in the absence of a protective order or other remedy or receipt of a waiver by Company, Employee is nonetheless, in the opinion of reputable outside legal counsel, legally compelled to disclose Proprietary Information or Personal Information to any tribunal, Employee may, without liability hereunder, disclose to such tribunal only that portion of the Proprietary Information or Personal Information that such counsel advises is legally required to be disclosed; provided that Employee shall use her best efforts to preserve the confidentiality of the Proprietary Information or Personal Information, as applicable, including, without limitation, by cooperating with Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Proprietary Information or Personal Information,

as applicable, by such tribunal; and provided, further, that Employee shall promptly notify Company, prior to making or permitting any such disclosure, of (A) her intention to make or permit such disclosure, (B) the nature, scope and contents of such disclosure, and (C) the legal opinion of outside counsel with respect thereto.

(b)    Noncompetition; Nonsolicitation.

(i)    Employee acknowledges that pursuit of the activities prohibited by this Section 5(b) would necessarily involve the use or disclosure of Proprietary Information in breach of Section 5(a), but that proof of such breach would be extremely difficult. To prevent such disclosure, use and breach, and in consideration of her employment under this Agreement and the Special Payments, Employee agrees that, from the Employment Termination Date until the Noncompete Termination Date, she shall not directly or indirectly (A) engage in the Teleperformance Business, whether as an employee, consultant, advisor or otherwise, or assist others to do so, or (B) become a director, officer, shareholder, equity owner, or partner of, or otherwise enter into, conduct, engage in, consult or advise (any of the foregoing, "participate in"), directly or indirectly, any business or endeavor that is engaged in the Teleperformance Business. Employee shall not be in violation of this Agreement solely by reason of investing in stock, bonds or other securities of any company engaged in the Teleperformance Business (but without otherwise participating in such company), if (1) such stock, bonds or other securities are registered with or listed on any national or international securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended and (2) such investment by Employee does not exceed, in the case of any class of the capital stock of any one issuer, one percent (1%) of the issued and outstanding shares of such capital stock or, in the case of bonds or other securities, one percent (1%) of the aggregate principal amount thereof issued and outstanding.    Employee hereby acknowledges and agrees that (Y) the nature of the Teleperformance Business is not limited to the physical locations of the offices of Company or any of its Affiliates but rather is carried on throughout the world and (Z) given the nature of the Teleperformance Business and her knowledge of the Teleperformance Business, its Clients, Prospects, Suppliers and employees, competition from Employee anywhere in North America, Central America, South America, Europe, Asia, Australia or Africa would cause irreparable harm, damage and injury to Company and its Affiliates.

(ii)    Employee agrees that, from the Employment Termination Date until the twenty-four (24)-month anniversary of the Employment Termination Date, she shall not, and shall not assist others to, (A) solicit, employ, hire, or otherwise obtain services (directly or indirectly) or induce, cause, or encourage, or attempt to induce, cause, or encourage, to leave Company or any of its Affiliates, any person who is, on the Employment Termination Date, or was, at any time during the two (2)-year period preceding the Employment Termination Date, an employee of or consultant to Company or any of its Affiliates; or (B) take any action that is reasonably likely to result in a breach of clause (A) of this Section 5(b)(ii). In addition, Employee agrees that, from the Employment Termination Date until the Noncompete Termination Date, she shall not, and shall not assist others to, (C) request, advise or in any manner attempt to influence, directly or indirectly, any Client or Prospect of Company or any of its Affiliates to deal with any Person other than Company or its Affiliates in the acquisition of products or services in the Teleperformance Business; (D) solicit any Clients or Prospects of Company or any of its Affiliates, whether personally or through, for, or on behalf of a third party; (E) request, advise or in any

manner attempt to influence, directly or indirectly, any Supplier of Company or any of its Affiliates to alter, modify or in any way change in any respect such Supplier's relationship or course of dealing with Company or any of its Affiliates; or (F) take any action that is reasonably likely to result in a breach of clauses (A), (B) (C),  (D) or (E) of this Section 5(b)(ii).

(iii)  On or promptly after the Employment Termination Date, Company will send to Employee a Separation Agreement and General Release substantially in the form of Exhibit B hereto (the "Release"). If, within twenty-one (21) days after the Employment Termination Date, Employee executes and delivers the Release to Company (and does not revoke it within seven (7) days (or such other statutorily-required period) after the date of such execution), then as long as Employee complies with the Continuing Provisions and the Release, Company will pay the Special Payment (as defined below) to Employee on a semi-monthly basis during the period described in the next sentence, at the times and pursuant to the procedures established by Company.  Subject to Employee's compliance with the Continuing Provisions and the Release, the Special Payments shall be made over the period beginning on the later of (A) the third (3rd) payroll date following the Employment Termination Date and (B) the date on which such payment is required to be made pursuant to Section 11, and ending on the third (3rd) payroll date after the Noncompete Termination Date.  Notwithstanding the preceding sentences of this Section 5(b)(iii), Company reserves the right to waive, by written notice to Employee within thirty (30) days after the Employment Termination Date, Employee's post-termination obligations under Section 5(b)(i) and (ii).  If such obligations are so waived by Company, then Employee shall not be entitled to any Special Payments.  For avoidance of doubt, Employee shall not be entitled to receive any Special Payments unless (1) she has executed and delivered the Release to Company within twenty-one (21) days after the Employment Termination Date and has not revoked it within seven (7) days after the date of such execution, and (2) Employee has complied, and continues to comply, at all times and in all respects with the Continuing Provisions and the Release.  Further, for avoidance of doubt, if Employee's employment is terminated under Section 4(a) due to her death, then she shall not be entitled to receive any Special Payments, and if Employee dies after the Employment Termination Date but prior to payment in full of the Special Payments due for the period between the Employment Termination Date and the date of death, then Company shall pay such Special Payments due for such period to the Person prescribed by Company policy under such circumstances.

(iv)  Employee acknowledges that the covenants of Employee set forth in this Section 5 are an essential element of this Agreement and that, but for the agreement of Employee to comply with these covenants, Company would not have entered into this Agreement. Employee acknowledges that this Section 5 constitutes an independent covenant and shall not be affected by performance or nonperformance of any other provision of this Agreement by Company.  Employee has independently consulted with her counsel and after such consultation agrees that the covenants set forth in this Section 5 are reasonable and proper.

(v)  Employee acknowledges and agrees that the covenants and restrictions in this Section 5(b) are necessary for the protection of Company's legitimate business interests and are reasonable in scope and content.  Employee agrees that Company or any of its Affiliates may enforce this covenant by obtaining, in addition to any monetary damages, injunctive relief to enjoin Employee for its violation; provided that if any court of competent jurisdiction applying New York law determines that the restrictions in this Section 5(b) are not fully

enforceable as set forth herein, then Employee shall fully honor such restriction as a court of competent jurisdiction shall allow.  In view of the substantial value being paid by Company to Employee hereunder, the Parties acknowledge and agree that the time during which this Agreement will remain in effect is reasonable.  Further, Employee acknowledges and agrees that (A) her obligations pursuant to <u>Section 5(a)</u> of this Agreement shall survive indefinitely and (B) pursuit of the activities prohibited by <u>Section 5(b)</u> of this Agreement prior to the Noncompete Termination Date would inevitably involve the use or disclosure of Proprietary Information in breach of <u>Section 5(a)</u>, but that proof of such use or disclosure would be extremely difficult to detect until after substantial injury has already occurred.

