UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**ATHINA KARAHOGITIS,**

   Plaintiff,

v.                                      No. 4:24-cv-00706-P

**TPUSA, INC., ET AL.,**

   Defendants.

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant TPUSA, Inc.'s (TPUSA) Motion for Summary Judgment. ECF No. 57. Having considered the Motion, relevant docket filings, and the applicable law, the Court will **GRANT** the Motion.

## BACKGROUND

This case stems from allegations concerning an employee's employment agreement, claims of discrimination, and eventual termination. Plaintiff, Athina Karahogitis, worked on global contracts for different subsidiaries owned by Teleperformance SE (Teleperformance). From at least 2017 until 2022, Karahogitis worked for one of Teleperformance's subsidiaries in Greece, Ypiresia 800 – Teleperformance A.E. (TP Greece). Karahogitis's work for TP Greece was performed through a service agreement between TP Greece and a company she owned, Excaliber International SRL (Excaliber).

After being recruited by another Teleperformance subsidiary, TPUSA, for a new position in the United States, Karahogitis signed a termination agreement on December 31, 2022, ending Excaliber's service agreement with TP Greece. The termination agreement required Karahogitis to submit a request for any unpaid commissions she was owed by TP Greece. That agreement was later amended on July 20, 2023

(Amended Termination Agreement), after Karahogitis had already been employed by TPUSA for more than seven months.

On January 1, 2023, TPUSA hired Karahogitis as a Global Deputy Chief Client Officer (GDCCO). Karahogitis signed an employment and non-competition agreement (Employment Agreement) and moved to the United States from Greece for the GDCCO position. The GDCCO position was created to support other client officers in certain regions. As GDCCO, Karahogitis reported to Miranda Collard. Ms. Collard was the individual responsible for Karahogitis's hiring, and termination, nearly one year later.

The Parties dispute Karahogitis's performance in her new role from the time she was hired in January 2023 until her termination on December 1, 2023. Karahogitis was first informed in September 2023 that the GDCCO position was being eliminated, and her clients would be moved to another "vertical" because of restructuring. Ms. Collard informed Karahogitis that she would need to join another vertical as well. However, two months later, on November 29, 2023, Karahogitis was informed she was being terminated and then officially terminated on December 1, 2023.

Karahogitis brought this lawsuit on July 29, 2024. On June 18, 2025, TPUSA moved for summary judgment on Karahogitis's remaining claims for sex, age, and disability discrimination, failure to pay equal pay for equal work, breach of contract, and fraud. The Court now addresses that Motion.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it might affect the outcome of a case. *Id.* Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

2

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence available in the record but need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). The Court need not sift through the record to find evidence in support of the nonmovant's opposition to summary judgment. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## ANALYSIS

TPUSA moves for summary judgment on all claims: sex, age, and disability discrimination, failure to pay equal pay for equal work, breach of contract, and fraud. The Court will address each in turn.

### A. Sex, Age, and Disability Discrimination Claims

Karahogitis brings her sex discrimination claims under Title VII, disability discrimination and failure to accommodate claims under the Americans with Disabilities Act (ADA), and age discrimination under the Age Discrimination in Employment Act (ADEA). The Parties dispute whether the same actor defense applies for all discrimination claims. Accordingly, the Court will begin with analysis of the same actor defense and then address each discrimination claim.

1. Same Actor Defense

The same actor defense applies when "the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff" and it "gives rise to an inference that discrimination was not the motive behind plaintiff's termination." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000).

TPUSA contends that Ms. Collard hired and fired Karahogitis. In her Response, Karahogitis argues there is a fact dispute because, in her deposition, Karahogitis testified that Ms. Collard "broadly informed her that 'the Teleperformance Group had decided to terminate' her." *See* ECF No. 69 at 35 (citing Karahogitis's deposition transcript). Karahogitis further argues that other individuals, Daniel Julien and

3

Augustin Grisanti, were involved in hiring and promoting her. *Id.* at 35. Lastly, Karahogitis points to TPUSA's privilege log as evidence that Joao Cardoso was consulted regarding Karahogitis's termination. *Id.*