(c)     <u>Remedies</u>.  Nothing in this <u>Section 5</u> is intended to limit any remedy of Company or any of its Affiliates under any applicable law.

(d)     <u>Certain Definitions</u>.  As used in this Agreement:

(i)     "<u>Applicable Consideration</u>" shall mean an aggregate amount equal to the higher of (A) her Base Salary and Bonus Compensation, if any, paid to or earned by Employee with respect to the calendar year preceding the year in which the Employment Termination Date occurs (irrespective of when such Bonus Compensation, if any, was actually paid) or (B) the quotient obtained by dividing (y) the aggregate of the Base Salary and Bonus Compensation, if any, paid to or earned by Employee with respect to the three (3) calendar years preceding the calendar year in which the Employment Termination Date occurs (irrespective of when such Bonus Compensation, if any, was actually paid) by (z) three (3).

(ii)     "<u>Client</u>" shall mean any customer or client of Company or any of its Affiliates at any time during the two (2)-year period preceding the Employment Termination Date;

(iii)     "<u>Noncompete Period</u>" shall mean, subject to <u>Section 17</u>, the period beginning on the Employment Termination Date and ending on the Noncompete Termination Date.

(iv)     "<u>Noncompete Termination Date</u>" shall mean the twenty-fourth (24th) month anniversary of the Employment Termination Date or, if earlier, the date of Employee's death.

(v)     "<u>Prospect</u>" shall mean any Person to whom Company or any of its Affiliates has made a formal contact via an officer of such Person, a formal presentation or a written proposal at any time during the two (2)-year period preceding the Employment Termination Date.

(vi)     "<u>Special Payment</u>" shall mean an amount calculated as follows:  the (A) the Applicable Consideration <u>divided by</u> (B) forty-eight (48) (<u>i.e.</u>, semi-monthly installments over the twenty-four (24) month Noncompete Period), and reduced by all required federal, state or local taxes, withholdings or deductions, if any.

(vii)     "<u>Supplier</u>" shall mean any Person who shall have supplied any product or service to, or been a subcontractor of products and services for, Company or any of its

Affiliates at any time during the two (2)-year period preceding the Employment Termination Date.

       6.    <u>Intellectual Property</u>.

       (a)    <u>IP Assignment</u>. Employee hereby assigns, and agrees to assign in the future, to Company or, at Company's request, to a Company Affiliate all right, title and interest in and to any and all Inventions (including all Intellectual Property Rights therein) conceived, made, invented, developed, or reduced to practice by Employee, either alone or jointly with others, during the period of her employment with Company, which relate to the business of Company or any of its Affiliates or actual or demonstrably anticipated research or development of Company or any of its Affiliates, or result from any work performed by Employee for Company or any of its Affiliates. Employee recognizes and understands that this Agreement does not require assignment of any Inventions that he develops entirely on her own time without using Company's equipment, supplies, facilities, or trade secret information, except for Inventions that either: (i) relate at the time of conception or reduction to practice of the Invention to Company's or any of its Affiliate's business, or actual or demonstrably anticipated research or development of Company or any of its Affiliates; (ii) result from any work performed by her for Company or any of its Affiliates; or (iii) that are otherwise Company's or any of its Affiliate's property. Employee recognizes and understands that this Agreement does not apply to any Invention which qualifies fully as a nonassignable Invention under Section 2870 of the California Labor Code or equivalent laws of other states, if applicable. Employee represents that she has reviewed the notification provided on <u>Schedule 6(a)</u> hereto (Limited Exclusion Notification) and agrees that her signature on this Agreement acknowledges receipt of the notification. As used herein, "<u>Inventions</u>" means ideas, inventions, know-how, works of authorship, discoveries, processes, source and object codes, developments, techniques, and improvements; and "<u>Intellectual Property Rights</u>" means all past, present and future trade secret rights, patent rights, copyrights, moral rights, and other proprietary rights in any jurisdiction. Inventions assigned to Company under this <u>Section 6(a)</u> are hereinafter referred to as "<u>Company Inventions</u>." Employee acknowledges that all original works of authorship that are made by Employee (solely or jointly with others) within the scope of her employment and that are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

       (b)    <u>IP License</u>. If any Company Inventions or Intellectual Property Rights therein, including moral rights, cannot (as a matter of law) be assigned to Company, then (i) Employee unconditionally and irrevocably waives the enforcement of such rights and all claims and causes of action of any kind against Company with respect to such rights, and (ii) to the extent Employee cannot (as a matter of law) make such waiver, Employee unconditionally grants to Company an exclusive, perpetual, irrevocable, worldwide, fully-paid and royalty-free license (with the right to sublicense through multiple levels of sublicensees) under any and all such rights (A) to reproduce, create derivative works of, distribute, publicly perform, publicly display, and otherwise use Company Inventions in any medium or format, whether now known or hereafter discovered, (B) to use, make, have made, sell, offer to sell, import, and otherwise exploit any product or service based on, embodying, incorporating, or derived from Company Inventions, and (C) to exercise any and all other present or future rights in Company Inventions.

     (c)    <u>Assistance and Attorney-in-Fact</u>.  Employee will assist Company in perfecting and enforcing Company Inventions.  To that end, Employee will execute, verify, and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request in connection with applying for, obtaining, perfecting, evidencing, sustaining and enforcing the Intellectual Property Rights in Company Inventions.  In addition, Employee will execute, verify and deliver assignments of Company Inventions and Intellectual Property Rights therein to Company or its designee.  In the event Company is unable for any reason, after reasonable effort, to secure Employee's signature on any document needed in connection with the actions specified in this <u>Section 6</u>, Employee hereby irrevocably designates and appoints Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, which appointment is coupled with an interest, to act for and on Employee's behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by Employee.

     (d)    <u>Prior Inventions</u>.  Employee has set forth on <u>Schedule 6(d)</u> a complete list of all Inventions, if any, that Employee has, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of Employee's employment with Company, that Employee considers to be her property or the property of third parties and that Employee wishes to have excluded from the scope of this Agreement (collectively referred to as "<u>Prior Inventions</u>").  If no such Inventions are listed on an attached <u>Schedule 6(d)</u>, Employee represents that there are no Prior Inventions. If, in the course of Employee's employment with Company, (i) Company or any of its Affiliates requests the right to use a Prior Invention or (ii) Employee incorporates a Prior Invention into a Company product, process or machine, Company (and any of its Affiliates) is hereby granted and shall have a nonexclusive, perpetual, irrevocable, worldwide, fully-paid and royalty-free license (with the right to sublicense through multiple levels of sublicensees) to make, have made, modify, use and sell such Prior Invention.  Notwithstanding the foregoing, Employee agrees that she will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without Company's prior written consent.

     7.    <u>Release</u>.  In view of, and in exchange for, the substantial value being paid by Company to Employee under this Agreement, Employee hereby releases (<u>i.e.</u>, gives up) all known and unknown claims that she currently has against Company, TP Greece, all current and former direct and indirect parents, subsidiaries, related companies, partnerships, joint ventures and all Affiliates of Company and TP Greece and, with respect to each of them, their predecessors and successors; and, with respect to each such Person, all its past, present, and future employees, officers, directors, managers, stockholders, owners, partners, members, representatives, assigns, attorneys, agents, and any other Persons acting by, through, under or in concert with any of the Persons listed in this <u>Section 7</u>, and their successors, except for (a) payment of commissions or other payments, if any, due to Consultant under the 2022 SIP for the last two (2) quarters of the fiscal year ended December 31, 2022, subject to Consultant's submission of all applicable documentation with respect thereto and approval thereof as contemplated by the 2022 SIP, (b) claims that the law does not permit her to waive by signing this Agreement, and (c) claims under the Age Discrimination in Employment Act of 1964.  For example, Employee is releasing all common law contract, tort, or other claims she currently might have, as well as all claims he currently might have under the Worker Adjustment &

Retraining Notification Act (WARN Act), Title VII of the Civil Rights Act of 1964, Sections 1981 and 1983 of the Civil Rights Act of 1866, the Americans With Disabilities Act (ADA), the Employee Retirement Income Security Act of 1974 (ERISA), the Older Worker Benefit Protection Act, and any other domestic or foreign laws.