These arguments are inadequate to create a fact issue. Ms. Collard's statement that "Teleperformance" was terminating Karahogitis is not unordinary. A supervisor may refer to executive actions as actions taken by the company when making hiring and firing decisions. These words alone do not mean Ms. Collard was not making the decision. Moreover, while Karahogitis possesses a belief that others were involved in her hiring, her deposition testimony confirms that she has nothing to corroborate this belief.[1] And speculation about what information a privilege log may contain does not constitute competent summary judgment evidence.[2]

The evidence shows that Ms. Collard made the decision both to hire and fire Karahogitis. Karahogitis reported to Ms. Collard at all times during her employment. Ms. Collard informed Karahogitis that her position was being eliminated in September 2023. After failing to find another vertical for Karahogitis to join, Ms. Collard then terminated Karahogitis in November 2023. Indeed, in her declaration, Ms. Collard confirms, "I made the decisions to hire [Karahogitis], eliminate [Karahogitis's] position of GDCCO, and to terminate [Karahogitis's] employment with TPUSA." ECF No. 59 App. 710 ¶ 4.

---

[1]*See* ECF No. 59 App. 386:8 (In response to the question "Did either Daniel or Agustin ever tell you that they were part of the decision-making process to promote you to this new role?" Karahogitis answered, "I was not involved in those discussions, so I wouldn't know.").

[2]In both cases cited by Karahogitis in response to TPUSA's Motion, greater evidence of additional involvement in hiring and firing was present. For example, in *Eyob v. Mitsubishi Caterpillar Forklift America Inc.*, the defendant admitted that the person who fired the plaintiff "questioned the decision [to hire plaintiff] but ultimately approved it" after another individual "actually made the decision . . . ." No. CV H-16-1688, 2017 WL 3215171, at *5 (S.D. Tex. July 28, 2017), *aff'd*, 745 Fed. Appx. 209 (5th Cir. 2018). Likewise, in *Bautista v. Quest Diagnostics Clinical Laboratories, Inc.*, evidence was presented that the plaintiff was hired "with the approval" of multiple directors, managers, and the human resources recruiter. No. CIV.A. H-11-4162, 2013 WL 4647677, at *6 (S.D. Tex. Aug. 29, 2013). No such evidence has been presented here.

Karahogitis's beliefs and speculations, without any other evidence, cannot overcome such clear evidence. Thus, the Court will apply the same actor defense "giv[ing] rise to an inference that discrimination was not the motive behind plaintiff's termination." *Russell*, 235 F.3d at 228 n.16.

2. Sex Discrimination

TPUSA moves for summary judgment on Karahogitis's claim for sex discrimination under Title VII. To establish a *prima facie* claim for sex discrimination under Title VII, a plaintiff must show "(1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she was the subject of an adverse employment action, and (4) she was treated less favorably because of [her] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (citation modified). Once a *prima facie* case is made, the burden shifts to the employer under the *McDonnell-Douglas* framework to "offer an alternative non-discriminatory explanation for the adverse employment action." *Id.* If the employer provides a legitimate non-discriminatory explanation, the burden shifts back to the employee to show that such reason is merely a pretext. *Id.*

The first three elements of the *prima facie* standard are undisputed. Karahogitis is female, qualified for the position, and suffered an adverse employment decision through her termination. The only contested element is whether Karahogitis can present evidence that she was treated less favorably than similarly situated males under similar circumstances.

"Direct evidence of discriminatory intent is evidence which, if believed, proves the fact without inference or presumption." *Normore v. Dallas Indep. Sch. Dist.*, 677 F. Supp. 3d 494, 517 (N.D. Tex. 2023) (Brown, J.) (citation omitted). Workplace comments may qualify as direct evidence if the comments are "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [sex] was an impermissible factor in the [adverse employment

5

action]." *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). "Mere stray remarks, however distasteful, do not demonstrate discriminatory animus." *Read v. BT Alex Brown Inc.*, 72 F. App'x. 112, 120 (5th Cir. 2003)(citing *Texas Instruments Inc.*, 100 F.3d at 1181). "Rather, for comments in the workplace to provide sufficient evidence of discrimination, they must be 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Id.* (citation omitted).