8.    Assignment; Successors and Assigns.

(a)    Employee agrees that she will not voluntarily assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement, nor shall Employee's rights be subject to encumbrance or the claims of creditors.    Any purported assignment, transfer or delegation shall be null and void to the maximum extent permitted by applicable law.

(b)    Company may assign, sell or transfer its rights and obligations under this Agreement in connection with the sale of Company to, or the merger or consolidation of Company with, any other Person, or the sale by Company of all or substantially all its properties or assets (any of the foregoing, a "Company Sale"), and thereafter Company shall not have any further responsibilities or liabilities under this Agreement; provided that the successor assumes all the obligations of Company under this Agreement.    In addition, Company may transfer its rights and obligations under this Agreement in a transaction other than a Company Sale to any Person who assumes all the obligations of Company under this Agreement; provided that Company remain(s) secondarily liable for such obligations under this Agreement.    Upon any such sale, merger or assignment, all references to Company (other than the reference to Company contained in the immediately preceding proviso) shall be deemed to be to such successor.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns, and shall not benefit any Person other than those described above.

9.    Withholding.  Company shall be entitled to withhold or deduct from any amounts payable to Employee pursuant to this Agreement any amount it reasonably determines it is required to withhold or deduct under applicable law, rules, regulations, court order or other requirement (e.g., required payroll and income tax withholding).

10.    Notices.  All notices and other communications required or permitted hereunder shall be in writing (which term shall include facsimile, email or other electronic transmission) and shall be deemed to have been duly given (a) upon actual receipt, when delivered by hand, (b) upon receipt of transmission confirmation, when sent by facsimile, email or other electronic transmission, followed by overnight courier or international courier, as applicable (with postage prepaid and confirmation requested), (c) three (3) Business Days after mailing by registered or certified mail within the United States, (d) one (1) Business Day after sending by overnight courier (with postage prepaid and confirmation requested) within the United States or (e) two (2) Business Days after sending by international courier (with postage prepaid and confirmation requested):

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

**EXECUTION COPY**

    (a)    If to Employee, to:

        Athina Karahogitis
        Email:  akarahogiti@gmail.com

or to such other Person(s) or address(es) as Employee shall furnish by notice to Company in writing in accordance with this <u>Section 10</u>.

    (b)    If to Company, to:

        TPUSA, Inc.
        1991 South 4650 West
        Salt Lake City, UT  84104
        Attention: Global Chief Client Officer
        Email: [miranda.collard@teleperformance.com](mailto:miranda.collard@teleperformance.com)

        with a copy to:

        TPUSA, Inc.
        1991 South 4650 West
        Salt Lake City, UT  84104
        Attention: Chief Financial Officer
        Email:  akash.khandelwal1@teleperformance.com

    and

        Teleperformance Group, Inc.
        1601 Washington Avenue, Suite 400
        Miami Beach, FL 33139
        Attention: Chief Legal and Compliance Officer
        Email:  [leigh.ryan@teleperformance.com](mailto:leigh.ryan@teleperformance.com)

    and

        Teleperformance Group, Inc.
        1601 Washington Avenue, Suite 400
        Miami Beach, FL 33139
        Attention: Global Chief Operating Officer
        Email:  agustin.grisanti@teleperformance.com

or to such other Person(s) or address(es) as Company shall furnish by notice to Employee in writing in accordance with this <u>Section 10.</u>

    11.    <u>Section 409A</u>.  If any amounts that become due under this Agreement constitute "nonqualified deferred compensation" within the meaning of Section 409A of the U.S. Internal Revenue Code of 1986, as amended, payment of such amounts shall not commence until Employee incurs a "separation from service", within the meaning of Treasury Regulation Section 1.409A-1(h) without giving effect to any optional elections thereunder.  If, at the time of

Employee's separation from service, Employee is a "specified employee" (as defined under U.S. Internal Revenue Code Section 409A), any benefit as to which Section 409A penalties could be assessed that becomes payable to Employee on account of her "separation from service" (including any amounts payable pursuant to the preceding sentence) will not be paid until after the later of six (6) months and one (1) day after her separation from service (the "409A Suspension Period") or such later date as may be set forth in any other applicable plan or policy. Within fifteen (15) calendar days after the later of the end of the 409A Suspension Period or such later date as may be set forth in any other applicable plan or policy, Employee shall be paid a lump sum payment in cash equal to any payments delayed because of the preceding sentence, together with interest on them for the period of delay at a rate not less than the average prime interest rate published in *The Wall Street Journal* on any day chosen by Company during that period. Thereafter, Employee shall receive any remaining benefits as if there had not been an earlier delay. For purposes of Section 409A, each payment made hereunder is treated as a separate payment. Notwithstanding anything to the contrary in this Agreement, Employee shall be required to submit all expense reimbursement requests to Company, in the form and with such substantiation as required by Company, within ninety (90) days of incurring the expense, but in any case within five (5) days after the Employment Termination Date; and all reimbursements shall be made by Company within ninety (90) days after receipt of a proper expense reimbursement request. No amount reimbursed in any calendar year shall affect the amount reimbursable in any other calendar year.

12. <u>Background Checks</u>. Employee understands, acknowledges and agrees that, at any time during the Period of Employment, Company may, with or without notice, perform a background check and/or drug and/or alcohol screening of Employee as a security and/or qualifications measure or pursuant to Company customer or client requirements. Employee further understands, acknowledges and agrees that Company has a zero tolerance policy for alcohol and illegal and non-prescription drugs, and any and all effects thereof, in the workplace.

13. <u>Entire Agreement</u>. The terms of this Agreement, including the exhibits and schedules hereto, are intended by the Parties to be the final and exclusive expression of their agreement with respect to the employment of Employee by Company and may not be contradicted by evidence of any prior or contemporaneous agreement regarding such employment, any and all of which are superseded as of the date hereof. The Parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative or other legal proceeding involving this Agreement.

14. <u>Amendments; Waivers</u>. Except as set forth in <u>Section 3</u>, this Agreement can be modified, amended or terminated only by an instrument in writing, signed by Employee and by a duly authorized representative of Company (other than Employee) acting on the express authorization of the Global COO, the Global CCO or a member of the Teleperformance Group senior management (other than Employee). By an instrument in writing similarly executed and authorized, any Party may waive compliance by another Party with any provision of this Agreement that such other Party was or is obligated to comply with or perform; <u>provided</u> that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy or

power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy or power provided herein or by law or in equity.

15.     Severability; Enforcement.  If any provision of this Agreement, or the application thereof to any Person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other Persons, places and circumstances shall remain in full force and effect.

16.     Governing Law.  The validity, interpretation, enforceability and performance of this Agreement is and shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of the conflicts of laws thereof (other than Section 5-1401 of the General Obligations Law of the State of New York), and the United States federal law, including patent and copyright laws.