Karahogitis claims to offer direct evidence of sex discrimination through various workplace comments. For example, Karahogitis recalls that three male employees, Joao Cardoso, Augusto Augustine, and Norbert Van Liemt, often interrupted and talked over women. ECF No. 69 at 11. Karahogitis claims that these individuals would also "express disbelief when women would describe solutions" and "use a very disrespectful tone towards her and cut her and other team members off." *Id.* at 22. In declarations by other female employees, Karahogitis presents evidence that male executives would "only [make] comments about women's beauty or attractiveness." *Id.* That women were "regularly marginalized, forced out of the company, [and] never paid promised commissions." *Id.* And that, unlike women, "men who were terminated were offered generous packages." *Id.*

These comments/allegations do not rise to the level of direct evidence of Karahogitis's sex discrimination claim. First, there is no showing that the comments were made proximate in time to Karahogitis's termination. Especially the comments purportedly heard by other individuals than Karahogitis herself. Second, there is also no showing that such individuals had authority over Karahogitis. Mr. Cardoso and Mr. Augustine are not alleged to be Karahogitis's superiors. And Mr. Liemt was not even a TPUSA employee. And third, there is no showing that such statements were related to Karahogitis's termination—the alleged comments, however distasteful, were made generally toward women, not Karahogitis specifically.

6

Because there is insufficient direct evidence to show sex discrimination, Karahogitis must use circumstantial evidence. Where a plaintiff relies on circumstantial evidence to support a discrimination claim, the claim is properly analyzed under the *McDonnell Douglas* burden shifting framework. *See Smith v. City of St. Martinville*, 575 Fed. App'x 435, 438 (5th Cir. 2014) (per curiam). Workplace comments may also be used as circumstantial evidence. As sufficient circumstantial evidence, the comments must involve: "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–58 (5th Cir. 2019) (citation modified).

The evidence cited above is likewise insufficient as circumstantial evidence to establish a *prima facie* case for sex discrimination. Even if the Court accepts that that alleged comments and disrespect constitute discriminatory animus, for the same reasons discussed with respect to the same actor defense, there is no evidence that any of the alleged individuals had influence over Karahogitis's termination. That decision was made by Ms. Collard alone, and Karahogitis does not provide evidence to create a genuine dispute of material fact that any individuals named above had influence or leverage over Ms. Collard's termination decision.

Karahogitis cannot make a *prima facie* case that she was treated unfavorably compared to other male workers. Consequently, the Court will grant summary judgment in favor of TPUSA on this claim.

### 3. Disability Discrimination & Failure to Accommodate

TPUSA's Motion argues that Karahogitis's disability discrimination claim under the ADA fails as a matter of law. Under the ADA, a plaintiff establishes a *prima facie* case for disability discrimination by proving: "(1) that she has a disability; (2) that she is qualified for the job; and (3) that she was subjected to the adverse employment action on account of her disability. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014) (citation modified).

As a threshold matter, it is unclear whether Karahogitis's epilepsy constitutes a cognizable disability under the ADA.[3] Karahogitis cites to one case, *EEOC v. Chevron Phillips Chem. Co.*, for the proposition that her epilepsy constitutes a disability under the ADA. 570 F.3d 606 (5th Cir. 2009). But *Chevron Phillips* observed that "relapsing-remitting conditions like . . . epilepsy . . . *can* constitute ADA disabilities depending on the nature of each individual case." *Id.* at 618 (emphasis added). Karahogitis provides no evidence for why her epilepsy should constitute a disability in *this* particular case. There are no medical records, for example, demonstrating the severity or nature of her epilepsy. *See Galvan v. City of Bryan, Tex.*, 367 F. Supp. 2d 1081, 1088 (S.D. Tex. 2004), *aff'd sub nom. Galvan v. City of Bryan, Tex*, 121 Fed. App'x. 567 (5th Cir. 2005) (granting summary judgment where plaintiff failed to present evidence showing severity and nature of epilepsy as an impairment).

The Court need not decide whether Karahogitis's epilepsy constitutes a disability, however, because Karahogitis does not connect her purported disability to her termination. Declarations from coworkers Ms. Bouklia and Ms. Sigacheva provide evidence that Karahogitis was "open and professional about her health problems in calls with the teams and clients," and that Ms. Collard and TPUSA were "aware of Ms. Karahogitis's disability." ECF No. 69 at 25–26. Indeed, the response goes to great lengths to show that many people *knew* about Karahogitis's epilepsy. But mere knowledge of someone's disability does not show causation between the disability and the termination. Karahogitis's failure to even assert any connection between her termination and Ms. Collard's knowledge of Karahogitis's epilepsy is

---

[3]Karahogitis's Complaint also discusses her cancer diagnosis relating to her disability discrimination claim. However, Karahogitis's response to TPUSA's Motion does not appear to dispute that "complications from cancer" do not amount to a disability under the ADA.