17.     Injunctive Relief.  The Parties agree that in the event of any breach or threatened breach of any of the covenants in Section 5 or Section 6, the damage or imminent damage to the value and the goodwill of the business of Company and its Affiliates will be irreparable and extremely difficult to estimate, making any remedy at law or in damages inadequate. Accordingly, the Parties agree that Company and its Affiliates shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of any such provisions by Employee, in addition to any other relief (including, without limitation, damages and recoupment of Special Payments made to Employee in consideration of the covenants in Section 5 and Section 6) available to Company under this Agreement or under law.  The Parties agree that the Noncompete Period shall not run during, and shall be extended by, any period in which Employee is in violation of Section 5 or Section 6.  In the event that Company obtains interim relief or a permanent injunction to enforce this Agreement, the Noncompete Period to be enforced shall re-commence at the time the interim relief or permanent injunction is granted.

18.     Consent to Jurisdiction.  Each of the Parties hereby irrevocably submits and consents to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and the Supreme Court of the State of New York in and for the County of New York, as may be appropriate, for the purpose of any action or proceeding brought by any Party in connection with this Agreement.

19.     Section Headings.  Section and other headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

20.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Electronic signatures and the exchange of copies of this Agreement and of signature pages by facsimile transmission, by electronic mail in portable document format ("pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

**EXECUTION COPY**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**EMPLOYEE:**

Athina Karahogitis

**TPUSA, Inc.**

By:

Name: Akash Khandelwal

Title:   Chief Financial Officer

[Signature Page of A. Karahogitis Amended and Restated Employment and Non-Competition Agreement]

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

**EXHIBIT A**
**To**
**AMENDED AND RESTATED**
**EMPLOYMENT AND NONCOMPETITION AGREEMENT**
**Of**
**ATHINA KARAHOGITIS**

**Annual Base Salary\* as of the Commencement Date pursuant to Section 3(a):**  USD $315,000 per year, prorated for any partial year during Period of Employment

**Annual Maximum Bonus Compensation\* for the year ending December 31, 2023 subject to Section 3(b):**  Up to USD $262,000 per year, depending upon achievement of personal and Company-related performance criteria as established and determined each year by the Global CCO

**Monthly Car Allowance\*:** USD $700 per month, prorated for any partial month during Period of Employment

**\*All amounts are gross, subject to all applicable withholdings**

**EXHIBIT B**
**To**
**AMENDED AND RESTATED**
**EMPLOYMENT AND NONCOMPETITION AGREEMENT**
**OF**
**ATHINA KARAHOGITIS**


**FORM OF RELEASE**

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

## SEPARATION AGREEMENT AND GENERAL RELEASE

TPUSA, Inc., a Delaware corporation, (the "Company") and I, Athina Karahogitis ("Employee" or "me" or "I"), have entered into this Separation Agreement and General Release (the "Release") to settle all known and unknown claims I might have against the Company and all related parties. Except to the extent governed by federal law, this Release shall be governed by the statutes and common law of New York, excluding any that mandate the use of another jurisdiction's laws. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended and Restated Employment and Non-Competition Agreement, dated as of January 1, 2023, between the Company and me (the "Employment Agreement").

The Company and I agree as follows:

1.    Separation from Employment.

The Company and I acknowledge and agree that effective as of the close of business [ENTER TIME ZONE] Time on _____ (the "Employment Termination Date"): (a) my employment with the Company is terminated; (b) the Employment Agreement is terminated, other than Sections 4(g), 4(h), 5 (other than, if I execute and deliver (and do not revoke) this Release as set forth therein, Section 5(b)(iii)), 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17 and 18 of the Employment Agreement and the definitions immediately following Section 2(b) of the Employment Agreement (collectively, the "Continuing Provisions"), which will survive such termination and continue in full force and effect indefinitely; and (c) other than rights, duties, obligations or liabilities under the Continuing Provisions and this Release, neither the Company nor I shall have any rights, duties, obligations or liabilities under the Employment Agreement, which shall be deemed terminated and of no further force and effect.

2.    Benefits.

(a)    In General. The Company promises that, if I execute and deliver this Release to the Company within 21 days after the Employment Termination Date (and do not revoke it within 7 days after the date of such execution) and comply with the terms of this Release and the Continuing Provisions, I will receive the benefits set forth in this Section 2. I understand and agree that I am not otherwise entitled to receive any of the benefits provided to me under this Release.

(b)    Special Payments. In exchange for, and subject to my execution and delivery to the Company of, this Release within 21 days after the Employment Termination Date (and no revocation hereof within 7 days after the date of such execution), and my continuing compliance with this Release and the Continuing Provisions during the Noncompete Period, the Company will pay me forty-eight (48) equal semi-monthly installments (other than, if applicable, payments delayed pursuant to Section 11 of the Employment Agreement) of $_____ each, less all required federal, state and local taxes, withholdings or deductions, if any (collectively, the "Special Payments")[1]. Subject to my continuing compliance with this Release and the Continuing

---

[1] To be calculated as set forth in Section 5 of the Employment Agreement and Exhibit A thereto.

Provisions, the Special Payments will be made, at the times and pursuant to the procedures established by the Company over the period beginning on the later of (i) _____ (the 3rd payroll date following the Employment Termination Date) and (ii) _____, the date on which such payment is required to be made pursuant to <u>Section 11</u> of the Employment Agreement, and ending on _____ (the 3rd payroll date after the Noncompete Termination Date). For avoidance of doubt, (A) I will not be entitled to receive any Special Payments unless (1) I have executed and delivered this Release to the Company within 21 days after the Employment Termination Date and I did not revoke it within 7 days after the date of such execution and (2) I have complied, and continue to comply, at all times and in all respects with this Release and the Continuing Provisions, and (B) I am not entitled to any Special Payments after the date of my death, <u>provided</u> that if I die prior to payment in full of the Special Payments due for the period between the Employment Termination Date and the date of my death, the Company will pay such Special Payments due for such period to the Person prescribed by Company policy under such circumstances.

3.     <u>Complete Release</u>.

(a)     <u>Claims Released</u>.  Except for the claims identified in <u>Section 3(b)</u>, I irrevocably and unconditionally release all known and unknown claims, promises, causes of action, or rights of any type or nature whatsoever that I now may have (the "<u>Claims</u>") with respect to any Released Party listed in <u>Section 3(d)</u>.  I understand that I am not releasing future claims.  I understand that the Claims I am releasing might arise under many different international, multinational, commonwealth, national, state, local or municipal laws (including statutes, regulations, other administrative guidance, and common law doctrines) of any country, region, territory or jurisdiction, including, by way of example but without limitation, the following:

<u>Federal, state and local anti-discrimination statutes</u>, such as the Age Discrimination in Employment Act ("<u>ADEA</u>") and Executive Order 11,141, which prohibit age discrimination in employment; Title VII of the Civil Rights Act of 1964, Sections 1981 and 1983 of the Civil Rights Act of 1866, Executive Order 11,246, which prohibits discrimination based on race, color, national origin, religion, or sex; the Equal Pay Act, which prohibits paying men and women unequal pay for equal work; the Americans With Disabilities Act and Sections 503 and 504 of the Rehabilitation Act of 1973, which prohibit discrimination based on disability; and any other federal, state, or local laws prohibiting discrimination in employment based on actual or perceived race, religion, color, national origin, ancestry, physical or mental disability, medical condition, marital status, sex, age, sexual orientation, or association with a person who has, or is perceived to have, any of those characteristics.