8

fatal to her claim. The Court will grant summary judgment on the disability discrimination and failure to accommodate claims.[4]

### 4. Age Discrimination

TPUSA's Motion also contends that Karahogitis's claim under the ADEA for age discrimination fails as a matter of law. To establish a *prima facie* claim for age discrimination, a "plaintiff must show that (1) she was discharged; (2) she was qualified for the position; (3) she was within the protected class at the time of discharge; and (4) she was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of her age." *Rachid v. Jack*, 376 F.3d 305, 309 (5th Cir. 2004) (citation modified). Here, the only contested element of the *prima facie* claim is the final element. As for (i) and (ii) of the final element, Karahogitis was not replaced by another individual, rather, her position was eliminated. Therefore, the only claim Karahogitis can make is that she was terminated because of her age.

Karahogitis's evidence for this claim comes from former TPUSA employee David Minkus, a Teleperformance list from 2020, and the distribution of her accounts to younger employees. Mr. Minkus testifies that he was terminated at 65 years old, and that human resources wrote, "at this point in [Mr. Minkus's] career, it did not make sense to have him get started on something else." ECF No. 70 Ex. P Minkus Decl. ¶ 22. Mr. Minkus also recalls various instances of workplace comments such as Ms. Collard saying she "needed to make organization decisions with a 20 year view, not 3-5 years." *Id.* ¶ 9. And the CEO saying, "[y]ou know what I love about your organization, [Ms. Collard]? It is all young people in their 40s. Well, maybe a few in their 50s, but not anyone old or in their 60s!" *Id.* ¶ 15.

Karahogitis also points to a Teleperformance list titled "2020 Top 100 < 45." The list allegedly celebrated "up and coming younger management resources" despite other individuals over 45 having "better

---

[4]Karahogitis's response does not present arguments on the failure to accommodate claim. And because Karahogitis cites to no evidence of requesting an accommodation for her alleged disability, this claim fails as a matter of law.

9

qualifications." ECF No. 69 at 27. Additionally, Karahogitis argues that, following her termination, her accounts were distributed to younger members on Ms. Collard's team. Those employees ages are as follows:

- Will Fritcher: 2 years and 10 months younger
- Mamte Rodriguez: 3 months younger
- Dan Kramer: 7 years older
- Rahul Jolly: 6 years younger

The Court will evaluate the strength of each piece of evidence beginning with Mr. Minkus's declaration. Mr. Minkus retired eighteen months before Karahogitis's employment began. Because such statements were made before Karahogitis began her employment, they may not be probative of discriminatory intent. *See Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 352 (5th Cir. 2007) (finding that a comment made six months before termination was "too vague and remote in time from [plaintiff's] firing"). However, unlike in *Berquist*, the statements recalled by Mr. Minkus are not vague—they are rather specific. The alleged comments by human resources, Ms. Collard, and the CEO all demonstrate a preference for younger over older employees.

As for the 100 > 45 list, on its face, a list celebrating success of those under 45 does not necessarily show discriminatory intent. Additionally, it was created years before Karahogitis's employment. It was also a Teleperformance list, not a TPUSA list. However, as a subsidiary of Teleperformance, and taking the list in conjunction with Mr. Minkus's declaration that "there were increasing references to Teleperformance's need to focus on a younger management team," it may be probative of TPUSA's tendency to focus on age in hiring and firing situations. ECF No. 70 Ex. P Minkus Decl. ¶ 4.