<u>Federal employment statutes</u>, such as the Worker Adjustment and Retraining Notification Act, which requires that advance notice be given of certain work force reductions; the Employee Retirement Income Security Act of 1974, which, among other things, protects employee benefits; and any other federal laws relating to employment, such as veterans' reemployment rights laws.

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

Other laws, such as any federal, state, or local laws restricting an employer's right to terminate employees, or otherwise regulating employment; any federal, state, or local law enforcing express or implied employment contracts or requiring an employer to deal with employees fairly or in good faith; any other federal, state, or local laws providing recourse for alleged wrongful discharge, tort, physical or personal injury, emotional distress, fraud, negligent misrepresentation, defamation, and similar or related claims; any other law relating to salary, benefits, and other employment matters, unless prohibited by law.

Examples of released Claims include, but are not limited to, the following (except to the extent explicitly preserved by Section 3(b) of this Release):  (i) Claims that in any way relate to or arose during my employment with the Company or any of its Affiliates, or the termination of that employment, such as Claims for wrongful termination in violation of public policy; (ii) Claims that in any way relate to the design or administration of any employee benefit program; (iii) Claims that I have irrevocable or vested rights to severance or similar benefits or to post-employment health or group insurance benefits, including any rights to coverage or benefits under any short- or long-term disability programs; or (iv) any Claims to attorneys' fees or other indemnities (such as under the Civil Rights Attorneys' Fees Act), with respect to Claims that I am releasing.

If, despite this Release, I sue or bring an arbitration action asserting any Claim that I have released, I will be liable to the Released Parties for their attorneys' fees, other defense costs, and any other damages that my suit or arbitration causes, except those attributable to ADEA Claims. I promise not to accept any relief or remedies not set forth in this Release as to any Claim I have released by signing it.

(b)     Claims Not Released.  This Release, by its terms, does not release (i) any claim that the law does not permit me to release, including but not limited to claims under the Fair Labor Standards Act or, if applicable, state workers' compensation laws, (ii) if applicable, any claim to vested benefits to which I am entitled under any qualified retirement plans of the Company in which I am a participant as of the Employment Termination Date, (iii) if applicable, any claim to any vested rights I have under any equity incentive plan of the Company or its Affiliates in which I am a participant as of the Employment Termination Date, as determined under the terms of such equity incentive plan and related plan documents, (iv) if I currently have an outstanding claim for disability payments or if I am currently receiving disability payments under the Company's long-term disability insurance policy, any right I may have to such disability payments, subject to the terms of such policy, (v) any right to purchase continued long-term disability insurance pursuant to the Company's long-term disability insurance policy, to the extent I am eligible to do so and subject to the terms of such policy, (vi) any right to purchase continued health plan coverage pursuant to the provisions of the Consolidated Omnibus Reconciliation Act of 1985, to the extent I am eligible to do so, and (vii) any claim that I may have to enforce the terms of this Release.

(c)     Unknown Claims.  I understand that I am releasing Claims that I may not know about.  That is my knowing and voluntary intent even though I recognize that someday I might regret having signed this Release.  Nevertheless, I am assuming that risk and I

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

agree that this Release shall remain effective in all respects in any such case. I expressly waive all rights I might have under any law that is intended to protect me from waiving unknown claims. I understand the significance of doing so.

      (d)      Released Parties. The "Released Parties" are the Company all current, former, direct and indirect parents, subsidiaries, related companies, partnerships, joint ventures, and all Affiliates of the Company and, with respect to each of them, their predecessors and successors; and, with respect to each such Person, all its past, present, and future employees, officers, directors, managers, stockholders, owners, partners, members, representatives, assigns, attorneys, agents, insurers, employee benefit programs (and the trustees, administrators, fiduciaries, and insurers of such programs), and any other Persons acting by, through, under or in concert with any of the Persons listed in this Section 3(d), and their successors; and a "Released Party" is any of the foregoing Persons.

      4.      Promises.

      (a)      Acceptance of Benefits. I am accepting the Special Payments under this Release in lieu of any other rights or benefits to which I possibly could be, or could become, entitled. I have not been told that the Company or any Released Party will rehire me. I promise not to seek employment with the Company or any Released Party unless an authorized officer of the Company or a Released Party, as applicable, personally asks me to do so.

      (b)      Continuing Provisions. I agree to comply with all Continuing Provisions.

      (c)      Company Property and Debts. On or prior to the Employment Termination Date, I have returned to the Company all property of the Company and/or its Affiliates, including, without limitation, all files, books, memoranda, manuals, documents, records, reports, notes, contracts, lists, blueprints, electronic media, diskettes, CD-ROMs, other documents and materials, all Proprietary Information and other information (including, without limitation, all copies of the foregoing), whether in printed, electronic, digital or other form, Company-provided credit cards, office keys, building access cards, security passes, parking cards, access or identification cards, Magnitude key fob(s), computers, cellular telephones, blackberries and any other property of the Company or any Released Party in my possession or control. I have submitted for reimbursement, and been reimbursed for, all Company expenses for which I am entitled to be reimbursed. I have repaid everything I owe to the Company or any Released Party, paid all amounts I owe on Company-provided credit cards or accounts (such as cell phone accounts), and canceled or personally assumed any such credit cards or accounts.

      (d)      Taxes. I am responsible for paying, will pay and will indemnify and hold the Company harmless against, any taxes on amounts I receive pursuant to this Release. I agree that the Company may withhold all taxes or other amounts it determines it is legally required to withhold on amounts paid to me under this Release. I agree not to make any claim against the Company or any other Person based on how the Company reports amounts paid under this Release to tax authorities.

(e)        Ownership of Claims.  I have not assigned or transferred any Claim I am purporting to release, nor have I attempted to do so.

(f)        Confidential and Proprietary Information and Existing Obligations.

(i)    I acknowledge that, in the course of my employment with the Company, I have obtained or had access to Proprietary Information.  I agree to always hold all Proprietary Information in strict confidence.  I agree and represent that I have not, directly or indirectly summarized, copied, disclosed to any third party, published, or in the case of tangible Proprietary Information, removed from the premises of the Company or any Affiliate of the Company, any Proprietary Information, except solely to the extent necessary to carry out my responsibilities under the Employment Agreement or otherwise in furtherance of the business of the Company or any of its Affiliates or as required by law, and I will not do so.  I also agree and represent that I have not made, and will not make, directly or indirectly, use of any Proprietary Information for my own purposes or for the benefit of any Person.  I further warrant and represent that all Proprietary Information in my possession, custody or control, whether in printed, electronic, digital or other form and including all copies thereof, has been returned to the Company by or on the Employment Termination Date.

(ii)    I acknowledge that, in the course of my employment with the Company, I have obtained or had access to Personal Information.  I agree to always hold all Personal Information in strict confidence.  I agree and represent that I have not, directly or indirectly, Inappropriately Used any Personal Information, and I will not do so.

(g)        Implementation.  I agree to sign and deliver any documents, certificates or instruments, and do anything else, that in the future is requested by the Company or any of its Affiliates to implement this Release.

(h)        Other Representations.  In addition to my other representations in this Release, I am making the following representations to the Company, on which I acknowledge it is relying in entering into this Release with me:

(i)    I have not suffered any job-related wrongs or injuries, such as any type of discrimination, for which I might be entitled to compensation or relief now or in the future.  I have properly reported any and all job-related wrongs or injuries for which I might be entitled to compensation or relief, such as an injury for which I might receive a workers' compensation award in the future.  I have properly reported all hours that I have worked and I have been paid all wages, overtime, commissions, compensation, benefits, and other amounts that the Company or any other Released Party should have paid me in the past.