Unlike the Minkus Declaration and Teleperformance list, however, the distribution of Karahogitis's accounts is not probative of age-based discrimination. For the sake of this analysis, the Court accepts Karahogitis's argument that the other employees on Ms. Collard's team "effectively replaced" her by assuming her accounts. *See Florer v. Elec. Data Sys. Corp.*, No. CIV. 3:03-CV-1175-H, 2004 WL 1898266, at *4 (N.D. Tex. Aug. 24, 2004) (Sanders, J.). However, the age comparison

between Karahogitis and the other team members is unclear, at best. "While most circuits have generally agreed that age ranges above ten years are significant (and those below are not), [the Fifth Circuit] has not established such a bright-line rule." *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 323 (5th Cir. 2021). Nonetheless, the Fifth Circuit has "implied that it is a close question whether an age difference of five years is significant." *Id.* On one hand, one employee that received a portion of Karahogitis's work is more than five years younger than her (Rahul Jolly). On the other, another employee to receive a portion of her accounts was 7 years *older* than Karahogitis (Dan Kramer). The other two, Will Fritcher and Mamte Rodriguez, are less than three years younger than Karahogitis. This mix of ages provides no clear indication one way or another.

Nonetheless, given the other evidence, the Court finds that Karahogitis has established a *prima facie* case for age discrimination. Under the burden-shifting framework, the Court now looks at whether TPUSA has provided a legitimate, non-discriminatory reason for terminating Karahogitis. TPUSA points to poor performance as the reason for her termination. TPUSA argues this is confirmed by evidence such as a presentation that was given by Karahogitis in April 2023 in the Dominican Republic. As admitted by Karahogitis in her deposition, she "froze" while giving this presentation. ECF No. 59 App. 415:1-11. Additionally, in August 2023, Ms. Collard emailed Karahogitis that Karahogitis was $12 million behind her original commitment. *Id.* App. 073. Given this evidence, TPUSA has provided a legitimate, non-discriminatory reason for Karahogitis's termination.

Under the *McDonnell Douglas* framework, Karahogitis must show that TPUSA's proffered reason for termination is pretextual. In support, Karahogitis makes three arguments: (1) that she provided competent evidence of strong performance including promotions and bonuses in 2022, a strong annual performance review from 2022, and good reviews from clients; (2) that TPUSA has offered shifting explanations for Karahogitis's termination, warranting an inference that TPUSA's reasons are pretextual; and (3) that TPUSA "scramble[d]" to create an exculpatory paper trail" for Karahogitis's termination, further

11

warranting a finding of pretext. ECF No. 69 at 30–31. As for the first, Karahogitis was hired as GDCCO in 2023. Any prior performance at TP Greece or anywhere else is irrelevant. The Court also disagrees that TPUSA has offered shifting explanations for Karahogitis's termination. The mere fact that restructuring or position redundancy were offered as potential explanations for termination does not contradict the theory of poor performance. Restructuring and position redundancy may be solutions/symptoms of poor performance—they are not incongruous. TPUSA's reasons for termination have remained consistent throughout this litigation. And lastly, the Court finds no merit to the allegation that TPUSA created an exculpatory paper trail. TPUSA has not relied on documents manufactured in Karahogitis's ultimate months of employment for this case. As discussed above, the evidence shows that her performance was criticized and evaluated throughout 2023.

Coupled with the inference that discrimination was not the motive for Karahogitis's termination based on the same actor defense, Karahogitis cannot overcome TPUSA's evidence to show TPUSA's explanation is false or unworthy of credence. Thus, the Court will grant summary judgment on the age discrimination claim.

### B. Failure to Pay Equal Pay for Equal Work

TPUSA makes various arguments for why Karahogitis's claim for failure to pay equal pay for equal work should be summarily dismissed. Karahogitis does not respond to those arguments in her response. Accordingly, finding that Karahogitis has conceded those arguments, the Court will grant summary judgment on this claim.

### C. Breach of Contract

TPUSA also moves for summary judgment on Karahogitis's claim for breach of contract. To establish a breach of contract claim under Texas law a plaintiff must show: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2018, no pet.). If a contract is unambiguous, "[t]he law is clearly established that we look solely to the

12

four corners of the contract to determine its meaning and intent." *Red Ball Oxygen Co., Inc. v. Sw. R.R. Car Parts Co.*, 523 S.W.3d 288, 293–94 (Tex. App.—Tyler 2017, no pet.). A contract is unambiguous "if it can be given a definite or certain legal meaning." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "Whether a contract is ambiguous is a question of law for the court to decide . . ." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

The breach of contract claim refers to alleged non-payments from the Amended Termination Agreement, signed on July 20, 2023, relating to Karahogitis's termination with TP Greece. Karahogitis first signed a termination agreement on December 31, 2022, which terminated the service agreement between Excaliber and TP Greece. That agreement was later amended on July 20, 2023. Karahogitis asserts that under the Amended Termination Agreement she is entitled to certain unpaid commissions and paid leave from TPUSA. Among other things, TPUSA argues that it is not a party to the Amended Termination Agreement.