(ii)    This Release is not an admission of wrongdoing by the Company or any other Released Party.

(iii)    I am intentionally releasing Claims that I do not know I might have and that, with hindsight, I might regret having released.

(iv)   If the Company or I successfully assert that any provision in this Release is void, the rest of this Release shall remain valid and enforceable unless the other Parties to this Release elects to cancel it.

(v)   I understand that this Release had to meet certain requirements to validly release any ADEA claims I might have had, and I represent that all such requirements were satisfied.  (These requirements are that (A) my entering into this Release had to be knowing and voluntary (i.e., free from fraud, duress, coercion or mistake of fact); (B) this Release had to be in writing and be understandable; (C) it had to explicitly waive current ADEA claims; (D) it could not have waived future ADEA claims; (E) it must have been paid for with something to which I was not already entitled; (F) the Company had to advise me in writing to consult an attorney; (G) the Company normally had to give me at least 21 days in which to consider my release; and (H) the Company normally had to give me at least 7 days within which to revoke my release after I signed it.)

(i)   <u>False Claims Representations and Promises</u>.  I have disclosed to the Company any information I have concerning any conduct involving the Company or any Affiliate that I have any reason to believe may be unlawful or that involves any false claims to the United States or any other jurisdiction.  I promise to cooperate fully in any investigation the Company or any Affiliate undertakes into matters occurring during my employment with the Company or any Affiliate.  I understand that nothing in this Release prevents me from cooperating with any United States government investigation.  In addition, to the fullest extent permitted by law, I hereby irrevocably assign to the United States government any right I might have to any proceeds or awards in connection with any false claims proceedings against the Company or any Affiliate of the Company.

(j)   <u>Cooperation Required</u>.  I agree that I will fully cooperate with the Company or any Affiliate of the Company in effecting a smooth transition of my responsibilities to others. Within 5 days of any request by the Company or any of its Affiliates or their representatives, I will draft a work status report regarding my pre-termination job responsibilities and communicate with any person identified by the Company or such Affiliate regarding those responsibilities.  Further, when requested by the Company or any of its Affiliates or their representatives, I will promptly and fully respond to all inquiries from the Company or any of its Affiliates or their representatives relating to any matter about which I have factual information needed by the Company or such Affiliate.  To the extent I incur reasonable out-of-pocket expenses (such as postage costs or telephone charges) in assisting the Company or any of its Affiliates at its request, the Company will mail me a reimbursement check for those expenses within 15 days after it receives my request for payment, along with satisfactory written substantiation of the claimed expenses.

(k)   <u>This Release to be Kept Confidential</u>.  I have not disclosed and will never disclose the underlying facts that led up to this Release, or the terms, amount, or existence of this Release, to anyone other than a member of my immediate family or my attorney or other professional advisor and, even as to such a person, only if the person agrees to honor this confidentiality requirement.  A violation of this confidentiality requirement by any such person is to be treated as a violation by me.  This <u>Section 4(k)</u> does not prohibit disclosures to the extent legally necessary to enforce this Release, nor does it prohibit disclosures to the extent otherwise

legally required.  I agree to notify the Company of a disclosure obligation or request within 3 days after I learn of it and permit, and cooperate with, the Company to take all steps it deems to be appropriate to prevent or limit the required disclosure.

(l)       Nondisparagement.  I agree not to criticize, denigrate or otherwise disparage in any way the Company any other Released Party or any of their respective businesses, operations, services, products, processes, policies, practices, standards of business conduct or other aspects of their business or operations.  The Company agrees to use reasonable efforts to cause its senior management not to criticize, denigrate or otherwise disparage in any way Employee or her work in any communication to a third party.  Nothing in this Section 4(l), however, shall prohibit any Party from complying with any lawful subpoena or court order or taking any other action affirmatively authorized by law.  Each Party agrees to notify each other Party of any such obligation or request within 3 days after learning of it and permit, and cooperate with, the other Parties to take all steps it deems to be appropriate to prevent or limit the required disclosure.

5.       Consequences of Violating Promises.

(a)       I acknowledge and agree that the agreements and benefits extended under this Release were agreed to by the Company in consideration of my compliance with this Release and the Continuing Provisions.  In addition to any other remedies provided for at law or equity, if I breach this Release or any of the Continuing Provisions (unless, in the reasonable opinion of the Global COO, the Global CCO or a designated member of the Teleperformance Group senior management, such breach is capable of being cured by me and I cure such breach within 5 business days after receipt of written notice of such curable breach from the Company), then upon written notice from the Company, I shall forfeit the right to receive any further Special Payments and I shall reimburse the Company for Special Payments already made to me (other than any portion thereof attributable to ADEA claims).

(b)       In addition to any other remedies or relief that may be available, including, without limitation, under Section 17 of the Employment Agreement, I agree to pay any attorneys' fees and damages (except those attributable to ADEA claims) that any of the Released Parties may incur as a result of my breaching a promise or covenant I made in this Release or in the Continuing Provisions, or if any representation I made in this Release was false when made.

6.       Consideration of Release.

I acknowledge that, before signing this Release, I was given at least 21 days in which to consider this Release.  I waive any right I might have to additional time within which to consider this Release.  I further acknowledge that:  (a) I took advantage of the time I was given to consider this Release before signing it; (b) I carefully read this Release; (c) I fully understand it; (d) I am entering into it voluntarily; (e) I am receiving valuable consideration in exchange for my execution of this Release that I would not otherwise be entitled to receive; and (f) the Company, in writing, encouraged me to discuss this Release with my attorney (at my own expense) before signing it, and that I did so to the extent I deemed appropriate.  I understand that I am entitled to revoke this Release, in writing, within 7 days after I sign it.  Such revocation must be delivered

to the Company as provided herein within the 7-day period, in which case I will receive no Special Payments and this Release will not go into effect. If I do not revoke this Release, it will become effective on the 8th day after I sign it. I understand that the Company does not need to sign this Release in order for it to become fully enforceable.

7.    <u>Miscellaneous</u>.

(a)    <u>Entire Agreement</u>. This Release constitutes the entire agreement between the Company and me relating to my termination of employment with the Company and its Affiliates, and supersedes all other correspondence, offers, proposals, promises, agreements or arrangements relating to the subject matter contained herein, including, without limitation, the Employment Agreement (other than the Continuing Provisions, which shall remain in full force and effect). In the event of any conflict between this Release and the Employment Agreement, this Release shall control. This Release cannot be modified or canceled in any manner, nor may any provision of it or any legal remedy with respect to it be waived, except by a writing signed by both me and an authorized officer of the Company. I acknowledge that the Company has not made any representations or promises to me (such as that my former position will remain vacant), other than those in this Release. If any provision in this Release is found to be unenforceable, all other provisions will remain fully enforceable.

(b)    <u>Successors</u>. This Release binds my heirs, administrators, representatives, executors, successors, and assigns, and will inure to the benefit of all Released Parties and their respective heirs, administrators, representatives, executors, successors, and assigns.

(c)    <u>Interpretation</u>. This Release shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against me or any Released Party. Unless the context indicates otherwise, the term "or" shall be deemed to include the term "and" and the singular or plural number shall be deemed to include the other. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Release.

(d)    <u>Notices; Counterparts</u>. Section 10 of the Employment Agreement shall apply to all notices or other communications required or permitted hereunder. <u>Section 20</u> of the Employment Agreement shall apply to this Release as if incorporated herein; provided that references in such <u>Section 20</u> to "Agreement" shall be deemed to refer to "Release."