Karahogitis argues that there are three ambiguities that make it unclear whether TPUSA is a party, thereby necessitating the introduction of parol evidence for clarification. She first argues that the Amended Termination Agreement guaranteeing such payments "is unclear about which Teleperformance entity had an obligation to Ms. Karahogitis." ECF No. 69 at 37. Next, that there is no integration clause, such that the Employment Agreement with TPUSA should be examined in conjunction with the Amended Termination Agreement. Lastly, that the Amended Termination Agreement describes obligations to pay Karahogitis "for the last two (2) calendar quarters of the fiscal year ended December 31, 2022 and the first two (2) calendar quarters of the fiscal year ended December 31, 2023." *Id.*

The Court finds all three arguments unpersuasive; the Amended Termination Agreement is unambiguous, and TPUSA is not a contracting party. To begin, the Amended Termination Agreement lists TP Greece and Excaliber as the contracting parties—not TPUSA. *See* ECF No. 59 App. 018. But even if the Amended Termination Agreement did not name TP Greece as the contracting party, the Agreement concerns payments owed from Karahogitis's time working for *TP Greece*

13

through her company, Excaliber. Thus, if the original termination agreement did not concern TPUSA's obligations, it follows that the Amended Termination Agreement did not either—especially without explicitly adding new parties or obligations to make such a distinction.

The lack of an integration clause and timing of the agreement are similarly unavailing. This was an amended agreement from the earlier termination agreement with TP Greece, not an agreement created for the first time halfway through Karahogitis's employment with TPUSA. And "where the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (citation omitted).

TPUSA was not in privity with Karahogitis for the Amended Termination Agreement. *See Mertiage Corp. v. Clarendon Nat'l Ins. Co.*, No. Civ.A. 3:03-CV-1439, 2004 WL 2254215, at *3 (N.D. Tex. Oct. 6, 2004) (Fish, C.J.) ("Texas law is clear that privity of contact is a requirement for a breach of contract claim and therefore, a non-party to . . . [a] . . . contract cannot be liable for breach of that contract."). The Court will enter summary judgment in favor of TPUSA on the breach of contract claim.

### D. Fraudulent Inducement

TPUSA also moves for summary judgment on Karahogitis's final claim for fraud. To establish a claim for fraudulent inducement a plaintiff must prove the following elements, "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019), *reh'g denied* (Oct. 18, 2019).

Karahogitis alleges TPUSA made various fraudulent representations. For example, that TPUSA told Karahogitis she "would be compensated for all prior business she had brought to Teleperformance through Excaliber." ECF No. 1 ¶ 56. And that she

14

"would receive advance notice if there were any issues related to her performance, including six months written notice such that she would have time to locate an alternative position and would not suffer an interruption in pay or benefits." *Id.* Also that she "was an outstanding performer who could expect to be with Teleperformance long term." *Id.* More generally, Karahogitis asserts that she was defrauded because TPUSA recruited her with the intent to convert her clients to Teleperformance and then fire her. ECF No. 69 at 43.

Outside of Karahogitis's deposition testimony reiterating the same allegations found in her Complaint, there is no evidence to corroborate such representations from TPUSA, much less show that they were made with knowledge of falsity or an intent to induce Karahogitis. Karahogitis's response cites to her deposition where she stated that her evidence of such allegations is found in "emails that were exchanged." ECF No. 69 at 43. Yet no such emails are included in her response to the Motion. Karahogitis likewise fails to demonstrate anywhere in the Employment Agreement or otherwise that such representations were made. Even if such statements were made, there is no proof that they were made with knowledge of falsity or an intent to induce Karahogitis.

Karahogitis's evidence of fraud is speculative at best. Therefore, the Court finds that summary judgment should be entered on Karahogitis's fraud claim.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** TPUSA's Motion and **ENTERS** summary judgment in TPUSA's favor on all counts.

**SO ORDERED** on this **7th day of August 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

15