8.    <u>Arbitration of Disputes</u>.

The Company and I agree to resolve any disputes we may have with each other through final and binding arbitration consistent with applicable law. For example, I agree to arbitrate any dispute about the validity of this Release or any discrimination claim. I also agree to resolve through final and binding arbitration any disputes I have with any other Released Party who elects to arbitrate those disputes under this <u>Section 8</u>. Arbitration shall be conducted by the American Arbitration Association in accordance with its employment dispute resolution rules and consistent with state law. A neutral arbitrator will preside over the arbitration and issue a written decision subject to limited judicial review. All remedies available under law will be

available in the arbitration. The arbitration proceedings will allow for adequate discovery. Commencement of the arbitration will be at a minimal cost to me. This agreement to arbitrate does not apply to government agency proceedings. **By agreeing to this Release, I understand that I am waiving my right to a jury trial.**

---

**YOU MAY NOT MAKE ANY CHANGES TO THE TERMS OF THIS RELEASE. BEFORE SIGNING THIS RELEASE, TAKE IT HOME, READ IT, AND CAREFULLY CONSIDER IT. YOU ARE ADVISED TO DISCUSS IT WITH YOUR ATTORNEY (AT YOUR OWN EXPENSE). IF YOU DECIDE TO SIGN IT, YOU MUST DELIVER A SIGNED COPY TO _____, C/O TPUSA, INC., 1991 SOUTH 4650 WEST, SALT LAKE CITY, UT 84104 OR VIA EMAIL TO:_____ BY 5:00 P.M. MOUNTAIN TIME ON OR BEFORE THE DATE THAT IS 21 DAYS AFTER THE EMPLOYMENT TERMINATION DATE. YOU WILL HAVE AN ADDITIONAL 7 DAYS AFTER YOU SIGN THE RELEASE TO REVOKE YOUR RELEASE. IF YOU CHOOSE TO REVOKE YOUR RELEASE, YOU MUST DELIVER A WRITTEN NOTICE OF REVOCATION TO _____ OR VIA EMAIL TO: _____ AT THE ADDRESS ABOVE BY THE 7TH DAY AFTER THE DATE YOU SIGNED IT. BY SIGNING THIS RELEASE, YOU WILL BE WAIVING YOUR KNOWN AND UNKNOWN CLAIMS.**

---

Executed at _____, _____ this __ day of _____, 20__.


_____
Employee

Executed this _____ day of _____, 20__.


**TPUSA, Inc.**


By:_____
Name:
Title:

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

**SCHEDULE**                                                                                     **1**

**Form of Termination Agreement**

**TERMINATION AGREEMENT**

This Termination Agreement (the "Agreement") is entered into effective as of December 31, 2022 among Ypiresia 800 – Teleperformance A.E., a Greek corporation ("TP Greece"), Excaliber International SRL, a Romanian company duly represented by Mrs. Athina Karahogitis (the "Consultant"), and Mrs. Athina Karahogitis, an individual and the sole associate and representative of Consultant ("AK").  Each of TP Greece, Consultant and AK may be referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Consultant, through AK, has provided services to TP Greece, most recently pursuant to a Service Agreement dated as of February 1, 2017 (as amended through the date hereof, the "Service Agreement");

WHEREAS, in addition to fees paid under the Service Agreement, TP Greece has paid to Consultant bonuses and/or commissions earned under various Strategic Account Manager Sales Incentive Plans or other arrangements as in effect from time to time, with the current such plan in effect as of January 2, 2022 (the "2022 SIP"); and

WHEREAS, effective as of January 1, 2023, (1) AK shall become an employee of Teleperformance Group, Inc., a Delaware corporation and affiliate of TP Greece (the "Company") pursuant to an Employment and Noncompetition Agreement between AK and the Company, and (2) Consultant shall cease (a) providing services to TP Greece pursuant to the Service Agreement and (b) to be entitled to any commissions, bonus or other payments pursuant to the 2022 SIP; provided that Consultant shall be entitled to a prorated portion of the variable bonus, if any, earned in the role of Global Deputy Chief Client Officer for the period from June 1, 2022 through December 31, 2022, up to a maximum of €116,667;

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree as follows:

1.    Termination of Service Agreement.  Effective as of the close of business Central European time on December 31, 2022, the Service Agreement is hereby terminated and no Party shall have any further rights or obligations to another Party thereunder except for (i) TP Greece's obligation to pay to Consultant (a) fees for services rendered through December 31, 2022, subject to all applicable withholdings, (b) reimbursement of fuel, telephone and travel expenses incurred through December 31, 2022, in each case in accordance with the terms of the Service Agreement, and (c) payment of a prorated portion of the variable bonus, if any, earned in the role of Global Deputy Chief Client Officer for the period from June 1, 2022 through December 31, 2022, up to a maximum of €116,667, and (ii) Consultant and AK's obligations under Section 9 (Confidential Information).

2.    Termination of 2022 SIP.

a.    Effective as of the close of business Central European time on December 31, 2022, the 2022 SIP and any other SIPs or other commission and/or bonus arrangements to subject to all applicable withholdings which Consultant or AK may have been a party with any company affiliated with Teleperformance SE (collectively with the 2022 SIP, the "TP SIPs") are hereby terminated and of no further force and effect. From and after December 31, 2022, neither

TP Greece nor any other company affiliated with Teleperformance SE shall have any obligations to Consultant or AK under the TP SIPs except for (i) payment of the commissions and bonuses based on farming targets and K-Sat, if any, due to Consultant under the 2022 SIP for the last two (2) calendar quarters of the fiscal year ended December 31, 2022, subject to Consultant's submission of all applicable documentation with respect thereto on or before March 15, 2023 and approval thereof as contemplated by the 2022 SIP; (ii) the Commission claw back provisions under the section of the 2022 SIP entitled "Interpretation and Administration"; and (iii) Consultant and AK's confidentiality obligations under the section of the 2022 SIP entitled "Confidentiality".

b. Each of Consultant and AK agrees to submit to TP Greece on or before March 15, 2023 accurate and complete documentation, as required by the Service Agreement and the 2022 SIP, with respect to any and all fees, commissions and/or bonuses earned by Consultant and fuel, telephone and travel expenses incurred by Consultant, in each case through December 31, 2022. Any and all commissions, bonuses and/or expenses for which accurate and complete documentation is not submitted pursuant to the Service Agreement or the 2022 SIP, as applicable, on or before March 15, 2023 shall be forfeited, and TP Greece shall have no further obligations under the Service Agreement, the 2022 SIP or any other TP SIPs.

3. Governing Law; Jurisdiction. The validity, interpretation, enforceability and performance of this Agreement is and shall be governed by and construed in accordance with the laws of Greece and any dispute arising hereunder shall be referred to the exclusive jurisdiction of the Courts of Athens.

4. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Electronic signatures and the exchange of copies of this Agreement and of signature pages by facsimile transmission, by electronic mail in portable document format ("pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

[Remainder of the Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.


**YPIRESIA 800 –**
**TELEPERFORMANCE A.E.**


By:_____
Name:
Title:


**EXCALIBER INTERNATIONAL SRL**


By:_____
Athina Karahogitis
Authorized Representative


_____
Athina Karahogitis

## SCHEDULE 6(a)

### Limited Exclusion Notification

### Applicable Only to Employees Who Reside or Work in California

This is to notify you in accordance with Section 2872 of the California Labor Code that the foregoing Agreement between you and Company does not require you to assign or offer to assign to Company any invention that you developed entirely on your own time without using Company's equipment, supplies, facilities or trade secret information <u>except for those inventions that either</u>:

(1)    Relate at the time of conception or reduction to practice of the invention to Company's business, or actual or demonstrably anticipated research or development of Company; or

(2)    Result from any work performed by you for Company.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

This limited exclusion does not apply to any patent or invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

By my signature on the foregoing Agreement, I acknowledge receipt of a copy of this notification.

DocuSign Envelope ID: 473CA02F-5CBF-40C0-B6A4-CB48C7C2DB87

## SCHEDULE 6(d)
## Employee's Prior Inventions

The complete and exhaustive list of Employee's Prior Inventions, to be covered under Section 6(d) of the Agreement, are as follows:

**NONE**

**EXHIBIT 5**

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Wednesday, June 7, 2023 16:18
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Hey Athina,

Triangulated your latest agreement and it states that you should submit your CAW's, pre (promotion)- January 1st), for payment for 2 quarters. Is that what you submitted? I don't have a view of what was actually submitted but there is a narrative out there that they were submitted through 2024 and some through 2026.

Thank you
Miranda

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Monday, May 22, 2023 9:02 AM
**To:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Subject:** Re: SIP Payments

Hi Miranda,

Demure whenever you want, am on my way to the airport now. What you thought is correct though, it's only for what was sold until 2022, some of the payouts had pending CAW signatures which I was chasing folks for. so there is a delay in these payouts, and a few go out until then. Nothing new- all old stuff.

Thanks,

Athina

---

**From:** Miranda Collard <Miranda.Collard@teleperformance.com>
**Sent:** Monday, May 22, 2023 09:17
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: SIP Payments

Hi Athina,

Let's chat on this when you get a minute. I thought I was approving SIP payments for 2022 per your new contract and not something outside of your contract. I got a message that this was to approve commission payouts out to 2026 but your 2023 comp was a full package adjustment per the language.

Let me know when you have time

Miranda

**EXHIBIT 6**



**2020 Top 100<45 L.A.B.**

| Name | Country | Email |
|------|---------|-------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Augusto Reyes | Spain | |
| | | |

TPUSA0001104

**EXHIBIT 7**

From:       Athina Karahogitis [akarahogiti@teleperformance.com]
Sent:       10/5/2023 8:20:20 AM
To:         Joao Cardoso [joao.cardoso@teleperformance.com]
Subject:    Re: EMEA Client Office - B24 & Q4RFT

Hi Joao,

I totally understand that agendas are fully booked for us all and that we are all trying to help accommodate schedules. My intention isn't to inconvenience anyone, however this visit happened last minute thus the adjustments being made.

Below are my client meetings so far - I do not have any others f2f other than the below:

October 5th and 6th ██████████ - Greece
October 10th /11th ██ - Connecticut
October 12th ████████ New York
October 18th / 19th ██ - Florida
End of October/beginning of November pending dates for ██ in Idaho, ████ in Tennessee, and ██████████ in Texas.

If it helps any, I can be available any time after 5:30 pm cet today or after 2:30 pm cet tomorrow as well as the hours I mentioned to Kelly.

Thank you, and apologies once again for any inconvenience. This is an important visit for us and I really want to make a difference for the region.

Regards,

Athina

---

**From:** Joao Cardoso <joao.cardoso@teleperformance.com>
**Sent:** Thursday, October 5, 2023 15:10
**To:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Subject:** RE: EMEA Client Office - B24 & Q4RFT

Hello Athina,
It is very difficult to work like this. I understand that you have a busy schedule, but these are the budget meetings!! I also have client meetings in South Africa, on top of the review of the country, on top of everything else, and then, everybody else have busy schedules also.
It is unmanageable to have everyone adapting to your constant requests to change bookings.

Can you please send me your client visit agenda for the next 4 weeks, starting with today.

Thanks

**From:** Athina Karahogitis <akarahogiti@teleperformance.com>
**Sent:** Thursday, October 5, 2023 12:23 PM
**To:** Kelly Grypari <kgrypari@teleperformance.com>; Maxime Pitel <maxime.pitel@teleperformance.com>
**Cc:** Joao Cardoso <joao.cardoso@teleperformance.com>; Maria Bouklia <maria.bouklia@teleperformance.com>
**Subject:** Re: EMEA Client Office - B24 & Q4RFT



EXHIBIT
6
M. Collcard

Hi Kelly ,

I will be in transit to another client meeting Monday to New York so what we can do is have the call at 5am , 6am or 3pm Tuesday NY time . Please let us know if any of those slots work.

I can provide the org chart in advance. If there is anything else needed in advance, please let me know so I can share.

Thank you,

Athina

**Regards,**

**Athina Karahogitis**
**Global Deputy Chief Client Officer |Teleperformance Group**
M USA +14254493115 | M EMEA +306942474529
Dallas, Texas USA | Athens, Greece EMEA akarahogiti@teleperformance.com

teleperformance.com | linkedin.com/company/teleperformance

**From:** Kelly Grypari <kgrypari@teleperformance.com>
**Sent:** Thursday, October 5, 2023 12:57:26 PM
**To:** Maria Bouklia <maria.bouklia@teleperformance.com>; Maxime Pitel <maxime.pitel@teleperformance.com>; Joao Cardoso <joao.cardoso@teleperformance.com>
**Cc:** Athina Karahogitis <akarahogitis@teleperformance.com>
**Subject:** Re: EMEA Client Office - B24 & Q4RFT

Maria, we are extremely late with the Budget. Tuesday is the last day that we can do the review. An org chart will be requested in advance.

**Kelly Grypari**
+49 152 5646 7515

**From:** Maria Bouklia <maria.bouklia@teleperformance.com>
**Date:** Thursday, 5. October 2023 at 11:48
**To:** Maxime Pitel <maxime.pitel@teleperformance.com>, Joao Cardoso <joao.cardoso@teleperformance.com>, Kelly Grypari <kgrypari@teleperformance.com>
**Cc:** Athina Karahogitis <akarahogitis@teleperformance.com>
**Subject:** RE: EMEA Client Office - B24 & Q4RFT

Dear all,

I am kindly asking you to let me know about your availability for the next week and I will adjust Athina's schedule accordingly. Please note that Athina will be in US at that time.

CONFIDENTIAL INFORMATION

Please also find a few options below:

Tuesday, 10th of October at 16pm CET
Wednesday, 11th of October at 14pm CET or 15pm CET
Friday, 13th at 14pm CET

Thank you.

Kind regards,
Mara

-----Original Appointment-----
**From:** Maxime Pitel <maxime.pitel@teleperformance.com>
**Sent:** Thursday, October 5, 2023 12:35 PM
**To:** Joao Cardoso; Athina Karahogitis; Kelly Grypari
**Subject:** Canceled: EMEA Client Office - B24 & Q4RFT
**When:** Thursday, October 5, 2023 2:00 PM-3:00 PM (UTC+01:00) Brussels, Copenhagen, Madrid, Paris.
**Where:** Microsoft Teams Meeting
**Importance:** High

Meeting cancelled. – client visit.
Maria will help to find a new suitable time for the review.

---

# Microsoft Teams meeting

**Join on your computer, mobile app or room device**
Click here to join the meeting

Meeting ID: 363 455 743 600
Passcode: WY6dtT
Download Teams | Join on the web

**Join with a video conferencing device**
385803337@t.plcm.vc
Video Conference ID: 127 334 647 3
Alternate VTC instructions

Teleperformance

Learn More | Meeting options

---

CONFIDENTIAL INFORMATION